# EXHIBIT 01

FILED
08-16-2017
Clerk of Courts
Fond du Lac County WI
2017CV000331
Honorable Robert J. Wirz
Branch 5

STATE OF WISCONSIN      CIRCUIT COURT      FOND DU LAC COUNTY

AGNESIAN HEALTHCARE, INC.
430 E. Division Street
Fond du Lac, WI 54935,

         Plaintiff,

vs.

CERNER CORPORATION, a Delaware
Corporation
c/o CT Corporation System
301 S. Bedford St., Suite 1
Madison, WI 53703

         Defendant.

Case No.

Case Codes: 30106, 30301, 30303

Amount claimed is greater than
$10,000

---

## SUMMONS

---

THE STATE OF WISCONSIN

To each person named above as a defendant:

     You are hereby notified that the plaintiff named above has filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

     Within forty-five (45) days of receiving this Summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an answer that does not follow the requirements of the Statutes. The answer must be sent or delivered to the Court, whose address is:

City/County Government Center
160 S. Macy Street
Fond du Lac, WI 54935

and to plaintiff's attorney, Edgarton, St. Peter, Petak & Rosenfeldt, at the following address:

10 Forest Avenue, Suite 200<br>
P.O. Box 1276<br>
Fond du Lac, Wisconsin 54936-1276

You may have an attorney help or represent you.

If you do not provide a proper answer within forty-five (45) days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 16th day of August, 2017.

EDGARTON, ST. PETER, PETAK & ROSENFELDT

Attorneys for Plaintiff, Agnesian HealthCare, Inc.

*/s/ John A. St. Peter*

John A. St. Peter, SBN 1016293
jstpeter@lawfdl.com
10 Forest Avenue, Suite 200
P.O. Box 1276
Fond du Lac, WI 54936-1276
Telephone: 920-922-0470
Facsimile: 920-922-9091

2



## CT Corporation

TO: Sara Meinhard
Cerner Corporation
2800 Rock Creek Pkwy # PA17-1078
Kansas City, MO 64117-2521

RE: **Process Served in Wisconsin**

FOR: Cerner Corporation (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Agnesian HealthCare, Inc., Pltf. vs. Cerner Corporation, etc., Dft. |
| **DOCUMENT(S) SERVED:** | Notice(s), Summons, Complaint, Exhibit(s), Attachment(s) |
| **COURT/AGENCY:** | Fond du Lac County Circuit Court, WI<br>Case # 2017CV000331 |
| **NATURE OF ACTION:** | Product Liability Litigation - Breach of Warranty - Integrated Solution |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Madison, WI |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/17/2017 at 10:55 |
| **JURISDICTION SERVED :** | Wisconsin |
| **APPEARANCE OR ANSWER DUE:** | Within 45 days of receipt |
| **ATTORNEY(S) / SENDER(S):** | John A. St. Peter<br>Edgarton, St. Peter, Petak & Rosenfeldt<br>10 Forest Avenue<br>Suite 200<br>PO Box 1276<br>Fond Du Lac, WI 54936-1276<br>920-922-0470 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/18/2017, Expected Purge Date: 08/23/2017<br><br>Image SOP<br><br>Email Notification,  Sara Meinhard  sara.meinhard@cerner.com<br><br>Email Notification,  Marc Elkins  melkins@cerner.com<br><br>Email Notification,  Daniel P. Devers  ddevers@cerner.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 301 S. Bedford St.<br>Suite 1<br>Madison, WI 53703 |
| **TELEPHONE:** | 302-658-7581/7582/7583 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

FILED
08-16-2017
Clerk of Courts
Fond du Lac County WI
2017CV000331
Honorable Robert J. Wirtz
Branch 3

STATE OF WISCONSIN          CIRCUIT COURT          FOND DU LAC COUNTY

---

AGNESIAN HEALTHCARE, INC.,
430 E. Division Street
Fond du Lac, WI 54935

        Plaintiff,

        v.

CERNER CORPORATION, a Delaware
corporation,
c/o CT Corporation System
301 S. Bedford St., Suite 1
Madison, WI 53703

        Defendant.

Case No.

Case Codes: 30106, 30301, 30303

Amount claimed is greater than $10,000

---

## COMPLAINT FOR DAMAGES AND RESCISSION

---

Plaintiff Agnesian HealthCare, Inc. ("Agnesian"), by its attorneys Williams Montgomery & John Ltd and Edgarton, St. Peter, Petak & Rosenfeldt, for its Complaint against Cerner Corporation ("Cerner" or "Defendant"), alleges as follows:

### NATURE OF THE ACTION

1.    Agnesian, a not-for-profit healthcare provider serving the greater Fond du Lac region for more than 120 years, seeks damages and other relief as a result of Cerner's wrongful conduct that occurred in connection with Cerner's sale, design, implementation and operation of an integrated registration, scheduling, billing and claims handling solution (the "Integrated Solution") for Agnesian's ambulatory clinics.

2.    The Integrated Solution went "live" in August 2015. Immediately after going live, Agnesian experienced pervasive errors inpatient billing statements. Agnesian began to

expend extraordinary amounts of time and financial resources to manually process patient billing statements. Continuing problems with the Integrated Solution resulted in a huge backlog of patient claims for reimbursement, the effects of which Agnesian is still experiencing.

3.      In the summer of 2016, Cerner represented that all major issues were resolved and that the Integrated Solution was stable. Based on Cerner's representations and the fact that the billing processes appeared to have improved over the previous few months, Agnesian believed at the time that the Integrated Solution had stabilized and the worst was behind it.

4.      However, in 2017, Agnesian discovered major additional coding errors, which had resulted in large numbers of undetected write-offs of claims made to insurance companies and other payers. As Agnesian later learned, Cerner's Integrated Solution was automatically writing off reimbursable charges for services without any notice to Agnesian.

5.      Due to the severity of the coding issues, Cerner admitted to Agnesian that the Integrated Solution needs to be rebuilt. Subsequently, the Cerner personnel tasked with rebuilding the Integrated Solution left Cerner. Even if Cerner is able to successfully rebuild the Integrated Solution, it will take many months thereafter to return to normalcy in billing collections. In the interim, stale charges will be required to be written-off. Moreover, as a result of these flaws, Agnesian may not be able to meet federally-mandated billing requirements.

6.      The instability of the Integrated Solution has caused and continues to cause grave damage to Agnesian's reputation in the community and millions of dollars in losses. Thousands of Agnesian patients have been subject to the stress of not being able to reconcile their billing statements to the health-care services provided, resulting in the sustained erosion of the community's confidence in Agnesian. Due to the extensiveness and depth of the problems, some of which may yet be unknown, Agnesian has not yet been able to fully quantify the damages caused by Cerner's wrongful conduct. However, Agnesian has been able to identify damages to Agnesian to date of at least $16 million and Agnesian continues to suffer damages of at least $200,000 per month. These are funds that are now unavailable for Agnesian to direct to

2

improving and expanding the scope and quality of health-care services in the greater Fond du Lac area.

## PARTIES

7.      Agnesian, sponsored by the Congregation of the Sisters of St. Agnes, is a Wisconsin non-stock, non-profit corporation based in Fond du Lac, Wisconsin. Agnesian operates a health-care system that provides a wide array of inpatient and outpatient healthcare services throughout the greater Fond du Lac area. Agnesian has hospitals in Fond du Lac, Ripon and Waupun and 13 clinic offices in the region. Agnesian's facilities are staffed with 3,400 employees and physicians.

8.      On information and belief, Cerner is a Delaware corporation with its principal place of business in Kansas City, Missouri. On information and belief, Cerner sells health information technology solutions to hospitals throughout the United States and abroad. In 2016, Cerner reported $4.8 billion in revenue.

## VENUE

9.      Venue is proper in this County pursuant to Wis. Stat. § 801.50(2)(a) because it is the County where the claim arose. Cerner is qualified to do business and does business in the State of Wisconsin. This action arises out of sales and service activities of Cerner within the State of Wisconsin and, in particular, Fond du Lac County.

## FACTUAL BACKGROUND

### Agnesian's Use of McKesson Solution

10.     For more than a decade, Agnesian had successfully used a McKesson solution for physician billing and patient scheduling at its regional ambulatory clinics. However, because of new federally-mandated diagnostic codes that were to go into effect in April 2014 (called "ICD-10"), Agnesian began reviewing options for complying with ICD-10 either by upgrading its McKesson solution or finding a cost-effective replacement for the McKesson solution.

3

11. Because Cerner had been providing inpatient management and billing solutions and services for Agnesian hospitals since 2004, Agnesian undertook an internal evaluation of Cerner's then-available solutions for ambulatory clinical patient management and billing in 2012. At the time, Agnesian decided that Cerner was not a good fit because Cerner's then-available solutions did not include features critical to Agnesian's ambulatory clinical practice, including anesthesia billing; the ability to calculate the RVUs (or "relative value units") that are used by Agnesian for determining physician compensation, and guarantor (a/k/a "family") billing.

### Cerner's Proposal to Switch to PowerWorks from McKesson

12. In May 2013, during a meeting with Cerner on unrelated issues, Agnesian executives asked Cerner for recommendations of possible alternatives to McKesson for Agnesian's ambulatory clinics. Instead of recommending a third-party as Agnesian expected, Cerner represented that it had developed an Integrated Solution for other ambulatory clinics. Cerner further represented that with a few modifications, it could provide an interim solution while the features for an Integrated Solution specifically for Agnesian could be developed. Cerner proposed that Agnesian temporarily use Cerner's soon-to-be discontinued PowerWorks' Revenue Cycle ("PWPM Billing") as a replacement for the McKesson billing solution and Cerner's then-current version of Millennium Practice Management ("CPM") for patient registration and scheduling. Cerner represented that its Integrated Solution — with anesthesiology billing, RVU calculation, and guarantor billing as added features — would be available in the near future and would meet Agnesian's needs.

13. In light of the looming federally-mandated change to ICD-10, and Cerner's representations that the features needed by Agnesian in the Integrated Solution would be available in the near future, Agnesian decided to move forward with Cerner's proposed interim solution: PWPM Billing for billing and claims management and CPM for registration and scheduling for its ambulatory clinics.

4

14.     Between July 2013 and March 2014, Cerner began the build-out of the interim replacement solution. Agnesian paid Cerner more than $300,000 for services relating to the build-out. During the build-out, Agnesian became increasingly dissatisfied with Cerner's progress. The interim solution being developed by Cerner failed to deliver basic functions required by Agnesian and was a significant step back in terms of productivity from the McKesson solution it was replacing.

### Cerner Pitches Integrated Solution

15.     In late March 2014, it was announced that the implementation of ICD-10 would be delayed until at least October 2015. Shortly thereafter, Cerner — knowing Agnesian's growing disenchantment with the PWPM Billing build-out — immediately began a sales effort to convince Agnesian to switch to Cerner's Integrated Solution. Cerner represented to Agnesian that the features Agnesian needed had been developed or would be available within a few months. Cerner represented that Cerner's Integrated Solution with those features could be implemented at Agnesian ambulatory clinics well before the new ICD-10 deadline.

16.     In inducing Agnesian to switch to its Integrated Solution, Cerner made a number of materially false and misleading statements of fact to Agnesian, including:

(a)     Success in Implementing its Integrated Solution. Cerner touted that it had successfully implemented its Integrated Solution at other hospital systems, including Adventist Health Systems facilities in Florida, California and Kansas. Cerner represented that its Integrated Solution provided substantial integration of clinical and billing functions, less complexity, and better results. For example, Cerner represented that Adventist's "Revenue Cycle Transformation" resulted in a significant reduction of the number of Adventist databases that needed to be used, the full integration of patient management with billing (which had been "Limited" with Adventist's legacy system), a reduction of the number of central business offices needed, and a substantial decrease in the number of "Bolt-ons" (i.e., add-on software programs) needed to perform revenue cycle functions. Cerner represented that its Integrated Solution had produced exceptional revenue-cycle results at these facilities. For example, Cerner represented

5

that Adventist's Florida Hospital Waterman facility, which went live with the Cerner solution on January 1, 2013, was able to achieve 100% of its cash target by April year-to-date 2014, and had an accounts receivable days ("AR Days") — a metric of how quickly healthcare charges are paid — of only 43.6 days. Similarly, Cerner represented that another Adventist Health System facility known as Shawnee Mission, which went live on September 1, 2013, had achieved 100% of its cash target by April year-to-date 2014, had AR days of only 50 days, and that its first-pass clean rate (claims that did not have technical deficiencies that would be rejected by payers) increased from 83% to 90% under Cerner's Integrated Solution. On information and belief, Cerner's representations concerning the successes with its Integrated Solution were materially false or misleading in that the "successes" touted by Cerner at other facilities were not representative of the experience of many healthcare systems throughout the country using Cerner's Integrated Solution. On information and belief, healthcare systems were experiencing significant problems with the implementation of Cerner's purported Integrated Solution, prompting some to take legal action and resulting in Cerner paying millions of dollars in confidential settlements.

(b)     Integration and Scalability. Cerner represented that its Integrated Solution provided Agnesian a "fully-integrated clinical, operational and financial system" with "revenue cycle solutions through a single platform," including "[s]calability across inpatient, outpatient and ambulatory venues," that would "[h]elp reduce complexity," and improve "[c]lean claim rates." This was untrue; the Integrated Solution did not provide Agnesian with a workable integrated system, a workable revenue cycle solution through a single platform, or scalability across inpatient, outpatient and ambulatory venues;

(c)     Claims Volumes. Cerner presented Agnesian with a number of revenue cycle success stories of its Integrated Solution based on its prior experience in successfully implementing the Integrated Solution at other facilities. These success stories included the ability to "[s]ubmit claims [to payers] at normal volume two weeks post go live." Cerner's representation was false; Agnesian cannot submit claims at normal volume now and, on information and belief, other Cerner clients previously experienced similar dismal results;

6

(d)     Use of PWPM Coding. Cerner represented that it could use the coding work for the PWPM build-out for the Integrated Solution, thereby saving time and money. The ability to use the PWPM coding for the Integrated Solution was critical to the timely implementation of the Integrated Solution by the new federally-mandated deadline. In truth, the PWPM coding did not work with the Integrated Solution;

(e)     RVU Capability. Cerner represented that the Integrated Solution had the capability to "leverage any of the 4 RVU types to customize to a client specific need" and that Cerner's DA2 analytical tool provided Agnesian with "multiple standard reports and an analysis tool." Neither representation was true;

(f)     Guarantor Billing Capability. Cerner represented that as part of the Integrated Solution, "[p]ayment plans [are] [] enabled at the guarantor level," and that "[m]ultiple patients with the same guarantor [are] on the same patient statement," and the Integrated Solution created a "single guarantor statement that includes encounters for all related patients." These statements were false as the functionality does not exist or does not work properly;

(g)     False and Misleading Demos. Cerner showed Agnesian a series of "demos," which purported to show the functionality and features of the Integrated Solution. The demos failed to provide a true and accurate representation of the Integrated Solution. For example, Cerner presented Agnesian with a demo of a screen for registration and scheduling. In truth, the Integrated Solution was unable to perform these key functions successfully.

17.     On information and belief, Cerner knew the above-described representations it made to Agnesian were false at the time or Cerner acted recklessly without caring whether its statements were true or false. Cerner also knew that its representations were material to inducing Agnesian to go forward with the Integrated Solution. As noted, Agnesian had previously rejected Cerner's Integrated Solution precisely because its then-current version could not calculate RVUs, anesthesia billing and guarantor billing. Similarly, Agnesian would not have gone forward with the Integrated Solution had it known at the time that Cerner could not successfully use the

7

PWPM coding. Rather, Agnesian would have upgraded its McKesson solution or retained a service provider other than Cerner.

18.     Relying on Cerner's above-described representations, Agnesian agreed to convert to the Integrated Solution for both practice management and billing at its ambulatory clinics. The parties executed a Cerner Sales Order dated June 10, 2014, a copy of which is attached hereto as Exhibit "A" (the "2014 Sales Order"). The 2014 Sales Order incorporates by reference the Cerner Business Agreement dated March 25, 2004 between Cerner and Agnesian (the "Agreement"). A copy of the Agreement is attached hereto as Exhibit "B."

19.     The 2014 Sales Order stated that the "project will leverage work done on the initial PWPM Billing and CPM Registration and Scheduling project to move the client to full CPM with a conversion on 8/1/2015" and that the "work will include the harvest of billing design and data from PWPM to move it to CPM billing and setting up the vendor connections out of Millennium."

## Cerner Pitches Contract Management

20.     In its sales presentations to Agnesian, Cerner also proposed that Agnesian purchase billing software called Contract Management to be incorporated into the Integrated Solution. Cerner represented that Contract Management would provide Agnesian with a sophisticated and automated means of determining if Agnesian was being properly paid for services by payers (e.g., insurance companies or Medicare) in accordance with the insurance policy or payer contract. Cerner touted its Contract Management module as a significant benefit to Agnesian. In fact, Cerner represented that Agnesian could not adequately manage its revenue cycle without a properly working and integrated contract management solution.

21.     Cerner represented that Contract Management was "powered by Trizetto," and was a "shared computing service that delivers the latest tools and content to manage reimbursement contracts and determine what you are owed." Cerner represented that Contract Management "powered by Trizetto" provided "sophisticated automation and efficient workflows" to verify "you are paid what you are owed." The representation that Contract

8

Management was "powered by Trizetto" was material because Trizetto was a non-Cerner solution that was used by payers. Thus, Agnesian was led to believe that Cerner could provide a re-badged Trizetto to Agnesian that was capable of working seamlessly with payers' systems. Cerner represented that Contract Management was available as an integrated part of Cerner's Integrated Solution. Cerner provided Agnesian with a "solution description" of Cerner Contract Management, which described the purported capabilities and features of Cerner Contract Management "powered by Trizetto."

22.    In reliance on Cerner's representations regarding Contract Management, including Cerner's "solution description," Agnesian signed a Cerner Sales Order dated February 26, 2015 for Contract Management (the "2015 Sales Order."). A copy of the 2015 Sales Order is attached hereto as Exhibit "C." The 2015 Sales Order incorporated by reference Cerner's "solution description" for Contract Management.

23.    On information and belief, directly contrary to Cerner's representations to Agnesian prior to the execution of the 2015 Sales Order, Contract Management "powered by Trizetto" was not available as part of the Integrated Solution. On information and belief, Contract Management was still in development and Cerner had experienced significant issues with coding, implementation and integration. On information and belief, Cerner never implemented Contract Management powered by Trizetto. Cerner's description of the purported capabilities and features of Contract Management in the "solution description" that was incorporated in the 2015 Sales Order was materially false and misleading—Contract Management never worked as described or provided Agnesian with the capabilities and features described in the "solution description."

24.    Cerner made the above-described misrepresentations and misleading statements to induce Agnesian to enter into the 2015 Sales Order. Had Agnesian known that Cerner did not have a fully-integrated working Contract Management module, Agnesian would not have entered into the 2015 Sales Order. Indeed, at the time, and known to Cerner, Agnesian was successfully using a contract management system from a company called MedAssets for inpatient billing and

9

could have used that contract management system for its ambulatory clinical practice. Cerner knew at the time that the above-described statements to Agnesian about Contract Management were false or made them recklessly without caring whether its statements were true or false.

25.     To date, Agnesian has paid Cerner in excess of $ 1.1 million in connection with the attempted implementation and operation of the Integrated Solution for Agnesian's ambulatory clinics.

### Initial Problems with Integrated Solution-Patient Billing

26.     Among other services being provided, Cerner was to submit claims for reimbursement on a monthly basis to insurance companies, Medicare, Medicaid and other payers. Cerner was also to prepare patient statements on a monthly basis. Agnesian's practice, if possible, was to send patient statements after insurance companies or other payers had processed the claims.

27.     The Integrated Solution went "live" on August 1, 2015. The first batch of patient statements were mailed in September 2015. Agnesian immediately discovered massive numbers of errors in patient statements. As each problem was detected, Agnesian reported the problem to Cerner for correction. Cerner attributed the problems to be primarily associated with components of Contract Management and Auto Calculate, and, in some instances, minor errors in ANSI codes pertaining to a small number of specific payers.

28.     Auto Calculate was a module of the Integrated Solution that estimated amounts covered by insurers and other payers versus amounts that the patient would be required to pay.

29.     ANSI (or "American National Standard Institute") billing codes are standard codes used by insurers and other payers to explain the payment, partial payment, or denial of a medical claim. Claims can be denied or partially denied because they are subject to deductibles or co-pays; a particular charge is not subject to reimbursement, or only subject to partial reimbursement; required information about the claim is missing, and a host of other reasons. Some ANSI codes cover "technical denials," which reject claims or adjust payments due to missing information or other technical reasons that, upon correction, will result in full or a larger

10

reimbursement to a provider such as Agnesian. As part of Cerner's services, Cerner was to write rules that would allow the Integrated Solution to recognize and process ANSI billing codes to ensure that patient statements were accurate and that Agnesian was being fully reimbursed by payers. Moreover, Cerner represented that Contract Management would identify errors in payers' remittances to Agnesian.

30.　In November 2015, Cerner represented to Agnesian that along with several other billing solution issues, the problems and issues associated with the ANSI billing codes were corrected.

31.　Agnesian, however, continued to experience significant errors in patient statements, which Cerner attributed to Contract Management and Auto Calculate. The problem was so serious that Agnesian suppressed outgoing statements being generated by the Integrated Solution and began to send out statements manually, a very labor intensive effort, which required the significant expenditure of funds and resources. These manual efforts went on for many months, continuing into the latter half of 2016. The inability to accurately generate patient statements created a large backlog of unprocessed patient statements, which led to write-offs. Despite representations by Cerner that it was working to fix the problems, and that the problems would be remedied, neither Contract Management nor Auto Calculate ever worked properly. Because of the continuing significant problems with Contract Management and Auto Calculate, and to avoid further damage to its billing systems, Agnesian demanded that Cerner de-install those components by the end of calendar year 2015. Contract Management module was removed in January 2016 and the removal of Auto Calculate was completed by May 2016.

### Cerner Falsely Represents that the Integrated Solution is Stable

32.　In January 2016, due to the removal of Contract Management, Agnesian requested a review of all of the ANSI billing codes to ensure that claims were being processed and reimbursed properly. The parties engaged in detailed discussions about how the Integrated Solution processed each one of the ANSI billing codes to ensure that the Integrated Solution applied the appropriate logic. In undertaking this effort, Cerner made changes to the billing rules

11

in Agnesian's production system and confirmed in writing to Agnesian that the changes were complete. Agnesian reasonably relied on these representations and believed them to be true. At the time Cerner made the representations concerning ANSI billing codes to Agnesian, Cerner either knew the statements were false or Cerner made the statements recklessly without caring whether they were true or false.

33. In May 2016, due to the fact that Agnesian had massive amounts of unprocessed patient billing statements dating back to 2015, Agnesian demanded that Cerner engage an on-site revenue cycle expert and project manager to reduce the backlog of unprocessed statements by August 1, 2016. Although the August 1, 2016 target date was not met, Agnesian experienced improved billing processes and believed that all major billing system issues had been resolved. Cerner reported on a weekly basis that the billing performance was positive and there were little or no issues. On information and belief, at the time that Cerner made these representations, it either knew the statements were false or Cerner made the statements recklessly without caring whether they were true or false.

### Cerner's Representations Induce the Signing of the Release

34. Based on Cerner's representations that the Integrated Solution was stable and that all major issues, including coding issues, had been resolved, Agnesian and Cerner entered into an agreement in September 2016, which included a release (the "2016 Release"). Agnesian relied on Cerner's statements concerning the stability of the Integrated Solution when entering into the agreement and would not have executed a release in favor of Cerner if Agnesian had known of the instability of the Integrated Solution due to major problems with ANSI billing code issues described herein. On information and belief, Cerner knew that the Integrated Solution was unstable, knew that the Integrated Solution was not properly processing ANSI codes, or Cerner made the statements to Agnesian recklessly without caring whether the statements were true or false. Alternatively, the 2016 Release was executed as a result of constructive fraud on the part of Cerner, or is voidable on the grounds of mutual mistake of fact. In exchange for rescission of

12

the 2016 Release, Agnesian stands ready and willing to tender back all moneys received by Agnesian in exchange for rescission of the 2016 Release.

### Agnesian's Discovery of Faulty ANSI Codes

35.     Although Cerner had represented that the Integrated Solution was stable, Agnesian continued to experience billing problems sporadically through the fall of 2016. As issues were identified, Agnesian would report the issues to Cerner, who would address and fix the specific issues and attribute most of the issues to the residual effects of the Contract Management and Auto Calculate modules, and/or payer processing/technical denial rule issues.

36.     In late 2016, thousands of incorrect patient statements were released by Cerner. In response to several service requests regarding the incorrect statements, Cerner performed an audit in early December 2016. The audit resulted in all of the system debit rules being rebuilt to be consistent with system credit rules. These rules determine how payments by payers should be applied to outstanding charges and what, if any, portion of the charges should be paid by the patient.

37.     In early January of 2017, in response to several additional service requests, Cerner conducted another audit and identified additional errors that Cerner attributed to billing logic problems associated with smaller volume payers.

38.     In late March of 2017, months after Cerner assured Agnesian that the Integrated Solution was stable, Agnesian noted that its reimbursements continued to be low relative to historical collections. Agnesian undertook a significant amount of analytical work to determine why reimbursements were so low.

39.     As a result of its analysis, Agnesian discovered that twelve frequently-used ANSI billing codes were not being processed correctly by the Integrated Solution. As a result of the ANSI billing code error, Agnesian was not being reimbursed for services rendered. In most cases, the charges were directly written off by the Integrated Solution without notice to

13

Agnesian, depriving Agnesian of the ability to appeal or process the claim appropriately. This, in turn, resulted in a loss of revenue for services provided.

40.    Cerner corrected the billing rules for the ANSI codes initially identified by Agnesian, but then Agnesian discovered additional ANSI billing code issues (beyond the initial twelve) causing significant billing errors.

### Cerner Admits the Integrated Solution Needs to be Rebuilt

41.    The massive and fundamental errors found by Agnesian in 2017 require a complete rebuild of the professional billing program logic—a project that is not expected to be completed until late Spring 2018 at the earliest. In fact, the entire project has now ground to a halt due to lack of qualified Cerner personnel who can rebuild the billing program logic because the qualified personnel who had been assigned to the project have left the employ of Cerner.

42.    Because of the necessity to rebuild the Integrated Solution's billing rules, Agnesian may not be able to upgrade to the federally-mandated 2018 Certified Electronic Health Record Technology platform. Failure to update its core electronic health record system materially impacts Medicare and Medicaid provider participation reimbursement to Agnesian.

### Damages

43.    On July 20, 2017, Moody's Investor Service revised the outlook for Agnesian's proposed $58 million fixed rate Revenue Bonds, Series 2017, to negative from stable, expressly citing "Agnesian's unfavorable variance to the FY 2016 budget and continuing weakening of margins and relative liquidity metrics through FY 2017 that are outside the A2 medians, following issues with the system's new professional billing solution." (emphasis added).

44.    The instability of the Integrated Solution has caused and continues to cause grave damage to Agnesian's reputation in the community and millions of dollars in losses. Thousands of Agnesian patients have been subject to the stress of not being able to reconcile their billing statements to the health-care services provided, resulting in the sustained erosion of the community's confidence in Agnesian. Agnesian has expended extraordinary amounts of time and

14

financial resources to manually process patient statements. Continuing problems with the system resulted in a large backlog of claims, the effects of which Agnesian is still experiencing.

45.     Due to the extensiveness and depth of the problems, some of which may be yet unknown, Agnesian has not yet been able to fully quantify the damages caused by Cerner's wrongful conduct. However, Agnesian has been able to identify damages to Agnesian to date of at least $16 million and Agnesian continues to suffer damages of at least $200,000 per month. These damages, combined with the potential lack of federal Medicare/Medicaid reimbursement, materially and significantly reduces Agnesian's ability to provide healthcare services to the general Fond du Lac community, and in particular, the underserved population.

46.     In engaging in the conduct described above, Cerner has acted in intentional disregard of Agnesian's rights.

## COUNT I
### (Breach of Warranty)

47.     Agnesian re-alleges and incorporates by references the preceding paragraphs as if fully set forth herein.

48.     Cerner warranted that all of the services provided "will be performed by qualified personnel in a good and workmanlike manner." Agreement, ¶ 8.3(F).

49.     Cerner's services were not performed by qualified personnel and/or work was not performed in a good and workmanlike manner.

50.     Agnesian took reasonable steps to notify Cerner within a reasonable time of known issues with the services being provided by Cerner. Notwithstanding, Cerner failed to remedy the issues in a timely manner.

51.     Agnesian has complied with its contractual obligations to Cerner.

52.     Cerner's breaches amounted to willful misconduct or, alternatively, gross negligence.

15

53.     Agnesian has suffered and continues to suffer harm as a result of Cerner's breaches.

## COUNT II
### (Intentional Misrepresentation/Fraud)

54.     Agnesian re-alleges and incorporates by references the preceding paragraphs as if fully set forth herein.

55.     Cerner made factual representations to Agnesian regarding (a) the availability, capabilities and features of the Integrated Solution and Contract Management; (b) the stability of the Integrated Solution; and (c) the incorporation of and proper processing for ANSI billing codes, which were untrue.

56.     Cerner knew its representations were untrue or made the representations without caring whether they were true or false.

57.     Cerner made the representations with the intent to defraud or to induce Agnesian to act upon them, including to induce Agnesian to execute the 2014 Sales Order, the 2015 Sales Order and the 2016 Release.

58.     Agnesian believed Cerner's representations to be true and relied on Cerner's representations in executing the 2014 Sales Order, the 2015 Sales Order and the 2016 Release.

59.     Agnesian has been damaged and continues to be damaged as a result of Cerner's conduct alleged herein.

## COUNT III
### (Negligent Misrepresentation)

60.     Agnesian re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

61.     Cerner owed a duty of care to Agnesian regarding its services.

62.     Cerner made factual representations to Agnesian regarding (a) the availability, capabilities and features of the Integrated Solution and Contract Management; (b) the stability of

16

the Integrated Solution; (c) the incorporation of and proper process for ANSI billing codes, which were untrue.

63.     Cerner breached its duty of care to Agnesian in making the representations alleged herein.

64.     Agnesian believed Cerner's representations to be true and relied on them to Agnesian's detriment.

65.     Agnesian has been damaged and continues to be damaged as a result of Cerner's conduct alleged herein.

## COUNT IV
### (Rescission of the 2016 Release)

66.     Agnesian re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

67.     The 2016 Release is voidable on grounds of fraud.

68.     Alternatively, the 2016 Release is voidable on grounds of constructive fraud or mutual-mistake of fact.

69.     In exchange for rescission of the 2016 Release, Agnesian stands ready and willing to tender back all moneys received by Agnesian in exchange for the 2016 Release.

## PRAYER FOR RELIEF

WHEREFORE, Agnesian prays for judgment against Cerner as follows:

1.      For rescission of the 2016 Release;

2.      For all compensatory damages, including direct, indirect, special, and consequential damages caused by Cerner's wrongful conduct;

3.      For punitive damages as provided for by Wis. Stat. § 895.043;

4.      For costs incurred herein;

5.      For such other, further or different relief as the Court may deem proper.

17

## JURY DEMAND

Agnesian demands a trial by jury on all matters and issues so triable.

Dated: August 16, 2017

By: /s/ *John A. St. Peter*
*One of the Attorneys for Claimant*
*AGNESIAN HEALTHCARE, INC.*
John A. St. Peter, SBN 1016293
EDGARTON, ST. PETER, PETAK &
ROSENFELDT
10 Forest Avenue, Suite 200
P.O. Box 1276
Fond du Lac, WI 54936-1276
Telephone: 920-922-0470
Fax: 920-922-9091
E: jstpeter@lawfdl.com

By: /s/ *Christopher J. Barber*
*One of the Attorneys for Claimant*
*AGNESIAN HEALTHCARE, INC.*
Christopher J. Barber
Illinois Bar No. 6192190
E: cjb@willmont.com
Peter J. Meyer
Illinois Bar No. 6187748
E: PJM@willmont.com
William B. McAllister
Illinois Bar No. 6315562
wbm@willmont.com
(*pro hac vice* pending)
WILLIAMS MONTGOMERY &
JOHN LTD.
233 South Wacker Drive, Suite 6100
Chicago, Illinois 60606
Telephone: 312-443-3200
Fax: 312-630-8500

18



PC FILED
08-16-2017
Clerk of Courts
Fond du Lac County WI
2017CV000331
Honorable Robert J. Wirtz
Branch 5

# CERNER SALES ORDER

**Prepared For:** Agnesian Health Care ("Client")
430 E Division St PO Box 385
Fond Du Lac, WI 54935-4560 USA

Expiration Date: September 10, 2014

**Cerner Sales Contact:** Barry Holcomb

**Phone #:** (816) 201-3707

**E-mail Address:** bholcomb@cerner.com

This Cerner Sales Order is made on June 10, 2014 ("Effective Date"), between Client and Cerner Corporation ("Cerner"), a Delaware corporation with its principal place of business at 2800 Rockcreek Parkway, Kansas City, Missouri, 64117. This Cerner Sales Order is subject to, and incorporates by reference, the Cerner Business Agreement, dated March 25, 2004, between Client and Cerner (the "Agreement").

## PAYMENT TERMS

### PROFESSIONAL SERVICES

Fixed Fee. Fifty percent (50%) of the total professional services fees will be paid on the Effective Date. The remaining 50% is payable 90 days following the Effective Date.

## FINANCIAL OVERVIEW

| Description | One-Time Fees | Monthly Fees | Annual Fees |
|---|---|---|---|
| Professional Services | | | |
|    Fixed Fee | 0.00 | | |
| TOTALS: | 0.00 | | |

All prices in this Cerner Sales Order are shown in US Dollar (USD).

## BILL OF DETAIL

### PROFESSIONAL SERVICES

| Phase | Project | **Bill Type | Solution | Rate | Metric | Qty | Fees |
|---|---|---|---|---|---|---|---|
| Quote: Cerner Sales Order (1-8257318499-R-1) | | | | | | | |
| 1 | Ambulatory | FF | PowerChart Ambulatory | | | | 0 |
| 1 | Cardiovascular | FF | Cerner Cardiovascular | | | | 0 |
| 1 | Consulting | FF | Implementation Services | | | | 0 |
| 1 | Consulting | FF | Quality Center | | | | 0 |
| 1 | RevWx | FF | Implementation Services | | | | 0 |

| Phase | Project | **Bill Type | Solution | Rate | Metric | Qty | Fees |
|---|---|---|---|---|---|---|---|
| Quote: PWx Services (1-8257458172-R-1) | | | | | | | |
| 1 | PWx | FF | Practice Management | | | | 0 |

**FF = Fixed Fee / FFS = Fee For Service

Professional services pricing is valid until September 10, 2014. If a Cerner Sales Order is not executed on or before such date, this pricing is considered null and void and will be subject to revision. Cerner will not schedule resources for implementation services until this Cerner Sales Order has been executed by both parties and processed by Cerner.

## SCOPE OF SERVICES

This section defines the service deliverables ("Scope") for the services set forth in this Cerner Sales Order.

Cerner
Agnesian Health Care
1-3S9GWN5
June 10, 2014

 **CERNER SALES ORDER**

- Estimated Project Duration: 17 Months
- Estimated Project Start Date: 7/1/2014

## PROFESSIONAL SERVICES

| IMPLEMENTATION SERVICES | |
|---|---|
| Project Duration | The following project start date is an estimate and subject to adjustment based upon the Effective Date of this Cerner System Schedule or Cerner Sales Order. Cerner requires a minimum of 90 days following the Effective Date to accommodate pre-project activities such as planning, staffing, and technology activities. The overall duration of this project (from the "Project Kick-Off" event to the "Go-Live" event), based on the scope of services detailed in this Cerner System Schedule or Cerner Sales Order, is expected to be 17 month(s).<br><br>• Estimated project start date: 7/1/2014 |
| Facility Implementation Strategy | This Scope assumes the design, build, and conversion of 1 facility(s) utilizing a centralized database environment and a single Go-Live event per phase, converting all solutions in that phase concurrently.<br><br>Go-Live will occur at the following facility(s):<br><br>• Agnesian Health Care |
| Technology Approach | The hosting platform for this project is Remote Hosted. The Cerner solutions will be hosted from the Designated Facility set forth in Attachment I of this Cerner System Schedule. |
| Go Live Support | Command Center Support for Go-Live Event. Cerner will provide 3 days of remote application/technical support and troubleshooting for issues logged to the help desk or command center during the Go-Live event. The Client super user team will support end users. After Go-Live, Cerner will provide remote application support until turnover to Cerner's SolutionWorks division, which occurs within 30 days after Go-Live. After turnover, all issues will be reported to SolutionWorks. |
| Cerner Delivery Project Team Work Space Assumptions | As needed and at Client's expense, Client will provide to the Cerner project team: a secure Cerner-assigned office (with door locks); work areas with network connectivity to Client network; and access to a network laser printer via a desktop computer with fat Client (configured to Cerner's minimum recommended configuration) access to appropriate Client domains and Clients using Citrix access. Client agrees to provide this access to each Cerner project team member while on Client site. Further, Client will provide a high-speed DSL line or network port through Client firewall for each Cerner associate on site to access the internet/Cerner network using Aventail software, and a phone line for each Cerner project team member that is assigned to be on site for more than 16 hours per week for at least 10 consecutive weeks. |
| Client Project Team | Client will identify and make available its project team members within 90 days following the Effective Date of this Cerner System Schedule or, if not identified and available within that timeframe, such delay will be considered a change in scope, and will require the execution of an Arrangement Letter setting forth the additional work effort and additional professional services fees. |
| Special Project Assumptions | Modifications to the design and build of the proposed solutions to meet specifications for individual facilities will result in additional professional services fees. |
| Scope Control | • There are controls on scope for the total number of a particular item within certain solution sections. Controls are present for the following reasons:<br>  o In order to achieve the project timeline with estimated Client project resources<br>  o Recommended use of the system and ease of maintenance long term<br>  o Maintain standard consulting fees<br>• Please note that controls on items are not functional limits of the *Cerner Millennium* System<br>• All requested modifications to this Scope must be evaluated for potential impact to the project plan and may result in a longer project timeline, additional Cerner/Client resources, and/or |



| IMPLEMENTATION SERVICES | |
|---|---|
| | additional fees. Cerner has a scope management process that will be utilized throughout the implementation to help keep the project on track. |
| **CPM Project Scope** | |
| This project will leverage work done on the initial PWPM Billing and CPM Registration and Scheduling project to move the client to full CPM with a conversion on 8/1/2015. The project will include the continuation of the CPM registration and scheduling build, RadNet, PharmNet, Ambulatory orders, Charge Services, Core locations and Core health plan build. New work will include the harvest of billing design and data from PWPM to move it to CPM billing and setting up the vendor connections out of Millennium. | |
| **Solution Resource** | **Role** |
| PharmNet | • Solution Architect to help continue to build out product formula's and move medication pricing schedules from PWPM to PharmNet. To remain on project from now until conversion. |
| RadNet | • Solution Architect/Delivery Consultant from RadNet team to build new RadNet orders in Prod after unit testing is completed. To remain on project from now until conversion. |
| CVNET | • Solution Architect to build and configure new ECG charge orders to go to the Charts. To remain on project from now until conversion. |
| Ambulatory | • Solution Architect and Delivery Consultant to redo quick orders pages. To remain on project from now until conversion. |
| Core | • Solution Architect and Delivery Consultant to continue to work on the new locations and health plan build. To remain on project from now until conversion. |
| Charge Services | • Solution Architect and Delivery Consultants to work on the clinic charge tiering. The pricing will now be held in Millennium. Need to get all fee schedules updated on the clinic tier. To remain on project from now until conversion. |
| CPM Reg/Sched | • Solution Architect and Delivery Consultant to continue working through outstanding issues and update conversations to remove PWPM only items and provider templates updates. |
| CPM Billing | • Solution Architect and Delivery consultant to build out CPM billing in its entirety. Will need them assigned asap to start working on the project. |
| PWPM Billing | • Solution Architect needed to help harvest data from PWPM to populate CPM DCW's and do knowledge transfer to CPM billing resources. Needed for 2 weeks once we have CPM billing resources assigned. |
| FSI | • Architect needed to continue working completing the interface from McKesson to Millennium with the new location updates. To remain on project from now until conversion. |
| CCL | • Continued work on the Notify MD, labels, and location CCL report changes. |
| Oncology | • Solution Architect needed to work through the logic to move oncology future appointments / orders to the new locations. |

Agnesian Health Care
1-3S9GWN5
June 10, 2014

Agnesian Health Care
1-3S8GWN5
June 10, 2014



**AUTHORIZATION**

By executing this Cerner Sales Order, Client agrees to purchase and take delivery of the products, services, Maintenance, and installation set forth herein. Please fax this Cerner Sales Order in its entirety, along with Purchase Order* (if applicable), to the Cerner Contract Management Office at 816-571-6947, and return all originals to the following address:

> Cerner Corporation
> Attn: Contract Management Office
> 2800 Rockcreek Parkway
> Kansas City, MO 64117
> USA

| AGNESIAN HEALTHCARE | | CERNER CORPORATION | |
|---|---|---|---|
| By: | _Nancy Birschbach_ | By: | |
| | (type or print) | | Teresa Waller |
| Title: | VP & CIO | Title: | Sr. Director, Contract Management |

Purchase Order #: _____
                          (if applicable)

Project Kick-off requested the week of: _____

*If Client chooses to submit a third-party Purchase Order, the third-party must submit payment in full along with this executed Cerner Sales Order in order for the scheduling of resources to commence.

**Client shall complete the following upon execution of this Cerner Sales Order:**

Client Invoice Contact: _Nancy Birschbach_

Contact Phone #: _920-926-4200_

Contact E-mail Address: _birschbachn@agnesian.com_

Client's account can be managed online at cerner.com by registering for Cerner eBill. To gain access to eBill, contact the Cerner Client Care Contact Center at 868-221-8677 or e-mail ClientCareCenter@cerner.com.

FILED
08-16-2017
Clerk of Courts
Fond du Lac County WI
2017CV000531

Honorable Robert J.
Wirtz
Branch 5

**CERNER BUSINESS AGREEMENT**

**BETWEEN**

**AGNESIAN HEALTHCARE**

**AND**

**CERNER CORPORATION**

March 24, 2004

ENTERED
4-1-03

Cerner Corporation
Legal Original
Document Control # 2004-440        460



## CERNER BUSINESS AGREEMENT

This Cerner Business Agreement (the "Agreement") is made on this 25 day of March, 2004 ("Effective Date")

between

| | |
|---|---|
| **Agnesian HealthCare** | **Cerner Corporation** |
| a not-for-profit corporation with its principal place of business at: | a Delaware corporation with its principal place of business at: |
| 430 E. Division Street, P.O. Box 385 Fond du Lac, WI 54936-0385 Telephone: (920) 923-7400 | 2800 Rockcreek Parkway Kansas City, MO 64117, U.S.A. Telephone: (816) 221-1024 |

Cerner provides certain Equipment, Licensed Software and Sublicensed Software, which it assists Client in implementing. Client wishes to implement a System pursuant to the terms and conditions of this Agreement. This Agreement consists of the documents listed at Exhibit A hereto. At a minimum, such documents include: Basic Terms and Conditions; Cerner System Schedule(s), which describe the software and hardware; and Project Agreement(s), which describe the implementation of the System and the related services being provided to Client hereunder. This Agreement will cover all of the licenses, products and services provided by Cerner to Client. Cerner and Client will execute additional Cerner System Schedules and Project Agreements to effect the provision of additional licenses, products and services in the future. All of those Cerner System Schedules and Project Agreements shall be subject to the terms and conditions of this Agreement.

In the event of conflicts between (or ambiguities within) the Basic Terms and Conditions and the Exhibits or Cerner System Schedules, the Basic Terms and Conditions shall control.

Each capitalized term used in the Agreement shall have the meaning given to it in Article X of the Basic Terms and Conditions.

| | |
|---|---|
| **AGNESIAN HEALTHCARE** | **CERNER CORPORATION** |
| By _____ | By _____ |
| Robert A. Fale | Marc G. Naughton |
| Title _____President, Chief Executive Officer_____ | Title _____Chief Financial Officer_____ |

**SIGNATURE PAGE**

# CERNER BUSINESS AGREEMENT
## BASIC TERMS AND CONDITIONS

### PREAMBLE:

**Vision:** Agnesian HealthCare and Cerner share a common vision of providing the best possible quality of care. We believe Information Technology can help achieve the vision by making care delivery safer, more effective with improved outcomes, more efficient, more convenient and less costly.

**Missions:**

- Agnesian HealthCare will provide compassionate care that brings Hope, Health, & Wholeness to those we serve by honoring the sacredness and dignity of all persons at every stage of life. Agnesian is rooted in the healing ministry of the Catholic Church as it continues the mission of its sponsor, The Congregation of Sisters of St. Agnes.
- Cerner will connect individuals with the right information and resources at the right time and location to achieve the optimal health outcome.

**Values:**

**Agnesian HealthCare:**
At the **HEART** of Agnesian's healthcare ministries it affirms these values:

- **H**onesty – Agnesian will bring truth and fairness to all relationships.
- **E**xcellence – Agnesian will continually improve the quality of its services and the knowledge and competencies of its staff.
- Comp**A**ssion – Agnesian will be compassionate to one another and to those seeking wholeness of body, mind, spirit and especially the poor and vulnerable
- **R**espect – Agnesian will honor the individuality and God-given worth of all people by promoting human rights and giving witness to justice.
- S**T**ewardship – Agnesian will protect its spiritual, human, natural and fiscal resources for future generations and collaborate with others committed to improving its community's health

**Cerner Corporation:** Similarly, Cerner affirms the following:

- Uncompromising Integrity – We keep our commitments and promises
- Client Focused - We will strive and thrive to serve our clients
- Giving back to the Community – We support the communities in which we work and live. We recognize we are part of a bigger picture.
- Continuous Innovation – We will strive to continuously deliver new/enhanced solutions to our care givers so they can continue to enhance the quality of care
- Associate Centric - We will provide a results-oriented work environment for our associates to work, grow, enjoy and prosper.

**Principles:**

Agnesian and Cerner commit to following principals:

**Agnesian & Cerner:**
- Courteous aggressive action – be proactive, respectful and professional
- No surprises
- No compromises on patient safety
- Always think win-win

We recognize things don't always go as planned. We will work collaboratively, in the spirit of partnership, to resolve any and all issues that may arise over time.

3

# I. LICENSED SOFTWARE

1.1. **License Grant.** Subject to the terms and conditions of this Agreement, Cerner grants to Client a non-exclusive, non-transferable, world-wide, royalty-free, perpetual license to use the Licensed Software solely as specified in this Agreement.

1.2. **Scope of Use.**

    A.    Users authorized by Client may use the Licensed Software solely in accordance with the Scope of Use specifications set forth in Attachment 1 of the applicable Cerner System Schedule. Provided that Client is not in material breach of its obligations under this Agreement, Client may subsequently expand its scope of use by paying Cerner's fee for expansion of Client's scope of use pursuant to the applicable Cerner System Schedule. Client will be responsible for the compliance of all users, including those in each Permitted Facility, to the confidentiality and use restrictions of this Agreement.

    B.    Cerner shall provide Client with a copy of the Licensed Software. Client shall have the right to make and use sufficient back-up and archival copies to support its permitted use of the Licensed Software, including copies for purposes of testing, training, or for a redundant environment, but all such copies shall be the sole property of Cerner. No right to use, print, copy, modify, create derivative works of, adapt, translate, distribute, disclose, decompile or reverse engineer the Licensed Software is granted, except as expressly set forth in this Agreement. Cerner hereby reserves all rights not expressly granted hereunder.

    C.    The System shall reside at the Designated Facility, or, upon advance written notice to Cerner, Client's designated data processing location. Client may, upon advance written notice to Cerner, relocate the Licensed Software or any of the components of the System to a different data processing location under the control of Client or contractor or agent of Client upon Cerner's prior written consent, which consent will not be unreasonably delayed or withheld. Client may outsource the operation of Licensed Software or any of the components of the System to Superior Consultant Company provided that Superior executes a non-disclosure agreement with Cerner containing confidentiality and non-disclosure obligations substantially similar to those set forth in this Agreement.

1.3. **Protection of Licensed Software.** The Licensed Software (whether received in writing, on magnetic tape or on other storage media) is a product proprietary to Cerner based upon and containing trade secrets and other confidential information not known to the public. Client shall protect the Licensed Software in the same manner it uses to protect its own intellectual property to prevent disclosures and uses of the Licensed Software that are not expressly permitted under this Agreement. At a minimum, Client shall:

    A.    Retain in strict confidence and not disclose or otherwise make available the Licensed Software to anyone except Client's employees, consultants, agents or customers with a need to know in order to carry out Client's permitted use of the Licensed Software. Client shall inform all outside consultants and agents that all information shared with them concerning the Licensed Software is confidential and should not be disclosed or used except as necessary to carry on business with Client; provided that each such person has first entered into a written agreement containing restrictions at least as protective of the Licensed Software as this Agreement. Cerner shall also have written confidentiality agreements with any consultants and agents it uses to provide implementation or other products or services under this Agreement.

4

B. Prior to complying, notify Cerner to the extent reasonably practicable if Client determines that the law or an order of a court or other government agency requires a non-permitted disclosure or use of the Licensed Software.

C. Maintain written records of the number and location of all copies of the Licensed Software.

D. Reproduce (and refrain from removing or destroying) all copyright and proprietary rights notices that are placed upon or within the Licensed Software.

E. Erase or otherwise destroy, prior to disposing of media, all portions of the Licensed Software contained on such media.

F. Notify Cerner promptly (within three (3) business days) in writing upon learning of any unauthorized disclosure or use of the Licensed Software, and cooperate fully and promptly with Cerner to cure any unauthorized disclosure or use of the Licensed Software.

1.4. Escrow of Source Code. Cerner has deposited and will maintain the Licensed Software's source code with an escrow agent in accordance with the Escrow Agreement attached as Exhibit B. Upon expiration or termination of the Escrow Agreement attached hereto, Cerner will enter into a successor escrow agreement on terms and conditions substantially similar to those in Exhibit B. Cerner represents that Exhibit B includes all Licensed Software as of the Effective Date. Cerner agrees that the source code will be kept current with the most current release of the Licensed Software. In the event Cerner ceases to do business without a successor or any other triggering event listed in the Escrow Agreement occurs, Client shall have the right to obtain such source code in accordance with the terms of the Escrow Agreement. Upon execution of this Agreement, Cerner will notify the escrow agent that Client is a beneficiary under the Escrow Agreement.

1.5. Possession and Use of Source Code. Subject to the terms and conditions of this Agreement, Cerner grants to Client a non-exclusive, non-transferable, world-wide, royalty-free, perpetual license to use such source code. If source code is obtained by Client under the provisions of Section 1.4, such source code shall remain subject to every license restriction, proprietary rights protection, and other Client obligations specified in this Agreement with respect to the Licensed Software. Notwithstanding the preceding sentence, Client may use and modify source code for the sole purpose of supporting its use of the Licensed Software as expressly permitted under this Agreement, and for no other purpose whatsoever. When source code resides in a central processing unit, Client shall limit access to its authorized employees, contractors or agents who have a need to know in order to support the Licensed Software. Client shall at all times implement strict access security measures in order to prevent unauthorized disclosure, use, or removal of source code. Client also agrees that all persons with access to the source code shall execute confidentiality agreements in form reasonably satisfactory to Cerner. To the extent that Client is no longer receiving Support services from Cerner, Cerner is not responsible for (i) the uses Client makes of the source code or (ii) compliance of such source code with applicable FDA and other governmental and professional regulatory requirements.

## II. EQUIPMENT, SUBLICENSED SOFTWARE AND SUBSCRIPTIONS

2.1. Purchase of Equipment and Sublicensed Software.

Client agrees to purchase from Cerner the Equipment and Sublicensed Software set forth on any Cerner System Schedule executed by the parties. Prior to purchasing any equipment or software from any third party in connection with the acquisition by Client of any additional product or service of Cerner, Client shall provide Cerner the opportunity to match the terms, including price and payment terms, offered by the authorized third party reseller relating to such equipment or software. Notwithstanding the preceding sentence, Agnesian shall have no obligation to purchase

5

such equipment or software from Cerner, even if Cerner matches the terms offered by such third party. Subject to Paragraph 9.25 below, future purchases of Equipment and certain Sublicensed Software licenses may be accomplished by a written purchase order (setting forth in reasonable detail a description of the Equipment and/or Sublicensed Software) or a change order signed by Client and Cerner. All such purchases shall be subject to the terms and conditions of this Agreement. Cerner will assist Client in the validation of purchased hardware, peripheral devices, and the use of device configurations which are not purchased or obtained from Cerner. Cerner accepts no responsibility or liability for any costs, expenses, claims or damages incurred by Client or any third party as a result of the failure of the System, or any component thereof, or any other system of Client to function properly and/or without interruption as a result of the use of devices not purchased, obtained from, or approved by, Cerner.

2.2.    **F.O.B. Prices.** Unless specified otherwise on a Cerner System Schedule, the Equipment is priced F.O.B. the manufacturer's plant. Cerner shall arrange, pre-pay, and invoice Client for insurance and shipping with respect to delivery of the Equipment. If Client has agreed in writing to a shipment date, Client agrees to pay all cancellation, re-stocking, storage and additional transportation fees incurred as a result of Client's failure to accept delivery of the Equipment. Unless mutually agreed upon, if Cerner has agreed in writing to a shipment date and said shipment is delayed through no fault of Client then Cerner shall pay the equivalent of all re-stocking, storage, and additional transportation fees, as if they had been incurred. If the order is incorrect in any way, Cerner shall pay all re-stocking, storage, and transportation fees incurred.

2.3.    **Cerner Security Interest.** Cerner retains a security interest in each item of Equipment listed on a Cerner System Schedule until the Client pays Cerner in full for the applicable item of Equipment listed on that Cerner System Schedule. Client agrees to execute all documents (such as a UCC-1 or its equivalent) necessary for Cerner to perfect a security interest in such Equipment within ten (10) days of Cerner's request and within ten (10) days of the satisfaction of Client's payment obligations for such Equipment, Cerner agrees to file the appropriate amendments (such as a UCC-3 or its equivalent) to remove any applicable security interest.

2.4.    **Sublicense Grant.** Subject to the terms and conditions of this Agreement, including, without limitation, Exhibit C, Cerner grants to Client a non-exclusive, non-transferable and non-assignable sublicense to use the Sublicensed Software on the terms and conditions which are set forth for end-users in the underlying license granted to Cerner by the Sublicensed Software supplier. If execution by Client of a separate sublicense agreement is required by a Sublicensed Software supplier, Cerner shall so inform Client. In such case, Client shall either execute same or be denied access to that portion of the Sublicensed Software. If Client declines to execute the supplier's sublicense agreement, Cerner shall have no responsibility for any impairment to Equipment, Sublicensed Software or Licensed Software functionality, reliability or performance occasioned by the absence of such item of Sublicensed Software. Except as expressly set forth in this Agreement, Cerner does not make any warranties or guarantees regarding functionality, reliability or performance of the Equipment and/or Sublicensed Software. Except as expressly set forth in this Agreement, all warranties, if any accompany such product(s), are the responsibility of the third party supplier only and are set forth on Exhibit C.

2.5.    **Data Subscription Services.** Cerner, or Cerner through a subsidiary or a third party, agrees to make subscription services available to Client that provide outcome comparative analyses or similar services, as set forth on a Cerner System Schedule. If Client executes a Cerner System Schedule that provides for such subscription services, Client agrees to facilitate and ensure appropriate access to its computer systems for purposes of periodic data collection, including but not limited to appropriate security level access to install programs to automate the extraction of data. In addition, Client agrees to submit data to Cerner on a monthly basis (or as otherwise agreed to by the parties) in a format specified by Cerner. Cerner will certify in writing that the Client's format is acceptable. Client acknowledges and agrees that delivery by Cerner of the applicable subscription services is dependent upon Client's delivery of data each month during the term of the Cerner System Schedule. Cerner agrees that it will not use or disclose any Protected

6

Health Information, as that term is defined in the HIPAA Business Associate and Data Use Addendum attached hereto as Exhibit J (the "HIPAA Addendum"), received from Client pursuant to this Section 2.5, except as may be permitted in accordance with the Addendum.

## III. INSTALLATION

3.1.  Site Preparation. Client or its contractor, as applicable, will prepare its Designated Facility for the installation of Licensed Software, Equipment and Sublicensed Software by a date agreed upon by the parties and set forth in a Project Agreement or Arrangement Letter. In the event the site(s) is/are not prepared by such agreed-upon date, Client agrees to accept shipment, either at Client facility or at a bonded warehouse certified for storage of computer equipment. Such storage will be at Client's expense. In such case, Client accepts all responsibility for damage or loss, and agrees to promptly pay to Cerner any fees due upon installation of the Equipment and Sublicensed Software. The parties shall mutually determine the Licensed Software and Sublicensed Software installation schedule no later than thirty (30) days prior to shipment of the items on the applicable Cerner System Schedule. Equipment will be shipped only upon written authorization by Client.

3.2.  Installation Responsibilities. Cerner and Client, or Client's contractor, as applicable, will each perform the specific installation tasks identified in a Project Agreement or Arrangement Letter. Cerner will also assist Client and Client's contractor, as applicable, with the installation of Equipment and/or Sublicensed Software. Client will be responsible for installation and costs related to data communication lines and cabling as set forth the in the Project Agreement.

3.3.  Installation Fees. Client agrees to pay the fees as indicated in each Cerner System Schedule, Project Agreement or Arrangement Letter for the installation of the Licensed Software, Equipment and Sublicensed Software. Upon request by Client and for additional fees, Cerner will install third party hardware and/or software not purchased through Cerner.

## IV. PROJECT IMPLEMENTATION

4.1.  Project Team Environment. Client, or its contractor, as applicable, will provide a designated work area, access to facilities, access to systems, and other items identified in each Project Agreement or Arrangement Letter as items reasonably necessary for Cerner's personnel to provide the services set forth in this Agreement.

4.2.  Learning Events. The specific learning events that Cerner will conduct are set forth in a Project Agreement or Arrangement Letter. The learning events will take place at Client's site, or at a Cerner educational facility in one of its business centers. Client will be responsible for all travel and temporary living expenses incurred by its employees while attending training at Cerner's facility, and for all Cerner reimbursable expenses as set forth in Paragraph 7.3 below when Cerner personnel provide training to Client at any place other than Cerner's facility. Cerner will provide such training between the hours of 8:00 a.m. and 5:30 p.m., Monday through Friday. Training services provided at other times will constitute a change in scope according to Section 4.4 below.

4.3.  Project Implementation Scope. The scope of each Implementation will be based upon the assumptions set forth in a Project Agreement or in an Arrangement Letter. Each party (or its designee, to the extent that the party delegates any portion of its duties) will fulfill Project responsibilities assigned to such party in each executed Project Agreement and Arrangement Letter.

4.4.  Changes in Scope. Any changes to the scope of a Project Agreement will be set forth in an Arrangement Letter identifying the additional products, services, associated costs and deliverables approved by both Client and Cerner. In the event of conflicts between (or ambiguities within) the Project Agreement and a subsequent Arrangement Letter, the Arrangement Letter will control. In

7

the event of conflicts between Arrangement Letters, the most recent Arrangement Letter will control.

4.5. **Conversions.** Unless otherwise agreed by Cerner and Client, all conversions will occur on weekdays, weekends and non-Cerner Holidays. A premium will be paid by the Client for each conversion that occurs on a Cerner Holiday.

4.6. **Project Suspension.** If Client requests that a Project be suspended, the terms of suspension shall be set forth in an Arrangement Letter. Client understands additional costs may be incurred in the process of Project suspension, and also when the Project resumes, including, but not limited to, increased professional service rates, planning, defining scope, reviewing and documenting completed work, and educating new Project team members. Client further acknowledges and agrees that Cerner is not obligated to provide the same Project team members that were assigned to the Project prior to the suspension. So long as Client continues to fulfill the Client obligations set forth in the applicable Project Agreement or Arrangement Letter, Cerner may not suspend a Project without the prior written approval of Client. In the event Client is not fulfilling such obligations, Cerner will provide notice of such and an opportunity to cure prior to suspension.

**5. LICENSED SOFTWARE SUPPORT**

5.1. **Licensed Software Support and Support Fees.** Cerner will provide Client or Client's designee Support services for Licensed Software as described under this Agreement, including Exhibit E. Client shall pay Cerner fees for such Support as set forth on any Cerner System Schedule entered into by the parties. Unless otherwise agreed to by the parties, Support fees for any component of Licensed Software shall be payable by Client beginning upon the First Productive Use of such component. Support fees do not include the voice and data communication charges incurred by Cerner and Client. Client shall reimburse Cerner for such voice and data communication charges incurred by Cerner at Cerner's actual cost. On July 1, 2007 the monthly Support fees for Licensed Software set forth on Cerner System Schedule No. 1 shall increase by seven percent (7%), effective July 1, 2007. Beginning on July 1, 2008 monthly Support fees for Licensed Software shall be increased annually effective July 1 through June 30 of the following year by an amount equal to fifty percent (50%) of Client's price increase percentage, as the same is published in the applicable year's minutes of the meetings of the Board of Trustees of Client and in the local newspaper; provided, however, in no event shall such percentage increase in Support fees in any year beginning July 1, 2008 be less than four percent (4%) or greater than seven percent (7%). Should there be a change in Client's business such that annual price increases are no longer determined and published in the manner contemplated by the preceding provisions, Client and Cerner will mutually agree upon a alternate adjustment metric to determine annual increases to Support fees.

5.2. **New Releases.** Cerner shall provide New Releases to Client or Client's designee so long as Client remains on Support. The price of each New Release is included in the Support fee. Client shall, at its own expense, obtain any Equipment and Sublicensed Software required to run New Releases in the event Client elects to implement such New Release. If Client requests assistance from Cerner to install such New Releases, Client agrees to pay Cerner's installation charges and other costs incurred by Cerner. If Client achieves First Productive Use on any Licensed Software other than a "production" release (e.g., on an alpha, beta or "early adopter" release) of such Licensed Software, Client agrees to install the production release within six (6) months after Cerner makes that production release generally available to its clients. Cerner agrees to make available support for the HNA Millennium Licensed Software platform for at least five (5) years following the Effective Date.

5.3. **Termination of Support.** Client may not terminate Support for any component of Licensed Software before the end of twelve (12) full months after First Productive Use of such component of Licensed Software, after which time it may terminate Support for such component upon three hundred and sixty-five (365) days' prior written notice to Cerner. Except as set forth below and subject to the last sentence of Section 5.2, Cerner may not terminate Support for any component of Licensed Software

8

for two (2) years from the latter of (a) First Productive Use of such component of Licensed Software or (b) First Productive Use of a New Release of such component. Cerner may, however, immediately terminate Support of such component if Client (i) fails to pay undisputed invoices relating to such Support after forty-five (45) days prior written notice from Cerner to Client, (ii) creates and uses programs that write to Cerner databases that are not otherwise contemplated under this Agreement and that materially adversely affect Cerner's ability to provide Support, or (iii) fails to upgrade to the most current release (or the minimum version published by Cerner) of any Sublicensed Software, which release is made available by Cerner to Client (i.e. if an upgrade to Sublicensed Software is required by a third-party supplier, Cerner will extend this upgrade requirement to Client) and such failure materially adversely affects Cerner's ability to provide Support. Notwithstanding anything to the contrary contained herein, Cerner shall not be obligated to provide Support for any component of Licensed Software that has (1) not been upgraded to the current release or the release immediately preceding the current release or (2) not been upgraded for over two (2) years if a commercially available New Release of such software was available. Cerner will have no obligation to provide assistance with problems to the extent caused by Equipment or Sublicensed Software failure where Client is not on Maintenance with Cerner with respect to such Equipment or Sublicensed Software. Subject to the last sentence of Section 5.2, Cerner will provide at least two (2) years' prior written notice to Client should Cerner discontinue support for any component of Licensed Software. If Cerner replaces such component of Licensed Software with a substitute product with the same or increased functionality, Client may license the substitute product without the payment of any additional license fees.

5.4.  Additional Services. After completion of the installation and Implementation activities described in Articles III and IV above, Cerner shall make available certain additional, optional consulting services that Client may request from time to time. Such additional services are beyond the normal scope of Support. Additional services include, but are not limited to, additional training or retraining of Client's employees, on-site assistance in the installation of New Releases, performance of tasks necessitated by Equipment or Sublicensed Software failures which occur while Client is not on Cerner-supplied Maintenance, and consultation services. Cerner shall charge Client for any such additional services or assistance at Cerner's then-current rates. If Client requests such additional services, Cerner shall inform Client that the services requested constitute additional services. Upon approval by Client, Cerner shall provide the requested service at an additional fee as described above.

## VI. EQUIPMENT AND SUBLICENSED SOFTWARE MAINTENANCE

6.1.  General. At Client's option, Cerner shall provide Maintenance to Client or Client's designee for Equipment and Sublicensed Software, as identified on a Cerner System Schedule. Maintenance services shall begin upon installation of the Equipment and Sublicensed Software. Cerner may subcontract all or part of its performance under this Article VI to a third party maintenance supplier; provided, however, any such subcontracting shall in no way relieve Cerner of its obligations under this Agreement. Maintenance services are obtained from Cerner by contacting the same Cerner service center through which Client receives Support.

6.2.  Maintenance Services for Equipment. To the extent Client elects to obtain Maintenance services from Cerner, Cerner shall provide the following Maintenance services for Equipment: (i) initial determination to identify the source of the problem, problem management, critical situation escalation and recovery services; (ii) dispatching and coordinating the activities of the third party Maintenance supplier; (iii) communicating with the third party Maintenance supplier and Client or Client's designee throughout the resolution of the issue; (iv) field change orders; (v) inclusion of Equipment issues in a tracking database, and (vi) those Maintenance services described on Exhibits D and K, together with such other Maintenance services procured through a third party for Client under this Agreement. Any specific service levels (response times, hours of service availability, etc.) to be provided by a third party Maintenance supplier are set forth in the Maintenance agreement(s) attached as Exhibit D. Exhibit D is subject to change by Cerner at any time following expiration of any then-current Maintenance period. Cerner and its third party

9

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 36 of 164   Document 1-1

Maintenance suppliers are also responsible for correcting any problems that can be cured through the above-specified Maintenance services. Maintenance services for Equipment do not include any services other than those services specifically identified in this Agreement. Client will not be required to upgrade the Equipment for a period of three (3) years following the Effective Date, except as necessary for New Releases for which Client elects to implement.

6.3. **Maintenance Services for Sublicensed Software.** To the extent Client elects to obtain Maintenance services from Cerner, Cerner shall provide the following Maintenance services for Sublicensed Software: (i) initial determination to identify the source of the problem, problem management, critical situation escalation and recovery services; (ii) distribution to Client or Client's designee of all new versions of Sublicensed Software that Cerner is authorized to distribute; (iii) distribution to Client or Client's designee of all other revisions, patches, modifications, updates, or fixes of the Sublicensed Software that Cerner is authorized distribute; (iv) communicating with third party Maintenance providers and Client or Client's designee throughout the resolution of the issue; (v) inclusion of Sublicensed Software issues in a tracking database, and (vi) those Support services described on Exhibit E and Maintenance services described on Exhibit K, together with such other Maintenance services procured through a third party for Client under this Agreement. Maintenance services for Sublicensed Software do not include any services other than those services specifically identified in this Agreement.

6.4. **Maintenance Warranties, Fees and Term.** If Client elects to obtain Maintenance for Equipment and Sublicensed Software under this Article 6, such Maintenance shall commence upon the earlier of installation or thirty (30) days after shipment of such Equipment or Sublicensed Software. To the extent Client elects to obtain Maintenance services from Cerner, Client agrees to begin paying Maintenance fees on the later of (i) the expiration of any applicable warranty, or (ii) the earlier of (A) installation, or (B) thirty (30) days after shipment. Maintenance services will continue for an initial term of one (1) year, or such longer period as agreed upon by the parties. Maintenance shall automatically renew for additional periods of the same duration, unless Client provides Cerner with written notification of its intent to terminate Maintenance no less than ninety (90) days prior to the expiration of the then-current period. In addition, Client agrees to immediately notify Cerner of any Equipment or Sublicensed Software that is no longer being used by Client or which Client otherwise no longer requires Maintenance. Cerner shall have the right to terminate Maintenance services in the event that (i) Client fails to pay undisputed invoices related to such Maintenance after forty-five (45) days prior written notice from Cerner to Client, or (ii) Cerner's third party Maintenance suppliers no longer provide Maintenance services to Cerner through no fault of Cerner. All unpaid charges for Maintenance shall become immediately due and payable upon such termination. Client is responsible for all penalties or fees that may apply if Maintenance services are terminated by Client, then later reinstated.

## VII. PAYMENTS

7.1. **Terms for Payment.** Except as set forth in any Cerner System Schedule, Project Agreement or Arrangement Letter, Client shall pay Cerner all amounts due under this Agreement as follows:

    A. **Purchases in Excess of $50,000.** In the event the parties enter into any Cerner System Schedule, Project Agreement or Arrangement Letter which provides for the acquisition of software, equipment, or implementation or other services in an aggregate amount in excess of fifty thousand dollars ($50,000), Client shall pay Cerner such amount as set forth in such Cerner System Schedule, Project Agreement or Arrangement Letter at the times and in the manner set forth therein.

    B. **Purchases of less than $50,000.** In the event the parties enter into any Cerner System Schedule, Project Agreement or Arrangement Letter which provides for the acquisition of software or equipment in an aggregate amount less than fifty thousand dollars ($50,000), Client shall pay Cerner such amount upon installation of the software and equipment provided thereunder.

10

C.    Professional Service Fees. Client will pay for Cerner's professional services as described in the applicable Project Agreement, Arrangement Letter or Cerner System Schedule.

D.    Support and Maintenance. Cerner shall invoice Support and Maintenance fees on a monthly basis, in advance, as of the first day of each calendar month. Charges for a partial month's service shall be prorated on a daily basis.

E.    Other Charges. Cerner shall invoice all other charges and fees (such as freight charges, Cerner's travel and temporary living expense reimbursements, long distance telephone and express courier bills, telephone line and other data communication charges, fees for additional services and similar items) monthly following the date Cerner incurs them.

F.    General. The parties acknowledge that Client intends to pay all undisputed invoices within thirty (30) days of receipt; provided, however, the parties further acknowledge and agree that Client's failure to pay such invoices within such thirty (30) day period shall not constitute a breach of this Agreement. Notwithstanding the preceding sentence, Client shall pay all undisputed invoices within forth-five (45) days following their receipt by Client. Any disputed invoice shall be payable within thirty (30) days of written agreement by both parties that the dispute relating to such invoice has been resolved. Client shall also pay a finance charge on all undisputed amounts that are more than forty-five (45) days past due at a rate of interest equal to the lesser of one and one-half percent (1.5%) per month or the maximum permissible legal rate. Client shall also reimburse Cerner for reasonable collection costs, including attorneys' fees, relating to the collection of any such undisputed past due amounts. If (1) undisputed invoices for professional services fees are not paid by Client within ninety (90) days of the invoice or (2) Client is in default under its agreement with a third party financing company with whom Cerner has a contractual relationship, Cerner may suspend its performance of such services under the applicable Project Agreement(s) according to the relevant terms of Section 4.6 above after Client's failure to cure such non-payment or default within thirty (30) days of notice from Cerner.

7.2.    Taxes. Except as set forth below, Client shall pay for all taxes imposed in conjunction with this Agreement, including, but not limited to sales, use, excise and similar taxes based on or measured by charges payable under this Agreement and imposed under authority of federal, state or local taxing jurisdictions. This Client obligation specifically excludes foreign, federal, state and local taxes based upon Cerner's net income or corporate existence. If tax exempt, Client shall attach a copy of its sales tax exemption certificate as Exhibit F to this Agreement.

7.3.    Cerner Reimbursable Expenses. Client agrees to reimburse Cerner for the following travel and temporary living expenses incurred by Cerner in conjunction with performance of Cerner's services under this Agreement:

A.    Air travel, not to exceed the coach or tourist class rate to Client's location or other location on Client's behalf. Cerner will use best efforts to purchase air travel tickets in advance. Cerner air travel tickets purchased within seven (7) days of travel will require Client's prior approval.

B.    Auto rentals while at Client's location, not to exceed one mid-size rental auto for every three (3) Cerner employees or agents.

C.    The standard Cerner per diem rate for meals, and the actual cost of lodging and miscellaneous expenses, such as taxi fares (where no rental car is involved), parking and tips, etc., directly related to a business trip to Client's location, or to accommodate travel for Cerner employees or agents from a Client site, to support Client training and database building, project leadership briefings or other activities pursuant to this Agreement. The

11

per diem rate is set forth on each Project Agreement. Cerner reserves the right to make reasonable changes to this rate upon sixty (60) days' prior written notice to Client.

D. Physical relocation of Cerner employees to Client site, as required and mutually determined and agreed upon in writing by Cerner and Client.

Cerner shall also receive reimbursement for the actual cost of all data and voice communications and express courier charges incurred by Cerner with respect to delivering services to Client under this Agreement. Client shall provide long distance and local telephone, express courier, postage, copying and similar services to Cerner personnel at no charge when they are incurred at Client's location for the benefit of Client.

7.4 ~~Assignment of Payments. Client acknowledges and agrees that Cerner may assign its interest in or~~ otherwise grant a security interest in payments due pursuant to this Agreement in whole or in part to an assignee Cerner will continue to perform its obligations under this Agreement to Client following such assignment or granting of a security interest. Client hereby consents to and shall acknowledge every such assignment or granting of a security interest as shall be designated by written notice given by Cerner to Client.

## VIII. WARRANTY, INDEMNITY AND LIABILITY LIMITATION

8.1. Warranty and Indemnity. Cerner represents and warrants that:

A. It has authority to enter into this Agreement, grant Client the licenses described in this Agreement and otherwise perform is obligations hereunder; and

B. The Licensed Software, Product Descriptions and Documentation do not infringe any U.S. (or foreign to the extent enforceable in the U.S.) patents, trademarks and copyrights or other intellectual property right of a third party.

Client's exclusive remedy with respect to breach of the warranty contained in Section 8.1(B) shall be that Cerner will defend and hold Client and its directors, officers, employees, and agents harmless, at Cerner's own expense, from all Losses arising out of or resulting from such breach.

If an injunction is obtained against Client's use of any item of Licensed Software by reason of an infringement described above, or if in Cerner's opinion any item of Licensed Software is likely to become the subject of a claim of such infringement, Cerner will at its option and at its own expense (i) procure the right for Client to continue using the item of Licensed Software which is the subject of the infringement claim, or (ii) replace or modify such item so that it becomes non-infringing provided that the item conforms to Cerner's then-current Product Descriptions and Documentation. If neither (i) and (ii) above are reasonably available to Cerner, Client may terminate the license for the infringing Licensed Software and Cerner will grant Client a refund of the applicable Licensed Software fee (calculated on a 5-year, straight line depreciated basis) in exchange for termination of any related license and the immediate return of such item of Licensed Software. In addition, if as a result of the injunction relating to the infringing item Client is unable to use any material portion of the functionality of the affected System in accordance with the terms of this Agreement, Client will be entitled to terminate this Agreement and receive a refund equal to the applicable Licensed Software fees paid for the System (calculated on a 5-year, straight line depreciated basis) in exchange for termination of all licenses and the immediate return of the Licensed Software relating to the System.

Cerner shall not have any obligation to Client under any provision of this Section 8.1 if the infringement claim is based upon the use of any item of Licensed Software in combination with any software program or equipment, or any part thereof, not authorized, furnished or recommended by Cerner, or the misuse of Licensed Software in a manner outside the scope of the Project Descriptions or Documentation.

12

CLIENT'S RIGHTS UNDER THIS SECTION 8.1 CONSTITUTE ITS SOLE AND EXCLUSIVE REMEDY AND CERNER'S SOLE AND EXCLUSIVE OBLIGATIONS WITH RESPECT TO ANY INFRINGEMENT OF ANY PROPRIETARY RIGHTS OF ANY THIRD PARTY CLAIMED BY VIRTUE OF ANY USE BY THE CLIENT OF THE LICENSED SOFTWARE.

8.2.     **Pass-Through Provisions.**  Cerner passes through to Client the Equipment and Sublicensed Software end-user warranties set forth in the supplier pass-through provisions of Exhibit C, together with such other Maintenance warranties that Cerner may be permitted to pass through to Client pursuant to its agreement with the third party Maintenance suppliers.

8.3.     Additional Cerner Representations and Warranties.

A.     **Functionality Warranty.**  Cerner warrants that beginning upon the date of First Productive Use and extending for as long as Client remains on Support, the Licensed Software will, without Material Error, perform the functions set forth in the Product Descriptions and Documentation. Cerner agrees that it will not change the Product Descriptions or Documentation as a means of obviating Cerner's obligations under Section 8.3A.

If Cerner breaches this warranty with respect to any component of Licensed Software within thirteen (13) months after First Productive Use of such Licensed Software, Cerner will repair or replace such component of Licensed Software so that it does perform in accordance with such warranty. If, however, after repeated efforts (not to exceed six months from the date Cerner receives written notice from Client concerning the warranty breach), Cerner is unable to repair or replace such component of Licensed Software so that it performs in accordance with such warranty, Cerner will notify Client and Client will have ninety (90) days following such notice to terminate its license of such component of Licensed Software and receive a refund of two (2) times the license fees and Support paid to Cerner for such component. If Cerner breaches this warranty with respect to any component of Licensed Software after thirteen (13) months following First Productive Use of such Licensed Software, Cerner will repair or replace such component of Licensed Software so that it does perform in accordance with such warranty. If, however, after repeated efforts (not to exceed six months from the date Cerner receives written notice from Client concerning the warranty breach), Cerner is unable to repair or replace such component of Licensed Software so that it performs in accordance with such warranty, Client may, at Cerner's expense, return such component of Licensed Software and receive a refund (equal to the item's license fee calculated on a 5-year straight line depreciated basis beginning upon First Productive Use) as well as the component's Support fees paid since the failure was first reported to Cerner. In addition, if, at any time during the term of this Agreement, the non-functioning item causes Client to be unable to use any material portion of the functionality of the affected System in accordance with the terms of this Agreement, Client will be entitled to terminate this Agreement and receive a refund equal to the applicable Licensed Software fees paid for the System (calculated on a 5-year, straight line depreciated basis) in exchange for termination of all licenses and the immediate return of the Licensed Software. CLIENT'S RIGHTS UNDER THIS PARAGRAPH 8.3(A) CONSTITUTE ITS SOLE AND EXCLUSIVE REMEDY AND CERNER'S SOLE AND EXCLUSIVE OBLIGATIONS WITH RESPECT TO ANY BREACH OF THE WARRANTY SET FORTH IN SECTION 8.3(A).

B.     **Compatibility Warranty.**  During the term of this Agreement after First Productive Use, all components of the System listed on any Cerner System Schedule, Project Agreement or Arrangement Letter will be compatible with each other and will, for that number of concurrent users specified on any Cerner System Schedule, function together in accordance with the respective Product Descriptions and Documentation.

13

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 40 of 164   Document 1-1

C. **Equipment.** Cerner warrants that the Equipment specifications necessary for Client or its Designated Contractor to operate the System substantially in accordance with the Product Descriptions and Documentation are set forth on Attachment II to each Cerner System Schedule.

D. **Improvements.** Cerner warrants that it will provide at least eight (8) years prior notice to Client before requiring Client to upgrade to Cerner's next product family (e.g. after HNA Millennium) that requires the purchase by Client of a substantially different hardware platform.

E. **Compliance with Laws.** Cerner warrants that the services rendered pursuant to this Agreement are and will conform with all applicable laws, ordinances, orders, directions, rules, and regulations of the federal and state governments applicable thereto, all as they may be amended from time to time.

F. **Services.** Cerner warrants that all services provided by Cerner under this Agreement will be performed by qualified personnel in a good and workmanlike manner. Cerner will re-perform all services not performed in compliance with this warranty at no additional cost to Client. Upon Client's reasonable request, Cerner will replace any service personnel assigned to provide services to Client as soon as practically possible. Upon Cerner's reasonable request, Client will replace any service personnel assigned to assist Cerner as soon as practically possible.

G. **Product Descriptions and Documentation.** Cerner warrants that the Product Descriptions and Documentation are and will be of sufficient detail so as to allow reasonably skilled users to comprehend the operation of the System, and Cerner will, at no additional cost to Client, promptly correct any Product Descriptions and Documentation that does not conform to this warranty.

H. **No Disabling Devices.** Cerner warrants that, upon delivery, the System provided under this Agreement does not contain and thereafter Cerner will not insert any software viruses, time or logic bombs, Trojan horses, worms, timers, clocks, trap doors, or other computer instructions, devices, or techniques that erase data or programming, infect, disrupt, damage, disable, or shut down a computer system or any component of such computer system, including, without limitation, its security or user data, or otherwise cause the System to become inoperable or incapable of being used in accordance with this Agreement, Product Descriptions or Documentation.

I. **No Conflicts.** Cerner warrants that the execution of this Agreement and the performance of its obligations thereunder do not and will not result in any conflict, breach or default under any agreement to which Cerner is a party.

8.4. **Cerner Disclaimer of All Other Warranties.** The Cerner warranties contained in this Agreement extend to and are for the benefit of Client only and its permitted successors and assigns. Except as specifically set forth in this Agreement, Cerner makes no representations or warranties concerning either the Equipment or the Sublicensed Software (or other programs supplied to Client by Cerner and which are directly licensed to Client by a third party, or which are supplied by a third party to Client), nor does Cerner undertake any further obligations whatsoever. THE FOREGOING WARRANTIES ARE IN LIEU OF, AND EACH PARTY HEREBY EXPRESSLY DISCLAIMS, ALL OTHER WARRANTIES, BOTH EXPRESS AND IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY AND ALL PRODUCTS OR SERVICES (OR PORTIONS THEREOF) PROVIDED HEREUNDER.

8.5. **Additional Cerner Indemnity.** Cerner agrees to defend, indemnify and hold Client and its officers, directors, employees and agents harmless from and against any and all Losses to the extent arising

14

out of third party claims relating to: (i) Cerner's negligent design of the Licensed Software or any Material Errors, (ii) claims by Cerner's third party suppliers or subcontractors, (iii) breaches of Cerner's confidentiality obligations under this Agreement, including the HIPAA Addendum, (iv) any personal injury (including death) or damage to property resulting from Cerner's acts or omissions, (v) Cerner's gross negligence or willful misconduct; (vi) Cerner's breach of any representation or warranty contained in this Agreement (except for the warranties set forth in Section 8.1(B) and 8.3(A)).

8.6.    **Client Indemnity.** Client will defend, indemnify and hold Cerner and its officers, directors, employees and agents harmless from and against any and all Losses arising out of third party claims relating to: (i) Client's use of the System other than in accordance with the terms of this Agreement and applicable standards of good clinical practice; (ii) breaches of Client's confidentiality obligations; (iii) personal injury (including death) or damage to property resulting from Client's acts or omissions; and (iv) Client's gross negligence or willful misconduct. The foregoing indemnity shall not apply to the extent that Cerner is obligated to indemnify Client under this Article VIII.

8.7.    **Indemnity Procedure.**

A.    **Procedure.** Any party entitled to the benefits of indemnification under this Article 8 (an "Indemnified Party") and seeking indemnification for any losses, liabilities, damages, penalties, and claims and all related costs, expenses and other charges (including all reasonable attorneys' fees and reasonable costs of investigation, litigation and settlement) ("Losses") or potential Losses from a claim asserted by a third party against the Indemnified Party (a "Third Party Claim") will give written notice to the party obligated to provide indemnification hereunder (an "Indemnifying Party") specifying in detail the source of the Loss or potential Loss under Article 8. Written notice to the Indemnifying Party of the existence of a Third Party Claim must be given by the Indemnified Party promptly after the Indemnified Party receives notice of the potential claim, except that the Indemnified Party will be foreclosed from seeking indemnification pursuant to this Section 8.7 by any failure to provide such prompt notice of the existence of a Third Party Claim to the Indemnifying Party only to the extent that the Indemnifying Party actually incurs an incremental Loss, out-of-pocket expense or otherwise has been materially damaged or prejudiced as a result of such delay.

B.    **Defense.** The Indemnifying Party may elect to compromise or defend, at the Indemnifying Party's own expense, any Third Party Claim, except as otherwise provided in this Section 8.7(B). The assumption of the defense, compromise and settlement of any Third Party Claim by the Indemnifying Party will be an acknowledgment of the obligation of the Indemnifying Party to indemnify the Indemnified Party with respect to such claim under this Section 8.7. If the Indemnifying Party elects to compromise or defend a Third Party Claim, it will, within thirty (30) days after receiving notice of the Third Party Claim (ten (10) days if the Indemnifying Party states in such notice that prompt action is required), notify the Indemnified Party of its intent to do so, and the Indemnified Party will cooperate, at the expense of the Indemnifying Party, in the compromise of, or defense against, such Third Party Claim. If the Indemnifying Party elects not to compromise or defend against the Third Party Claim, or fails to notify the Indemnified Party of its election to do so as provided above, or otherwise abandons the defense of such Third Party Claim, the Indemnified Party may compromise or defend such Third Party Claim at the cost and expense of the Indemnified Party. Notwithstanding anything to the contrary contained herein, in connection with any Third Party Claim in which the Indemnified Party reasonably concludes that there are specific defenses available to the Indemnified Party which are different from or in addition to those available to or being pursued by the Indemnifying Party, then the Indemnified Party will have the right to assume and direct the defense of such Third Party Claim. In such an event, the Indemnifying Party will pay the reasonable fees and disbursements of

15

Case 2:17-cv-01254-JPS    Filed 09/15/17    Page 42 of 164    Document 1-1

counsel of the Indemnifying Party and counsel of the Indemnified Party. However, neither the Indemnifying Party nor the Indemnified Party may settle or compromise any claim over the objection of the other, except that (i) consent to settlement or compromise will not be unreasonably withheld by the Indemnified Party and (ii) if the sole settlement relief payable to a Third Party in respect of such Third Party Claim is monetary damages that are paid in full by the Indemnifying Party and such settlement includes an unconditional term releasing the Indemnified Party and its affiliates and customers from all liability in respect of such Third Party Claim, the Indemnifying Party may settle such claim without the consent of the Indemnified Party.

8.8. **Limitation of Liability.** IN NO CASE SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT TORT, OR ANY OTHER LEGAL THEORY. SUCH EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, AND LOSS OF SAVINGS OR REVENUE.

To the extent that Exhibit C and Exhibit D contain liability limitations with respect to Equipment and Sublicensed Software, such limitations state the total maximum liability of Cerner (and then only to the extent that Cerner can collect from the supplier for Client's benefit) and each supplier with respect to Equipment and Sublicensed Software.

NOTWITHSTANDING ANY OTHER PROVISION HEREIN, THE MAXIMUM LIABILITY OF EITHER PARTY FOR ALL CLAIMS WHATSOEVER ARISING UNDER THIS AGREEMENT SHALL BE LIMITED TO THE GREATER OF (1) THREE MILLION DOLLARS ($3,000,000), OR (2) THE AGGREGATE LICENSE FEES PAID OR PAYABLE BY CLIENT UNDER THIS AGREEMEENT.

NOTWITHSTANDING ANY PROVISION CONTAINED IN THIS AGREEMENT TO THE CONTRARY, THE LIMITATIONS OF LIABILITY SET FORTH IN THIS SECTION 8.8 SHALL NOT APPLY TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS, BREACHES OF A PARTY'S CONFIDENTIALITY OBLIGATIONS, BREACHES OF SECTION 1.2 OR 1.3, OR A PARTY'S WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.

8.9. **Force Majeure.** Except for obligations to pay money where the other party has performed the service or delivered the product to which payment relates, neither party shall be responsible for failure to fulfill its obligations under this Agreement due to causes beyond its reasonable control, including but not limited to war, terrorism, sabotage, insurrection, riots, civil disobedience and the like, acts of governments and agencies thereof, labor disputes, accidents, fires or acts of God. In such event, the delayed party shall perform its obligations hereunder within a reasonable time after the cause of the failure has been remedied, and the other party shall be obligated to accept such delayed performance.

## IX. GENERAL PROVISIONS

9.1. **Term of Agreement.** This Agreement shall commence on the Effective Date and remain effective until all licenses and all Support, Maintenance and other services are terminated in accordance with this Agreement.

9.2. **Termination Rights:**

   A.   **Termination by Client.**

   (i)   In addition to the termination rights provided elsewhere under this Agreement, Client shall have the right to terminate all or any portion of this Agreement if Cerner materially breaches any provision of this Agreement. If Client elects to terminate all or any portion of this Agreement, Client shall send a notice of

16

termination specifying each breach with reasonable specificity and this Agreement (or such portion thereof designated by Client) shall be terminated thirty (30) days following delivery of such notice unless during such thirty day period (i) Cerner shall have cured each such breach to Client's satisfaction, or (ii) with respect to a breach which may not reasonably be cured within such thirty (30) day period, Cerner shall have commenced, be diligently pursuing cure of and shall cure such breach as soon as practical (except that such breaches shall be cured in all cases within ninety (90) days of such notice).

(ii)    Following any termination, Cerner will, at Client's request, cooperate with Client and Client's contractors or agents for a reasonable period of time not to exceed twenty-four (24) months to allow Client to convert its information systems to another vendor. During such period Client may continue to use any Licensed Software that has reached First Productive Use prior to receipt of notice of termination and Client shall pay to Cerner on a monthly basis (a) charges for Support and Maintenance, (b) Cerner's charges for Cerner personnel participating in such conversion, and (c) Cerner's charges for reasonable out of pocket expenses incurred in connection with such cooperation. Upon conversion by Client to another information system, Client shall immediately cease using and return to Cerner or destroy all copies of the Licensed Software and Sublicensed Software and, upon request, certify to Cerner in writing such return or destruction.

The exercise or non-exercise of any right granted under this Agreement will not operate as a waiver of any right which may subsequently accrue to a party under any provision of this Agreement and will not preclude the exercise by such party of any other rights or remedies which such party may have in law or in equity under the terms of this Agreement.

B.    Termination by Cerner. Cerner shall have the right to terminate this Agreement, any Cerner System Schedule, and any related license if (1) Client materially breaches Paragraphs 1.2, 1.3 or 9.8, or (2) Client becomes more than forty-five (45) days delinquent in paying any sums which are due and which are not the subject of a good faith dispute. No such termination shall occur, however, until Client first receives prior written notice and a thirty (30) day cure period with respect to such breach or delinquency, or with respect to a breach which may not reasonably be cured within such thirty (30) day period, Client shall have commenced, be diligently pursuing cure of and shall cure such breach as soon as practical (except that such breaches shall be cured in all cases within ninety (90) days of such notice). Upon termination, Client shall begin to transition to a new information system (which shall in no event exceed twelve (12) months to completion from the time of notification) and return or destroy all copies of the Licensed Software and certify to Cerner in writing concerning such return or destruction following such transition.

9.3.    Governance; Reports; Dispute Resolution

A.    Relationship Executives. Within ten (10) days following the Effective Date, Client and Cerner shall each designate an individual as its "Relationship Executive." The Relationship Executives are not expected to participate in the day-to-day performance of the parties' responsibilities under this Agreement. They shall generally be responsible for matters relating to overseeing the each parties' obligations under this Agreement and for monitoring and resolving disagreements or disputes that may arise between the parties in connection with the Agreement. Either party may change its Relationship Executive upon written notice to the other party.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 44 of 164   Document 1-1

**B.     Governance Committees.**

Within thirty (30) days of the Effective Date, the parties shall form an "Executive Committee" composed of the Relationship Executives and two other senior representatives of each party and, as directed by Client, three representatives from Client's outsourcing service provider. The Executive Committee shall meet not less than quarterly at times and places to be mutually agreed upon by the representatives. The Executive Committee shall generally be responsible for (i) matters relating to long-term strategy and overall direction of the parties' relationship, (ii) monitoring and ensuring business alignment between the parties, (iii) overseeing the development and deployment of performance monitoring and reporting tools reasonably acceptable to Client senior management, and (iv) resolving disagreements or disputes that may arise between the parties in connection with the Agreement that are not otherwise resolved by the Relationship Executives as provided in Section 9.3(A) above, as well as such other matters as may be agreed by the parties. A party may change its representative on the Executive Committee upon notice to the other party.

Within thirty (30) days of the Effective Date, the parties shall form an "IT Operations Committee" composed of Cerner's Project Executive, Client's Director of Information Services, together with senior representatives from those operation and business units of Client as Client may designate from time to time, and, as directed by Client, representatives from Client's outsourcing service provider. The IT Operations Committee shall meet not less than monthly during any active Implementation project at times and places to be mutually agreed upon by the representatives. The IT Operations Committee shall generally be responsible for monitoring and ensuring compliance with the terms of the Agreement, as well as such other matters as may be agreed by the parties and approved by the Executive Committee. A party may change its representative on the IT Operations Committee upon notice to the other party.

**C.     Meetings and Reports.** Cerner shall prepare and deliver to Client the reports described in any Cerner System Schedule, Project Agreement or Arrangement Letter or as otherwise agreed upon by the parties ("Reports") by the respective deadlines specified. Cerner shall modify the Reports or provide additional Reports as reasonably requested by Client from time to time. Cerner's Relationship Executive shall provide a regular monthly status Report to Client's Relationship Executive no later than by the fifteenth (15th) day of the following month. Cerner shall be responsible for preparation of agendas, minutes, and other routine administrative functions incident to the operations of the Executive and IT Operations Committees.

**D.     Arbitration and Injunctive Relief.** In the event of any disagreement or dispute between the parties, Cerner and Client agree to work cooperatively to resolve the dispute amicably as set forth in this Section 9.3, or at other appropriate, mutually determined management levels. In the event that a resolution at such management levels does not occur, either party may submit the dispute to binding arbitration at a site in the state of the principal place of business of the non-petitioning party under the then-prevailing rules of the American Arbitration Association, Inc., a New York corporation. Judgment upon any award in such arbitration may be entered and enforced in any court of competent jurisdiction. Notwithstanding any provision of this Agreement to the contrary, Client acknowledges that any breach of Client's obligations with respect to Cerner's proprietary rights will result in irreparable injury for which money damages will not be an adequate remedy and that, in such event, Cerner shall be entitled to injunctive relief in addition to any other relief a court may deem proper.

**9.4.     Availability of Records.** Until the expiration of four (4) years after the furnishing of services under this Agreement, Cerner agrees that the Secretary of the Department of Health and Human Services (the "Secretary") and the Comptroller General of the United States, or the designee or duly authorized representative of either of them, shall have access to all books and records of Cerner pertaining to the subject matter of this Agreement and the provision of services under it, in accordance with the criteria presently or hereafter developed by the Department of Health and

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 45 of 164   Document 1-1

Human Services as provided in Section 952 of the Omnibus Reconciliation Act of 1980 (the "Act"). Upon request of the Secretary, the Comptroller General, or the designee or authorized representative of either of them, Cerner shall (at reasonable times and places during normal business hours) make available this Agreement, and all books, documents and records of Cerner that are necessary to verify the nature and extent of the costs of the services provided by Cerner furnished in connection with this Agreement. Notwithstanding the foregoing provisions, the access to the books, records and documents of Cerner and any related organization provided for herein shall be discontinued and become null and void upon a finding by a court or quasi-judicial body of competent jurisdiction that this Agreement is outside the scope of the regulatory or statutory definition of those contracts and agreements included within the purview of Section 952 of the Act or the rules and regulations promulgated thereunder.

9.5.    FDA and Other Regulatory Bodies. Client and Cerner agree to cooperate fully with each other in satisfying any U.S. Food and Drug Administration (the "FDA") requirements and those of other regulatory bodies with respect to the System as used by Client. Without limiting any of Cerner's obligations under this Agreement, Client also warrants that prior to making First Productive Use of the System Client shall perform whatever tests it deems necessary to verify and certify that Client's workflow (as automated by the System) complies with all FDA and other governmental, accrediting, and professional regulatory requirements which are applicable to use of the System in Client's environment. Cerner warrants that the System, including the Licensed Software, complies with all FDA regulations applicable to Cerner as a medical device manufacturer and other governmental and regulatory requirements (subject to Section 9.26 below). Cerner and Client shall notify each other promptly, by letter or telephone call, concerning any inspections or other contacts by the FDA or other regulatory bodies with respect to the System and which could reasonably be expected to impact the use of the System.

9.6.    Information Management Tools. Client acknowledges and agrees that the Licensed Software and System furnished by Cerner are information management tools only and that they contemplate and require the involvement of Client's learned medical professionals. Client further acknowledges and agrees that Cerner has not represented its System as having the ability to diagnose disease, prescribe treatment, or perform any other tasks that constitute the practice of medicine or of other professional or academic disciplines relating to the field of medicine. In addition, all Content has been developed and reviewed by Cerner based upon published data and the experiences of qualified professionals whenever possible; however, it is Client's responsibility to validate all Content against its standard operating procedures, and all federal and state regulations governing the practice of medicine. Cerner shall not be responsible for any errors, misstatements, inaccuracies, or omissions regarding Content delivered to Client, although every effort has been made to ensure its quality and accuracy, other than errors, misstatements, inaccuracies, or omissions caused by the gross negligence or willful misconduct of Cerner or its agents. Except as expressly set forth herein, Client assumes all risk for selection and use of the Content. Client acknowledges that Cerner: (a) has no control of or responsibility for the Client's use of the Content, (b) has no knowledge of the specific or unique circumstances under which the Content provided may be used by the Client, and (c) has no liability to any person or institution for any change made to or data or information added to the Content by the Client or any party other than Cerner or Cerner's agents.

9.7.    Work Product. All Work Product is and will remain the sole and exclusive property of Cerner. Cerner may use such Work Product for internal purposes as well as for other clients so long as Cerner does not use any Confidential Information belonging to Client. Cerner hereby grants to Client a non-exclusive, non-transferable (except as otherwise set forth in this Agreement), royalty-free, perpetual license to use the Work Product supplied to Client by Cerner for Client's own internal purposes, and for no other purpose whatsoever.

9.8.    Confidentiality. Except as expressly permitted by this Agreement, Cerner and Client will not, nor will they permit their respective employees, agents, attorneys or independent contractors to, disclose, use, copy, distribute, sell, license, publish, reproduce or otherwise make available

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 46 of 164   Document 1-1

Confidential Information of the other party. Cerner acknowledges that Client uses Superior Consulting as its outsourcing service provider and disclosure and use by Superior of Cerner's Confidential Information shall not be considered a breach of this Section 9.8 so long as Superior has entered into a confidentiality agreement to protect such confidential information to the same degree as this Section 9.8. Cerner and Client will each (i) secure and protect the other party's Confidential Information by using the same or greater level of care that it uses to protect its own confidential and proprietary information of like kind, but in no event less than a reasonable degree of care, and (ii) advise each of their respective employees, agents, attorneys and independent contractors who have access to such Confidential Information of the terms of this Section 9.8. Notwithstanding the foregoing, either party may disclose the other party's Confidential Information to the extent required by applicable law or regulation, including without limitation any applicable Freedom of Information Act or sunshine law, or by order of a court or other governmental entity, in which case such party will so notify the other party as soon as practicable and in any event at least thirty (30) days prior to such party making such required disclosure. Upon execution of this Agreement and subject to the terms and conditions set forth in Exhibit H, Cerner agrees to grant to Client licensed access to the Cerner Knowledge Network Gold, Product Code CK-20980 (hereinafter "CKN GOLD"). CKN GOLD contains and provides certain copyrighted and other valuable information proprietary and confidential to Cerner. Each party hereby agrees to take responsibility for any breach of these terms and conditions by its employees, officers, agents, attorneys or representatives. This Section 9.8 shall not apply to information that is "protected health information" as defined at 42 C.F.R. § 164.501 as it may subsequently be amended or re-codified ("Protected Health Information"), the use and disclosure of which shall be governed by the HIPAA Business Associate and Data Use Addendum, dated as of the Effective Date and entered into by the parties concurrent with the execution of this Agreement, attached hereto as Exhibit J.

9.9.   Access to Data. With the prior written consent of Client, in each case, Client will grant to Cerner an irrevocable, nonexclusive, perpetual, world-wide, royalty-free right and license to use all Data for (i) analysis and incorporation of the Data in databases, reports, comparative data sets, scores or scoring systems generated therefrom; and (ii) creation and distribution of works and derivative works based on the Data; provided, however, that Cerner's use and disclosure of Data received from Client shall be subject to the terms and conditions of Section 9.8 above and Article 3 of the HIPAA Business Associate and Data Use Addendum attached hereto as Exhibit J. Cerner shall provide, install, and support the tools to perform the data extraction of Data that is collected, stored or generated through the use of the Licensed Software without charge.

9.10.  Notices. Any and all notices, requests, demands or other communications which relate to the other party's failure to perform or which otherwise affect either party's rights under this Agreement shall be deemed properly given when furnished by receipted hand-delivery to the other party, by an express courier, or by the U. S. Postal Service (postage prepaid, certified mail, return receipt requested).

Except in situations involving hand-delivery, the sender shall address all notices, requests, demands or other communications to the recipient at the address below.

If to Client, the communication shall be sent as follows:

Agnesian HealthCare
430 E. Division Street, P.O. Box 385
Fond du Lac, WI 54936-0385
Attention: President and Chief Executive Officer

20

If to Cerner, the communication shall be sent as follows:

Cerner Corporation
2800 Rockcreek Parkway
Kansas City, Missouri 64117 U.S.A.
Attention: President

9.11. **Amendment.** This Agreement may not be amended, modified, qualified or otherwise changed or altered except by a writing executed by a duly authorized representative of the Client and by the Chairman of the Board, Chief Executive Officer, President, Chief Financial Officer, Secretary, or any Executive Vice President or Senior Vice President of Cerner.

9.12. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

9.13. **Change of Product Line and System.** Cerner may at any time add, delete, or change the specifications for future releases with respect to products comprising Cerner's product line and System (but in no case shall such changes occur more than once in any one module in any six month period or reduce or otherwise materially change the overall functionality of same).

9.14. **Attorneys' Fees.** In the event that any arbitration or legal action is brought with respect to the subject of this Agreement, the prevailing party in such arbitration or legal action shall be entitled to receive reasonable attorneys' fees, as well as costs of the arbitration or legal action, in addition to any other relief it may receive.

9.15. **Governing Law.** This Agreement shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of Wisconsin.

9.16. **Severability and Effect of Laws.** The provisions of this Agreement shall obligate the parties only to the extent that such provisions are lawful. Any provision of this Agreement which is prohibited by law shall be ineffective (but only to the extent that, and in the locations where, such prohibition shall be applicable). The remainder of the Agreement shall remain in full force and effect, provided, however, that both parties agree the Agreement can continue to be performed in furtherance of the Agreement's original objectives.

9.17. **Assignment.** Except as set forth below, neither party may assign this Agreement or the licenses and privileges granted under it, nor may either party delegate its duties with respect to it. Cerner may, however, assign and delegate in conjunction with a reorganization or merger, or in conjunction with the sale of substantially all its assets to which this Agreement pertains, or in conjunction with any other assignment or transfer to which Client consents in writing, which consent shall not be unreasonably withheld. Similarly, Client may assign and delegate in conjunction with a reorganization or merger or in conjunction with the sale or other transfer of substantially all its assets to which this Agreement pertains, or in conjunction with any other assignment or transfer to which Cerner agrees in writing, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, in all circumstances the transfer or assignment by either party to a competitor of the other party shall not be undertaken without the written consent of the other party. Any assignment of this Agreement, by Client or Cerner, must be made in its entirety, including all rights and obligations.

9.18. **Prior Agreements.** This Agreement constitutes the entire agreement of the parties with respect to the arrangements described herein. Any prior or contemporaneous agreements or understandings between the parties are hereby terminated and superseded by this Agreement, with the exception of the agreements listed at Exhibit G, which agreements remain in effect.

9.19. **Cerner System Schedules and Project Agreements.** Concurrently with execution of this Agreement, the parties have executed one or more Cerner System Schedules and Project

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 48 of 164   Document 1-1

Agreements. The parties may enter into additional Cerner System Schedules and/or Project Agreements, which shall be subject to the terms and conditions of these Basic Terms and Conditions to the extent applicable. The parties acknowledge and agree that no changes may be made to executed Cerner System Schedules without complying with Section 9.11. Client agrees that, where a Cerner System Schedule shows the identity of an instrument or Foreign Information System Interface to be undetermined as of the execution date, Cerner shall be obligated to provide the interface only once for each interface line item listed on the Cerner System Schedule. If Client later changes the identity of an instrument or system to be interfaced, Cerner shall have the right to charge Client for Cerner's time, materials and other expenses incurred in performing work beyond the line item charge for the original interface.

9.20. Survival. Except to the extent that the parties agree in writing to the contrary, the following paragraphs shall survive termination of this Agreement: 1.2 (Scope of Use), with respect to return or destruction of all licensed materials and with respect to Cerner proprietary rights; 1.3 (Protection of Licensed Software); 7.1 (Terms for Payment); 7.2 (Taxes) and 7.3 (Cerner Reimbursable Expenses), but only with respect to payments, taxes and expenses accruing or incurred prior to termination; 8.1 (Warranty and Indemnity Regarding Licensed Software); 8.2 (Equipment and Sublicensed Software, End-User Warranties and Pass-Through Provisions), with respect to Client undertakings related to supplier warranty, limitations and disclaimers and to limitations on remedies and supplier liability; 8.4 (Cerner Disclaimer of All Other Warranties); 8.5 (Cerner Indemnity); 8.6 (Client Indemnity); 8.8 (Limitation of Liability); 8.8 (Force Majeure); 9.2 (Termination Rights); 9.3 (Arbitration); 9.4 (Availability of Records); 9.5 (FDA and Other Regulatory Bodies); 9.6 (Information Management Tools); 9.7 (Work Product); 9.8 (Confidentiality); 9.10 (Notices); 9.14 (Attorneys' Fees); and 9.15 (Governing Law).

9.21. Protective Equipment. Client shall supply to Cerner representatives who work at or visit the Client site the same protective equipment and clothing that Client employees use and wear when operating in the same or comparable environments owned or controlled by the Client.

9.22. No Hire. Cerner and Client agree that, without the prior consent of the other party, neither will offer employment to or discuss employment with or employ any of the other parties' associates, employees or agents until one year after this Agreement is terminated, provided the foregoing provision will not prohibit a general non-targeted solicitation of employment in the ordinary course of business or prevent either party from employing any employee who contacts such party at his or her own initiative without any direct or indirect solicitation by or encouragement from such party.

9.23. Waiver. All waivers of and consents to any terms and conditions of this Agreement (or any rights, powers or remedies under it) by either party must be in writing in order to be effective. No waiver or consent granted with respect to one matter or incident shall be construed to operate as a waiver or consent with respect to any different or subsequent matter or incident.

9.24. Site Visits and Client Credits. Client agrees that Cerner may bring its prospective clients to Client's site in order to observe the System in operation in a manner consistent with Cerner's confidentiality obligations under this Agreement and applicable state and federal law. Site visits will only be conducted with Client's prior approval and shall, in any event, be reasonable in scope and duration. Client shall have the right to refuse site visits based upon Client's sole judgment that the prospect is competitor of Client. Cerner will provide to Client details on the site visit process and responsibilities thirty (30) days prior to conducting a site visit. Client agrees to reasonably cooperate with Cerner in these site visits. Cerner and Client will work cooperatively to minimize disruptions at Client's site and to showcase both Client's institution as well as Cerner and the System in the best possible light. Cerner will schedule such visits in advance, and only at times mutually acceptable to both Client and to Cerner. A single site visit may include more than one representative from one or more prospective Cerner clients. Cerner shall be responsible for compliance by all Cerner personnel and Cerner contractors visiting Client's site with all of Client's policies and procedures that are provided to such persons in writing, including, without

22

limitation, Client's confidentiality and safety and security procedures. For each site visit hosted, Client will receive a certificate specifying the dollar amount of credits which may be applied toward Licensed Software, or toward the tuition portion of any Cerner-sponsored education course (to a maximum of 50% of the tuition for learning services). Such credits are not convertible to cash and may only be used toward the license of Licensed Software or the payment of tuition for education classes, as specified above. The site credits may not be applied toward the acquisition of Equipment or Sublicensed Products, or to defray the cost of Maintenance or Support.

9.25. **Purchase Orders.** If Client submits its own form of purchase order to request Licensed Software, Sublicensed Software, Equipment and/or professional services, any and all terms and conditions which may appear on such purchase order are of no force or effect and shall be superseded by the terms and conditions of this Agreement, unless otherwise agreed by the parties.

9.26. **Compliance with Laws.** Cerner warrants that the Licensed Software will, upon First Productive Use and during the term of the Agreement (so long as Client is receiving Support), enable Client to meet or exceed any applicable federal or state laws in effect on the Effective Date with respect to the operation and use of the Licensed Software. Without limiting the foregoing, with respect to the security regulations issued under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), on or before April 20, 2005. Cerner will provide, at no cost to Client, the following HIPAA-enabling functionality: role-based access controls, authentication mechanisms supported and integrated through Cerner's log-in process (except for biometric methods separately adopted by Client) for positive identification of users, and audit information abstracting for outbound use to supply audit log functionality selected by Client. Any modification or enhancement to the Licensed Software to meet new federal requirements will be made free of charge to Client, if made available generally and at no charge to Cerner's customer base. For federal requirements not made generally available at no charge, the cost of modification or enhancement will be prorated among Cerner's customer base in the United States. If any new requirements apply to Client's state only, the cost of modification or enhancement will be prorated among Cerner's customers in that state for the applicable item of Licensed Software. If such regulatory requirements apply only to Client's county or municipality, the cost of the modification or enhancement will be charged to Client. For federal or state laws enacted or modified after the Effective Date, Cerner will use commercially reasonable efforts to provide such modifications within: (i) 180 days after notice is given to Cerner of the law or regulation by Client (if a state law or regulation), or (ii) 180 days of the publication of a federal regulation in the Federal Register or (iii) the compliance date of the statute, whichever is later. If Client requires the modification or enhancement in advance of this date for a given federal or state law, Client shall be charged for the costs of development for the modification or enhancement. If a new state law covers the same subject matter requirement as a federal law, but has an effective compliance date in advance of the federal law, any software modification costs will be prorated among all of Cerner's customer base in that state for the applicable item of Licensed Software. With respect to the cost of modification or enhancement as described in this paragraph, the cost will be assessed to Client in the form of a one-time fee (with no increase in Support fees related thereto).

9.27. **Allowances on Future Purchases of Licensed Software.** Cerner shall provide Client allowances on Licensed Software purchased by Client after the Effective Date (excluding technology-based learning tools provided under any Project Agreement or Arrangement Letter, which are not subject to allowances under this Section 9.27) in accordance with this Section 9.27. Subject to the last sentence of this Section 9.27, such allowances shall be as follows: (i) for any Licensed Software purchased prior to the date ("Implementation Date") of completion of Phase I and Phase II of the Implementation described in Project Services Agreement No. 1, Client shall receive an allowance of ▓▓▓▓▓▓▓▓ from Cerner's List Price for such Licensed Software; (ii) for any Licensed Software purchased during the period after the Implementation Date through March 31, 2007, Client shall receive an allowance of ▓▓▓▓▓▓▓▓ from Cerner's List Price for such Licensed Software, and (iii) for any Licensed Software purchased after March 31, 2007, Client shall receive an allowance of ▓▓▓▓▓▓▓▓ from Cerner's List Price for such Licensed

23

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 50 of 164   Document 1-1

Software. Notwithstanding the preceding sentence and the discounts provided thereunder, in no event shall the allowance for Licensed Software purchased by Client during the period from the Effective Date through March 31, 2009 be less than (i) for cumulative Licensed Software purchased by Client having an aggregate List Price of ███ (ii) for cumulative Licensed Software purchased by Client having an aggregate List Price in excess of ███ and (iii) for cumulative Licensed Software purchased by Client having an aggregate List Price greater than ███ ███. Subject to the allowances above, Client shall have the option to purchase the solutions set forth on Exhibit I until August 31, 2006. The list price for such optional solutions is set forth on Exhibit I.

9.28.   **Reasonable Estimate.** Cerner and Client acknowledge that the estimated number of implementation and support FTE's needed by Client to operate the system is a reasonable estimate.

## X. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

10.1.   **Additional Products** shall mean items of Equipment or Sublicensed Software or Licensed Software (or any combination thereof) which constitute less than a full System and which Client acquires from Cerner in conjunction with a System acquired from Cerner under a previous Cerner System Schedule.

10.2.   **Agreement** shall mean this Basic Terms and Conditions document (comprised of Articles I through X), the signature page, any amendments, Exhibits, Cerner System Schedules, Attachments, Project Agreements and Arrangement Letters signed by both Client and Cerner, as the same may be amended from time to time.

10.3.   **Arrangement Letter** shall mean the document signed by both Cerner and Client, which is identified as an Arrangement Letter, and which sets forth the scope, work effort, deliverables, Cerner and Client responsibilities, and costs for professional services that are outside the scope of work originally identified in a Project Agreement.

10.4.   **Attachment** shall mean any document so designated and affixed to and made part of a Cerner System Schedule.

10.5.   **Basic Terms and Conditions** shall mean that portion of the Agreement containing only Articles I through X.

10.6    **Cerner** shall mean Cerner Corporation, a Delaware corporation, and its successors and assigns.

10.7.   **Cerner Holidays** shall mean New Year's Day (January 1), Good Friday, Easter, Memorial Day (last Monday in May), Independence Day (July 4), Labor Day (first Monday in September), Thanksgiving, Christmas Eve (December 24) ) (or the Friday before Christmas Eve if Christmas Eve falls on a Saturday or Sunday), and Christmas Day (December 25) (or the Monday after Christmas Day if Christmas falls on a Saturday or Sunday).

10.8.   **Cerner System Schedule(s)** shall mean all the Cerner System Schedules signed by both parties setting forth the scope of use, pricing, payment terms and components of the System.

10.9.   **Client** shall mean the entity acquiring the System under the terms and conditions of this Agreement, as set forth on the signature page (and including all Agnesian entities controlling, controlled by, or under common control with such entities). For purposes of this definition "control" means the ownership of fifty percent (50%) or more of voting power to elect directors thereof, or the power to operate or manage such entity through contract.

24

10.10. **Confidential Information** shall mean all technical, business, financial and other information that is disclosed by either party to the other, whether orally, in writing, or otherwise, information relating to the status of installation or Implementation of a Project, any disputes or disagreements between the parties, and all the terms and conditions of this Agreement (and the substance of the negotiations leading to it), all Cerner pricing information, the System, Work Product and all non-publicly available information related to Cerner products, services and/or methodologies. "Confidential Information" will not include any information (i) that is publicly available through no breach of this Agreement by Client or Cerner, (ii) that is independently developed or was previously known by Client or Cerner, (iii) that is rightfully acquired by Client or Cerner from a third party not under an obligation of confidentiality; or (iv) that is Protected Health Information.

10.11. **Content** shall mean the knowledge-based healthcare assessments and clinical pathways, medical vocabularies, rules, alerts and insights provided by Cerner and identified on any Cerner System Schedule, Project Agreement, Arrangement Letter or elsewhere in this Agreement.

10.12. **Data** shall mean all (i) data that is collected, stored, or generated through the use of the Licensed Software and (ii) Cerner-requested data that is not collected, stored, nor generated through the use of any Licensed Software, in each case requested by Cerner and subsequently transmitted to, or retrieved by Cerner for storage, and in each case from which the Licensed Software shall have removed all Obvious Identifiers prior to collection by or transmission to Cerner.

10.13. **Designated Facility** shall mean the Client location that will house the data center Equipment and the host Licensed Software identified on Attachment I to a Cerner System Schedule.

10.14. **Documentation** shall mean the printed and on-line materials that assist Client in using the System. Cerner and its suppliers reserve the right to modify Documentation to reflect changes in Equipment, Sublicensed Software and Licensed Software that may occur during the term of this Agreement; provided, however, that such Documentation shall not be modified so as to make errors or Material Errors acceptable or to otherwise materially adversely impact, including decrease, the functionality of the System.

10.15. **Effective Date** shall mean the date on which this Agreement becomes effective and is set forth on the signature page.

10.16. **Equipment** shall mean all data processing equipment and related components listed on any Cerner System Schedule.

10.17. **Escrow Agreement** shall mean the escrow agreement set forth as Exhibit B.

10.18. **Executive Committee** has the meaning set forth in Section 9.3.

10.19. **First Productive Use** shall mean Client's first use of an item of Licensed Software in a production or live environment following (i) completion by Cerner of any Implementation relating to such Licensed Software in a manner reasonably satisfactory to Client, (ii) satisfactory completion of any integration or related testing of the Licensed Software in accordance with the provisions of any Cerner System Schedule, Project Agreement or Arrangement Letter, (iii) such Licensed Software functioning in accordance with the Documentation and Product Descriptions and other terms and conditions of this Agreement.

10.20. **Foreign Information System Interface** shall mean the item of Licensed Software constituting Cerner's side of the software interface between the System and Client's other information system(s).

10.21. **HIPAA Addendum** has the meaning set forth in Section 2.5.

25

10.22. **HNA Millennium Licensed Software** shall mean the product name for Cerner's proprietary software that combines clinical, financial and management information applications, including all Licensed Software licensed to Client as of the Effective Date.

10.23. **Implementation** shall mean the delivery, installation, implementation, testing and acceptance of each component of the System, together with the process by which the System is optimized for use in Client's clinical, financial and administrative environment, all as set forth in this Agreement.

10.24. **Implementation Date** has the meaning set forth in Section 9.27.

10.25. **IT Operations Committee** has the meaning set forth in Section 9.3.

10.26 **Indemnified Party** has the meaning set forth in Section 8.7.

10.27. **Indemnifying Party** has the meaning set forth in Section 8.7.

10.28. **Licensed Software** shall mean the machine readable forms of specific computer software programs owned by Cerner and identified in any Cerner System Schedule, the Project Agreement, ~~Arrangement Letter or elsewhere in this Agreement, and all items of Product Descriptions, and~~ Documentation supplied by Cerner with respect to the computer software program portion of the Licensed Software. Licensed Software shall also include (i) any New Releases to which Client is entitled under this Agreement, (ii) any Content and any other computer software owned by Cerner, and (iii) any third party software embedded in or otherwise made a part of any of the foregoing. "Licensed Software" shall not include source code of any kind, nor shall it include Sublicensed Software or any program licensed to Client by any third party.

10.29. **List Price** shall mean, with respect to any Licensed Software, the price published by Cerner as generally available to a commercial purchaser of such Licensed Software.

10.30. **Losses** has the meaning set forth in Section 8.7.

10.31. **Maintenance** shall mean the services provided to Client pursuant to Article VI of this Agreement. Relevant pass-through provisions regarding specific services to be provided by a Maintenance supplier are attached as Exhibit D.

10.32. **Material Error** shall mean a failure of the applicable System component to function in accordance with either the Product Descriptions or Documentation (i) that materially adversely affects operation by any party authorized hereunder to use the System or (ii) that creates a material loss of functionality used in the daily operation of a module (e.g., Blood Bank).

10.33. **New Release** shall mean the distinctly identified (e.g. Release HNAM.20XX.01 for HNA Millennium Licensed Software), comprehensive collection and packaging of Licensed Software and supporting documentation components at a distinct point in time within a product's life cycle that Cerner makes generally commercially available.

10.34. **Obvious Identifiers** shall mean, with respect to a patient of Client or any of the relatives, employers or household members of the patient, the following information (and such other information as may subsequently be specified in 45 C.F.R. § 164.514(e)(2) or any successor provision): names; postal address information other than town or city, State and zip code; telephone numbers; facsimile numbers; e-mail addresses; social security numbers; medical record numbers; health plan beneficiary numbers; account numbers; certificate/license numbers; vehicle identifiers and serial numbers, including license plate numbers; device identifiers and serial numbers; Web Universal Resource Locators (URLs); Internet Protocol (IP) address numbers; biometric identifiers, including finger and voice prints; and full face photographic images and any comparable images

26

10.35. **Permitted Facility** shall mean (i) an entity or location controlled by Client, (ii) located within the United States, and (iii) designated by Client in writing from time to time. For purposes of this definition, "controlled" shall mean ownership of at least fifty percent (50%) of the stock of such entity or location, and/or the right to determine the management direction of such entity or location.

10.36. **Product Descriptions** shall mean the Software Product Descriptions (SPDs) for the Licensed Software.

10.37. **Project** shall mean the mutually agreed upon activities, timelines, responsibilities and deliverables relating to an Implementation project and detailed in a Project Agreement or Arrangement Letter.

10.38. **Project Agreement** shall mean a document executed by both Cerner and Client that sets forth, among other things, the scope, work effort, Cerner and Client responsibilities, and costs for professional services during any phase of a project.

10.39. **Protected Health Information** has the meaning set forth in Section 9.8.

10.40. **Relationship Executive** has the meaning set forth in Section 9.3.

10.41. **Reports** has the meaning set forth in Section 9.3.

10.42. **Scope of Use** shall mean the limitations on Client's use of the System, as set forth in Attachment I of a Cerner System Schedule.

10.43. **Standard Project Definitions Document (SPDD)** shall mean Cerner's then-current online document that describes the various aspects of a Project.

10.44. **Sublicensed Software** shall mean all third party software and/or Content listed on a Cerner System Schedule, Project Agreement elsewhere in this Agreement other than that third party software or Content embedded within Licensed Software.

10.45. **Support** shall mean those Cerner obligations to maintain the Licensed Software in working order or to sustain the useful life of the Licensed Software, including technical services which require contact with Client or its Permitted Users of the Licensed Software in person, via electronic mail or telephone, in order to help the Client or its Permitted Users resolve a problem that such Client has reported, all as more fully described in Exhibit E and in Cerner's Catalog of Services.

10.46. **System** shall mean the Equipment, Sublicensed Software and Licensed Software listed on any Cerner System Schedule, Project Agreement, Arrangement Letter or elsewhere in this Agreement and which collectively constitute a discrete product that addresses an area of clinical information management. For example, the PathNet product for laboratory, the RadNet product for radiology, and the PharmNet product for pharmacy (and their related Equipment and Sublicensed Software) would each constitute a System, while the Anatomic Pathology or Blood Bank modules and their related Equipment and Sublicensed Software would not.

10.47. **Third Party Claim** has the meaning set forth in Section 8.7.

10.48. **User** shall mean an individual person with a unique password and sign-on ID for access to the System, as designated by Client.

10.49. **Work Product** shall mean any customized or custom computer software programs, documentation, techniques, methodologies, inventions, analysis frameworks, software, or procedures developed, conceived or introduced by Cerner in the course of or as the result of Cerner performing professional services, installation services, Implementation services, issue

27

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 54 of 164   Document 1-1

## DOCUMENTS COMPRISING THE AGREEMENT

1.    **Basic Terms and Conditions**

2.    **Exhibit A -**    **Documents Comprising the Agreement**
3.    **Exhibit B -**    **High Technology Escrow Agreement**
4.    **Exhibit C -**    **Acquisition and Pass-Through Provisions for Equipment and Sublicensed Software**
5.    **Exhibit D -**    **Maintenance Services and Related Pass-Through Provisions**
6.    **Exhibit E -**    **Description of Support Services**
7.    **Exhibit F -**    **Client Tax Exemption Certificate**
8.    **Exhibit G -**    **Prior Agreements In Effect Between the Parties**
9.    **Exhibit H -**    **CKN Gold Agreement**
10.   **Exhibit I -**    **Optional Applications**
11.   **Exhibit J-**     **Business Associate Agreement**
12.   **Exhibit K-**     **Maintenance Services**

13.   **Cerner System Schedule No. 1- HNA Millennium**
14.   **Cerner System Schedule No. 2 – PACS**
15.   **Cerner System Schedule No. 3 – Cerner Provision Document Imaging**

16.   **Professional Services Project Agreement No. 1**

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 55 of 164   Document 1-1

## HIGH TECHNOLOGY ESCROW AGREEMENT

THIS HIGH TECHNOLOGY ESCROW AGREEMENT ("Escrow Agreement"), made and entered into this 1st day of January, 1996 ("Effective Date"), between CERNER CORPORATION, a Delaware corporation ("Cerner"), and Mark Twain Bank Kansas City, a national bank having its principal place of business at 11th and Baltimore, Kansas City, Missouri 64105 ("Escrow Agent"),

WITNESSETH:

WHEREAS, Cerner has entered into and in the future intends to enter into agreements (the "Cerner System Agreements") with the various parties thereto ("Clients" or, with respect to an individual client, "Client") pursuant to which Cerner will license to Clients the use of certain computer software programs for use in the healthcare industry (the "Licensed Software"), and

WHEREAS, Cerner desires to deposit in escrow the source codes and documentation (collectively, the "Source Code") for the Licensed Software so that such Source Code will be available to Clients in the event Cerner ceases doing business or supporting the Licensed Software, and

WHEREAS, Cerner desires to establish for the benefit of the Clients this Escrow Agreement, and

WHEREAS, the Escrow Agent is willing to act as escrow agent under the terms and conditions hereinafter set forth,

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, Cerner and the Escrow Agent hereby agree as follows:

1. ESCROW DEPOSIT. Cerner hereby deposits with the Escrow Agent for the benefit of the Clients the Source Code for the Licensed Software in its current (and, at Cerner's option, certain prior) versions. Cerner further agrees, for the benefit of the Clients, to deposit within thirty days after their first commercial release, the Source Code for any new versions of the Licensed Software and agrees not less often than once each year to deposit with the Escrow Agent a complete version of the Source Code encompassing all error corrections, improvements and modifications made by Cerner to the Licensed Software. A description of the Licensed Software's Source Code so deposited as of the Effective Date is set forth at Exhibit A to this Escrow Agreement. As each new deposit is made hereunder, Cerner shall update the description of the Licensed Software's Source Code contained within the deposit and shall supply such updated description to the Escrow Agent. Such updated description shall thereupon be attached to this Agreement as an updated Exhibit A. Cerner and Escrow Agent hereby agree that the property escrowed with the Escrow Agent (the "Escrowed Property") shall be held and disposed of by Escrow Agent in accordance with the terms and provisions hereof.

2. LABEL OF ESCROWED PROPERTY. Prior to the delivery of the Escrowed Property to Escrow Agent, Cerner shall conspicuously label for identification each document, magnetic tape, disk, or other tangible media upon which the Escrowed Property are written or stored.

3. ESCROW AGENT ACKNOWLEDGEMENT OF INITIAL DEPOSIT. Escrow Agent hereby acknowledges receipt of the initial delivery of the Escrowed Property and agrees to act as escrow agent and hold and dispose of the Escrowed Property in accordance with the terms hereof.

4. UPDATE TO ESCROWED PROPERTY. Escrow Agent shall give Cerner full access to the Escrowed Property so that Cerner may deposit the Source Code in accordance with paragraph 1 of this Escrow Agreement and remove any unsupported version of the Source Code as its replacement version is deposited. Escrow Agent shall have no duty or obligation to determine the actual contents of the Escrowed Property or the compliance by Cerner of the provisions of paragraph 1 hereof.

5. LIST OF CLIENTS ENTITLED TO RECEIVE SOURCE CODE. A list of the Clients who may become entitled to receive Source Code hereunder as of the Effective Date of this Escrow Agreement is set forth at Exhibit B hereto. Such list describes, with respect to each such Client, the Licensed Software to which it may become entitled to receive Source Code hereunder. Concurrent with the execution of each Cerner System Agreement, Cerner shall deliver to Escrow Agent written notice of such Cerner System Agreement, which notice shall include the name and address of such Client, and a list describing the specific items of Licensed Software to which such Client is entitled to receive Source Code. Cerner shall update the list to reflect changes (e.g., license of additional modules) with respect to the specific items of Licensed Software to which Client is entitled to receive Source Code.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 56 of 164   Document 1-1

## HIGH TECHNOLOGY ESCROW AGREEMENT

6.     TERM OF ESCROW AGREEMENT. This Escrow Agreement shall become effective January 1, 1996, and shall remain in full force and effect until the earliest to occur of (a) December 31, 2010, or (b) delivery to Escrow Agent of a writing signed by Cerner stating that Cerner terminates this Escrow Agreement and specifying the party to whom the Escrowed Property is to be delivered. In the event this Escrow Agreement terminates pursuant to clause (a) of this paragraph, the Escrow Agent shall deliver the Escrowed Property to Cerner. In the event this Escrow Agreement terminates pursuant to clause (b) of this paragraph, Escrow Agent shall provide written notice to all Clients and shall deliver the Escrowed Property to the specified party.

7.     DELIVERY FROM ESCROW TRIGGER EVENTS. If a Client shall give written notice to the Escrow Agent (a) of the cessation of business by Cerner, without a successor, or (b) of Cerner's cessation of Support for the Licensed Software without making provision for continued Support by a qualified third party on substantially the same terms, conditions and pricing, or (c) in the case of Cerner and a Client having entered into an agreement providing other circumstances under which such Client may be entitled to a copy of the Escrowed Property, and where a copy of such agreement has been provided to Escrow Agent by Cerner or the Client, of the existence of such circumstances, Escrow Agent shall within three business days thereafter mail to Cerner at its address set forth in this Escrow Agreement a copy of said notice. Unless within thirty (30) days after the date of mailing by Escrow Agent, Cerner shall file with the Escrow Agent its affidavit contesting the existence of such circumstances, Escrow Agent shall on the thirty-first day after the giving of such notice to Cerner, if such day is a business day (and if not, then on the first business day thereafter), arrange to have a competent data processing service make one copy of the Escrowed Property and deliver such copy in accordance with the Client's instructions. If an affidavit is filed by Cerner as aforesaid, then Escrow Agent shall not deliver the Escrowed Property to either Cerner or Client until (a) the dispute has been fully and finally adjudicated by a court of competent jurisdiction, or (b) all differences shall have been resolved by agreement of Cerner and Client and Escrow Agent shall have been notified thereof by an instrument signed jointly by Cerner and Client.

8.     SOURCE CODE COPYING FEES. Escrow Agent shall not have any responsibility to have a copy of the Escrowed Property made for the account of any Client unless the Client deposits with Escrow Agent, prior to the making of such copy, all fees and expenses to be incurred by Escrow Agent in the making of such copy.

9.     LIABILITY OF ESCROW AGENT. Escrow Agent shall have no obligation or liability hereunder except as a depository to retain the Escrowed Property and to dispose of same in accordance with the terms hereof. Escrow Agent shall not be required to ascertain the genuineness of any instruction or signature thereon and may act upon any notice or other document believed to be genuine. Escrow Agent shall not be liable for any action taken or omitted in connection with the performance of its duties pursuant to the provisions of this Escrow Agreement except for its own willful default or gross negligence. Escrow Agent shall not be required to take any action hereunder to deliver a copy of the Escrowed Property to any Client unless such Client shall indemnify and hold Escrow Agent harmless from any and all liability, damages, cost or expenses, including reasonable attorneys' fees, which may be sustained or incurred by Escrow Agent as a result of taking such action, except in the case of the willful default or gross negligence of Escrow Agent.

10.     CERNER TO PAY ESCROW AGENT FEES AND EXPENSES. Escrow Agent shall be entitled to receive reasonable compensation for its services hereunder from Cerner and shall be reimbursed by Cerner for any reasonable expense incurred by it hereunder, including the reasonable fees of any attorneys which it may wish to consult in connection with the performance of its duties hereunder.

11.     NOTICES. All notices, requests, claims, instructions and other communications which Escrow Agent may be required or may desire to give to Cerner hereunder shall be in writing, and shall be sent by certified or registered mail, postage prepaid, to Cerner Corporation, 2800 Rockcreek Parkway, Kansas City, Missouri 64117, Attention: Clifford W. Illig, President, or to such other person or place as Cerner shall furnish to Escrow Agent in writing, and if to Escrow Agent to: Mark Twain Bank Kansas City, 4901 Main Street, Kansas City, Missouri 64112, Attention: Melanie Alm, Senior Vice President, or to such other person or place as Escrow Agent shall furnish to Cerner in writing.

12.     BINDING OBLIGATION. This Escrow Agreement and all the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and shall inure to the benefit of the Clients and their respective legal representatives and assigns.

13.     GOVERNING LAW. This Escrow Agreement shall be governed and construed under the laws of the State of Missouri.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 57 of 164   Document 1-1

## HIGH TECHNOLOGY ESCROW AGREEMENT

14. __AMENDMENT__. This Escrow Agreement may not be amended without the written consent of all Clients.

IN WITNESS WHEREOF, Cerner and the Escrow Agent have entered into this Escrow Agreement as of the day and year first above written.

THIS DOCUMENT IS A REPRESENTATION OF THE ORIGINAL SIGNED AGREEMENT ON FILE WITH CERNER CORPORATION AND MARK TWAIN BANK.

MARK TWAIN BANK KANSAS CITY                    CERNER CORPORATION

By:_____\s_____          By:_____\s_____

_____Melanie Graham-Alm_____          _____Clifford W. Illig_____
        (Typed or printed)                        (Typed or printed)

Title:____Senior Vice President_____        Title:_____President_____

Date:_____12/27/95_____          Date:_____12/28/95_____

## HIGH TECHNOLOGY ESCROW AGREEMENT

Exhibit A to Cerner's High Technology Escrow Agreement

### HNA MILLENNIUM

The escrow deposit for HNA Millenium consists of source code, reference files, and manufacturing tools for the following:

| PRODUCT AREA |
|---|
| ADVANCED TECHNOLOGY |
| CARE COORDINATION |
| CARENET DEPARTMENTALS |
| CHARGE SERVICES |
| CHARTING |
| CLINICAL TRIALS |
| COLLECTIONS |
| COMPONENTS |
| CORE COMPONENTS |
| CVNET |
| DATA MANAGEMENT |
| DB TECHNOLOGY |
| DECISION SUPPORT |
| DESKTOP MANAGEMENT |
| DICTATION/TRANSCRIPTION |
| DISCERN |
| DOCUMENT MANAGEMENT |
| FIRSTNET |
| FORMS |
| FOUNDATIONS COMPONENTS |
| GLOBAL IMPLEMENTATION |
| HNA COMMON APPLICATIONS |
| ICU |
| IMAGING -- DOCUMENT |
| IMAGING -- PROVIEW |
| INSTALLATION |
| INTERNATIONAL DEVELOPMENT |
| IQHEALTH |
| KNOWLEDGE INDEX APPLICATIONS |
| MDI |
| OCF |
| OMF/POWERVISION TOOLS |
| OPEN AGREEMENT FOUNDATION |
| OPEN ENGINE |
| OPEN VIEW |
| OPEN PORT -- ESI |
| OPEN PORT -- ESO |
| OPENVIEW |
| OPERATIONS |
| OPF (OPEN PERSON FOUNDATION) |
| ORDER MANAGEMENT |

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 59 of 164   Document 1-1

## HIGH TECHNOLOGY ESCROW AGREEMENT

| |
|---|
| PATHLINK |
| PATHNET -- ANATOMIC PATHOLOGY |
| PATHNET -- BB DONOR |
| PATHNET -- BB TRANSFUSION |
| PATHNET -- BLOOD BANK |
| PATHNET -- COLLECTIONS |
| PATHNET -- COMMON SERVICES |
| PATHNET -- GEN LAB |
| PATHNET -- HLA |
| PATHNET -- LAB MANAGEMENT |
| PATHNET -- MICROBIOLOGY |
| PATHNET -- OUTREACH SERVICES |
| PATHNET -- ROBOTICS |
| PERSON MANAGEMENT |
| PHARMNET INPATIENT |
| POWERCHART |
| POWERCHART OFFICE |
| PRINT SERVICES |
| PROCALL |
| PROCALL -- TELEDOC |
| PROCARE CARE MANAGER |
| PROCARE PROFILING SUITE |
| PROCARE RISK MANAGER |
| PROCURE |
| PROFILE |
| PROFIT |
| PROLINK |
| RADNET |
| REVISION QUALITY |
| REVISION TOOLS |
| RRD |
| SCHEDULING |
| SCRIPT MANAGEMENT |
| SERVERS & SERVICES |
| STRUCTURED CLINICAL DOCUMENTATION |
| SURGINET |
| SYSTEM MANAGEMENT |
| TECHNOLOGIES |
| UTILITIES |
| WEB ARCHITECTURE |
| WORKBENCH |
| WORKLOAD |

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 60 of 164   Document 1-1

EXHIBIT C

# PASS-THROUGH PROVISIONS—MULTUM

With respect to the proprietary drug information service (for purposes of this particular Exhibit C only, the "Service") provided to Client by Cerner Multum, Inc. ("Multum"), the following provisions shall apply:

Client may only use the Service in connection with Cerner software. Every effort has been made to ensure that the information provided in the Service is accurate, up-to-date, and complete, but no guarantee is made to that effect. In addition, the drug information contained herein may be time sensitive.

The Service does not endorse drugs, diagnose patients, or recommend therapy. The Service is an informational resource designed to assist licensed healthcare practitioners in caring for their patients; however, it is not a substitute for the care provided by licensed healthcare practitioners. The absence of a warning for a given drug or drug combination in no way should be construed to indicate that the drug or drug combination is safe, effective or appropriate for any given patient. Multum does not assume any responsibility for any aspect of healthcare administered with the aid of information the Service provides.

## Disclaimer of Warranties

CLIENT ACKNOWLEDGES THAT THE SERVICE IS PROVIDED ON AN "AS IS" BASIS. EXCEPT FOR WARRANTIES WHICH MAY NOT BE DISCLAIMED AS A MATTER OF LAW, MULTUM MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OR NATURE OF THE CONTENT OF THE SERVICE, WARRANTIES OF TITLE, NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Client acknowledges that updates to the Service are at the sole discretion of Multum. Multum makes no representations or warranties whatsoever, express or implied, with respect to the compatibility of the Service, or future releases thereof, with any computer hardware or software, nor does Multum represent or warrant the continuity of the features or the facilities provided by or through the Service as between various releases thereof.

## Assumption of Risk, Disclaimer of Liability, Indemnity

CLIENT ASSUMES ALL RISK FOR SELECTION AND USE OF THE SERVICE AND CONTENT PROVIDED THEREON. MULTUM SHALL NOT BE RESPONSIBLE FOR ANY ERRORS, MISSTATEMENTS, INACCURACIES OR OMISSIONS REGARDING CONTENT DELIVERED THROUGH THE SERVICE OR ANY DELAYS IN OR INTERRUPTIONS OF SUCH DELIVERY.

CLIENT ACKNOWLEDGES THAT MULTUM: (A) HAS NO CONTROL OF OR RESPONSIBILITY FOR THE CLIENT'S USE OF THE SERVICE OR CONTENT PROVIDED THEREON, (B) HAS NO KNOWLEDGE OF THE SPECIFIC OR UNIQUE CIRCUMSTANCES UNDER WHICH THE SERVICE OR CONTENT PROVIDED THEREON MAY BE USED BY THE CLIENT, (C) UNDERTAKES NO OBLIGATION TO SUPPLEMENT OR UPDATE CONTENT OF THE SERVICE, AND (D) HAS NO LIABILITY TO ANY PERSON FOR ANY DATA OR INFORMATION INPUT ON THE SERVICE BY THE CLIENT TO THE SERVICE.

MULTUM SHALL NOT BE LIABLE TO ANY PERSON (INCLUDING BUT NOT LIMITED TO CLIENT AND PERSONS TREATED BY OR ON BEHALF OF CLIENT) FOR, AND CLIENT AGREES TO INDEMNIFY AND HOLD MULTUM HARMLESS FROM ANY CLAIMS, LAWSUITS, PROCEEDINGS, COSTS, ATTORNEY'S FEES, DAMAGES OR OTHER LOSSES (COLLECTIVELY, "LOSSES") ARISING OUT OF OR RELATING TO (A) CLIENT'S USE OF THE SERVICE OR CONTENT PROVIDED THEREON AND (B) ANY DATA OR INFORMATION INPUT ON THE SERVICE BY ANY PERSON OR ENTITY OTHER THAN MULTUM, IN ALL CASES INCLUDING BUT NOT LIMITED TO LOSSES FOR TORT, PERSONAL INJURY, MEDICAL MALPRACTICE OR PRODUCT LIABILITY. FURTHER, WITHOUT LIMITING THE FOREGOING, IN NO EVENT SHALL MULTUM BE LIABLE FOR ANY DIRECT, EXEMPLARY, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, INCLUDING DAMAGES FOR LOSS OF PROFITS, LOSS OF BUSINESS, OR DOWN TIME, EVEN IF MULTUM HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE INFORMATION CONTAINED WITHIN THE SERVICE IS INTENDED FOR USE ONLY BY PHYSICIANS AND OTHER HEALTHCARE PROFESSIONALS WHO SHOULD RELY ON THEIR CLINICAL DISCRETION AND JUDGMENT IN DIAGNOSIS AND TREATMENT. AS BETWEEN CLIENT AND MULTUM, THE CLIENT HEREBY ASSUMES FULL RESPONSIBILITY FOR INSURING THE APPROPRIATENESS OF USING AND RELYING UPON THE INFORMATION IN VIEW OF ALL ATTENDANT CIRCUMSTANCES, INDICATIONS, AND CONTRAINDICATIONS.

Multum's total liabilities in connection with this agreement, whether arising under contract or otherwise, are limited to the fees received by Multum under this agreement specifically relating to the Client's service or product which is the subject of the claim.

35

EXHIBIT C

## PASS-THROUGH PROVISIONS--ZYNX

With respect to the knowledge-base content (for purposes of this particular Exhibit C only, the "Knowledge-Base Content") provided to Client by Zynx Health Incorporated ("Zynx"), the following provisions shall apply:

**1. License Grant.**

(a) Client is hereby granted a non-exclusive, non-transferable license to use the Knowledge-Base Content within the scope of the stated use and pursuant to any other applicable terms and conditions in the Agreement or Schedule, which this Exhibit C is attached to.

**2. Data Ownership.**

(a) Client agrees that Zynx shall be the joint owner with Client of all data and content generated from information and data submitted by Client and Zynx shall have a right to publish or sell to any third party, without notice or payments to Client, blinded data which has no patient identifiable elements. Zynx agrees that it will not use the blinded data after Client deletes such data from the software, which the Knowledge-Base Content is embedded in. All intellectual property owned by, licensed to or copyrighted by Zynx which has been used by Zynx to develop the Knowledge-Base Content, as well as the software which the Knowledge-Base Content is embedded in, including, but not limited to, any software code, databases, data not submitted by Client and interfaces, shall remain the sole and exclusive property of Zynx.

**3. Warranty.**

(a) CLIENT AGREES THAT THE KNOWLEDGE-BASE CONTENT IS PROVIDED ON AN "AS IS" BASIS, WITHOUT WARRANTY OF ANY KIND, AND ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT, ARE EXCLUDED BY ZYNX. ZYNX DOES NOT WARRANT THAT THE KNOWLEDGE-BASE CONTENT AND THE SOFTWARE WHICH SUCH CONTENT IS PART OF WILL OPERATE ON AN UNINTERRUPTED OR ERROR-FREE BASIS, AND NO WARRANTY IS MADE AS TO THE SELECTION OR ACCURACY OF THE KNOWLEDGE-BASE CONTENT, OR WHETHER THE KNOWLEDGE-BASE CONTENT CONTAINS AN IDENTICAL OR ACCURATE REPRODUCTION OF THE ORIGINAL LITERATURE OR SOURCE MATERIALS.

**4. Assumption of Risk.**

(a) Client agrees that while Zynx has attempted to incorporate key literature into the Knowledge-Base Content, the Knowledge-Base Content is not all-inclusive or necessarily complete, and there may be omissions, typographical and other errors, conflicting information or inaccuracies.

(b) Client and the other health care providers responsible for patient care shall retain full responsibility for all decisions relating to patient care, and the Knowledge-Base Content shall not be used as a substitute or replacement for diagnosis or treatment recommendations or other clinical decisions or judgment.

**5. Limitation of Liability; Indemnity.**

(a) IN NO EVENT WILL ZYNX BE LIABLE TO CLIENT FOR ANY DAMAGES, INCLUDING LOST REVENUES, PROFITS, DATA OR OTHER INFORMATION, OR FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, ARISING OUT OF THE USE OF OR INABILITY TO USE THE KNOWLEDGE-BASE CONTENT EVEN IF ZYNX HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b) Client shall indemnify and hold Zynx harmless from and against any and all claims and damages, including without limitation reasonable attorneys' fees arising out of, related to or in any way connected with Client's use of or inability to use the Knowledge-Base Content.

(c) Zynx's total liabilities, whether arising under contract or otherwise, are limited to the fees received by Zynx hereunder specifically relating to the Knowledge-Base Content, which is the subject of the claim.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 62 of 164   Document 1-1

EXHIBIT C

# IBM Customer Agreement - License

## Programs and Licensed Internal Code



Thank you for doing business with us through an IBM authorized remarketer. We are committed to providing you with the highest quality Products and Services. If, at any time, you have any questions or problems, or are not completely satisfied, please let the remarketer or us know.

We have signed agreements with IBM authorized remarketers to promote, market, and support some of our Programs. We have chosen these remarketers because of their skills and experience in a particular field. When you acquire our Programs from these remarketers, we confirm that we license the Programs to you under the terms of this Agreement. We are not responsible for 1) the actions of these remarketers, 2) any additional obligations they may have to you, or 3) any products or services that they (and not us) may supply to you.

This IBM Customer Agreement - License (called the "Agreement") covers the business transactions between us relating to the licensing of Programs listed in a Supplement and the provision of related Services. Some Programs you may acquire are used on certain specified machines (called "Specific Machines"), which use IBM Licensed Internal Code; therefore, this Agreement also covers Licensed Internal Code. Each Specific Machine will be identified in writing.

This Agreement and its applicable Attachments and Supplements are the complete agreement regarding these transactions. and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement. Once signed 1) any reproduction of this Agreement. an Attachment, or Supplement made by reliable means (for example, photocopy or facsimile) is considered an original and 2) all Products and Services you receive under this Agreement are subject to it.

*Agreed to:* (Customer name)

*Agreed to:*
International Business Machines Corporation

By _____
　　　　　Authorized signature

By _____
　　　　　　　Authorized signature

Name (type or print):

Name (type or print):

Date:

Date:

Customer address:

Customer address:

---

### IBM Authorized Remarketer Use

*The remarketer must ensure that 1) the above customer information, IBM office address, and the following information are filled in and 2) the IBM Office shown above receives a copy of this Agreement, signed by the customer.*

**IBM Authorized Remarketer name:**

**IBM Authorized Remarketer address:**

---

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 63 of 164   Document 1-1

EXHIBIT C

## 1. Definitions

**Designated Machine** is the machine, that you identify to us by type/model and serial (or plant order) number, on which you intend to use a Program for processing. When we specify that you do not have to provide this identification to us, the term "Designated Machine" means the single machine on which you may use the Program at any one time.

**Product** is a Program or Licensed Internal Code.

**Program** is the following, including features and any whole or partial copies:

1. machine-readable instructions;

2. a collection of machine-readable data, such as a data base; and

3. related licensed materials, including documentation and listings, in any form.

The term "Program" means an IBM Program and any non-IBM Program that we authorize the remarketer to market, and that it provides to you. The term does not include Licensed Internal Code.

**Service** is assistance, such as Program support.

**Specifications** is a document that provides information specific to a Program. We call the document "Licensed Program Specifications" or "License Information."

**Specified Operating Environment** is the machines and Programs with which a Program is designed to operate, as described in the Program's Specifications.

## 2. Agreement Structure

Some Programs and Services have terms in addition to those we specify in this Agreement. We provide the additional terms in documents called "Attachments," which are also part of this Agreement. The applicable Attachment (if any) will be provided to you.

For each order you place for Programs, you will be provided with a "Supplement" to this Agreement, which confirms the specific details of your order.

If there is a conflict among the terms of the various documents, those of an Attachment prevail over those of this Agreement. The terms of a Supplement prevail over those of both these documents.

You accept the additional terms in an Attachment or Supplement by 1) using the Program or Service, or allowing others to do so, 2) making any payment for the Program or Service, or 3) signing it, if applicable.

## 3. Charges for Programs

Charges for Programs may be one-time, recurring, or a combination of both. Charges for Programs are payable to the remarketer (and not to us).

## 4. License of Programs

An individual Program becomes subject to this Agreement when you receive it or we authorize you to make an Additional License Copy. When this occurs, we grant you a license for the Program. Programs are copyrighted and licensed (not sold). We do not transfer title to Programs to you.

**License Details**

Under each license, we authorize you to:

1. use the Program's machine-readable portion on only the Designated Machine, unless—

   a) the Designated Machine is inoperable. You may then use the Program on a backup machine,

   b) the Designated Machine cannot assemble or compile the Program. You may then assemble or compile it on another machine,

   c) we grant an "Installation License." You may then use the Program on any other machine in the same or adjoining rooms as the Designated Machine, or

   d) we grant a "Location License." You may then use the Program on any other machine in the same building with the same mailing address as the Designated Machine.

   If you change the Designated Machine, you agree to notify us of the change and its date;

2. store the Program's machine-readable portion in, transmit it through, and display it on, machines associated with the Designated Machine;

3. do the following to support your authorized use as described above —

   a) modify the Program's machine-readable instructions or data, or merge them into another Program, and

   b) make copies of the Program, provided you reproduce the copyright notice and any other legend of ownership on each copy or partial copy; and

4. use any portion of the Program we mark restricted (for example, "Restricted Materials of IBM") only to a) resolve problems related to the use of the Program and b) modify the Program so that it will work with other products.

23FM00004 Rev.002 4/16/02
Z125-4593-03 4/93 (MK003)     38     ARR3711

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 64 of 164   Document 1-1

EXHIBIT C

You agree to comply with any additional terms (for example, a usage restriction) that a Program's Specifications may contain. Specifications are provided to you with the Program. For an "AS IS" Program, any additional terms are contained in a document called "Notice of Availability."

You agree not to do any of the following:

1. sublicense, assign, or transfer the license for any Program;
2. distribute any Program to any third party; or
3. reverse assemble, reverse compile, or otherwise translate any Program.

**Conversion**

You may, at any time, convert a license we grant you under this Agreement to a license under the IBM Customer Agreement. We will invoice you the applicable charges.

**Distributed Features**

Some Programs have features (called "Distributed Features") that are designed to work with those Programs (called "Associated Programs"). If a Distributed Feature is specified in the Supplement, we authorize you to:

1. make a copy of the Distributed Feature and its documentation; and

2. distribute the copy to, and use it on, a machine other than the Designated Machine of the Associated Program. You may use the copy on only one machine at a time. Persons using a machine outside of your business enterprise may use the copy only to access the Associated Program.

**Additional License Copies**

If you prefer, for each license we grant, rather than requiring you to obtain another copy of the Program, we will authorize you to make an additional copy (called an "Additional License Copy"). Such authorization is granted when an additional copy (called an "Additional License Copy") is specified in the Supplement. Such authorization is granted when an Additional License Copy is specified in the Supplement.

**Program Packages**

We provide certain Programs together with their own license agreements. These Programs (called "Program Packages") are licensed under the terms of the agreements provided with them. This Agreement's patent and copyright terms apply to IBM Program Packages.

For a Program Package, we may specify that Additional License Copies apply. If so, 1) these copies are subject to the terms of the Program Package's agreement, except that you may not transfer them, and 2) you may copy all of the Program Package's printed documentation.

If a Program Package has Distributed Features, this Agreement's terms regarding Distributed Features apply.

If a Program Package is preloaded onto a machine for you, the Program in its standard package is your backup copy. You agree that you are bound by the terms of that Program Package's license agreement.

**Program Protection**

For each Program, you agree to 1) ensure that anyone who uses it (accessed either locally or remotely) does so only for your authorized use and complies with our terms regarding Programs, 2) maintain a record of all copies, and 3) if it is a licensed data base, allow access to the information contained in it only to your employees, agents, or subcontractors, and only in support of their work for you.

**Recurring-Charge Programs**

The license for a Program with a recurring charge terminates if the relationship between us and the remarketer ends, unless you keep the Program. If you do so, you must pay us the applicable charges.

**Variable-Charge Programs**

We may place a machine in a machine group. The charges for some Program licenses depend on the group of the Designated Machine. We call these Programs "Variable-Charge" Programs. Variable charges include graduated charges and processor-based charges. We will specify the group for a machine and will inform the remarketer of any changes.

For these licenses, the following apply:

1. if you change (including upgrade or downgrade) a Designated Machine to a machine in another group, you may incur a group-upgrade charge or a changed recurring charge. You agree to promptly notify us or the remarketer of the date of such a change; and

2. if a change or reassignment results in a lower charge, we do not give credits or refunds for one-time charges already due or paid.

**License Termination**

You may terminate the license for a Program on one month's written notice. For some Programs, if you terminate the license and replace that Program with another we specify, we only require payment of an upgrade charge. We may terminate any Program license we grant in this Agreement if you do not meet your obligations regarding Programs.

You agree to destroy all copies of the Program within three months after license termination. However, you may keep a copy in your archives.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 65 of 164   Document 1-1

EXHIBIT C

## 5. Warranty for IBM Programs

For each warranted IBM Program, we warrant that 1) we have the right to license it and 2) it conforms to its Specifications. The warranty period for a Program expires when its Program Services are no longer available.

Misuse, accident, modification, operation in other than the Specified Operating Environment, or failure caused by a product for which we are not responsible may void the warranty.

THIS WARRANTY REPLACES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

### Items Not Covered By Warranty

We do not warrant uninterrupted or error-free operation of a Product. We will identify IBM Programs that we do not warrant. We provide non-IBM Programs on an "AS IS" basis. However, non-IBM manufacturers, suppliers, or publishers may provide their own warranties to you.

## 6. Patents and Copyrights

If a third party claims that an IBM Product provided to you under this Agreement infringes that party's patent or copyright, we will defend you against that claim at our expense and pay all costs, damages, and attorney's fees that a court finally awards, provided that you 1) promptly notify us in writing of the claim and 2) allow us to control, and cooperate with us in, the defense and any related settlement negotiations.

If such a claim is made or appears likely to be made, you agree to permit us to enable you to continue to use the Product, or to modify it, or replace it with one that is at least functionally equivalent. If we determine that none of these alternatives is reasonably available, you agree to return the Product to us on our written request. We will give you a credit equal to your net book value for the Product, provided you have followed generally-accepted accounting principles.

This is our entire obligation to you regarding any claim of infringement.

### Claims for Which We are Not Responsible

We have no obligation regarding any claim based on any of the following:

1. your modification of a Product, or a Program's use in other than its Specified Operating Environment; or

2. the combination, operation, or use of a Product with any product, data, or apparatus that we did not provide.

## 7. Limitation of Liability

Circumstances may arise where, because of a default on our part or other liability, you are entitled to recover damages from us. In each such instance, regardless of the basis on which you are entitled to claim damages from us, we are liable only for:

1. payments referred to in our patent and copyright terms described above;

2. bodily injury (including death), and damage to real property and tangible personal property; and

3. the amount of any other actual loss or damage up to the greater of $100,000 or the charges (if recurring, 12 months' charges apply) for the Product or Service that is the subject of the claim.

This limit also applies to any of our remarketers, subcontractors, and Program developers. It is the maximum for which we are collectively responsible.

### Items for Which We are Not Liable

Under no circumstances are we, our remarketers, subcontractors, or Program developers liable for any of the following:

1. third-party claims against you for losses or damages (other than those under the first two items listed above);

2. loss of, or damage to, your records or data; or

3. economic consequential damages (including lost profits or savings) or incidental damages, even if we are informed of their possibility.

## 8. Changes to the Agreement Terms

In order to maintain flexibility in our Products and Services, we may change the terms of this Agreement by giving you three months' written notice. However, these changes are not retroactive. They apply as of the effective date we specify in the notice.

Otherwise, for a change to be valid, both of us must sign it. Additional or different terms in any order or written communication from you are void.

## 9. Agreement Termination

You may terminate this Agreement on written notice to us following the expiration or termination of all your obligations. Either of us may terminate this Agreement if the other does not comply with any of its terms.

Any terms of this Agreement which by their nature extend beyond its termination remain in effect until fulfilled, and apply to respective successors and assignees.

EXHIBIT C

## 10. General

Each of us 1) is free to enter into similar agreements with others, 2) will allow the other reasonable opportunity to comply before it claims that the other has not met its obligations, and 3) may communicate with the other by electronic means. Each of us agrees that when electronic communications are used, they are the equivalent of written and signed documents.

Neither of us 1) grants the other the right to use its trademarks, trade names, or other designations in any promotion or publication and 2) will bring a legal action under this Agreement more than two years after the cause of action arose.

You agree 1) not to assign, or otherwise transfer, this Agreement or your rights under it or delegate your obligations, without prior written consent; any attempt to do so is void, and 2) that you are responsible for the results obtained from the Products.

You may have additional rights under certain laws (such as consumer laws) which do not allow the exclusion of implied warranties, or the exclusion or limitation of certain damages. If these laws apply, our exclusions or limitations may not apply to you.

All your rights, all our obligations, and all licenses (except for Licensed Internal Code) are valid only in the United States and Puerto Rico. The laws of the State of New York govern this Agreement.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 67 of 164   Document 1-1

EXHIBIT C

**11. Licensed Internal Code**

Certain machines we specify (called "Specific Machines") use Licensed Internal Code (called "Code"). We own copyrights in Code. We own all copies of Code, including all copies made from them. Each Specific Machine will be identified in writing. If you are the rightful possessor of a Specific Machine, we grant you a license to use the Code (or any replacement we provide) on, or in conjunction with, only the Specific Machine, designated by serial number, for which the Code is provided. We license the Code to only one rightful possessor at a time.

Under each license, we authorize you to do only the following:

1. execute the Code to enable the Specific Machine to function according to our Official Published Specifications;

2. make a backup or archival copy of the Code (unless we make one available for your use), provided you reproduce the copyright notice and any other legend of ownership on the copy. You may use the copy only to replace the original, when necessary; and

3. execute and display the Code as necessary to maintain the Specific Machine.

You agree to acquire any replacement for, or additional copy of, Code directly from us in accordance with our standard policies and practices. You also agree to use that Code under these terms.

You may transfer possession of the Code to another party only with the transfer of the Specific Machine. If you do so, you must 1) destroy all your copies of the Code that were not provided by us, 2) either give the other party all your IBM-provided copies of the Code or destroy them, and 3) give the other party a copy of this page with the Specific Machine's identification information filled in below. We license the other party when it accepts these terms by initial use of the Code. These terms apply to all Code you acquire from any source.

Your license terminates when you no longer rightfully possess the Specific Machine.

**Actions You May Not Take**

You agree to use the Code only as authorized above. You may not do, for example, any of the following:

1. otherwise copy, display, transfer, adapt, modify, or distribute the Code (electronically or otherwise), except as we may authorize in the Specific Machine's Official Published Specifications or in writing to you;

2. reverse assemble, reverse compile, or otherwise translate the Code;

3. sublicense or assign the license for the Code; or

4. lease the Code or any copy of it.

---

**INFORMATION FOR SUBSEQUENT LICENSEE OF LICENSED INTERNAL CODE**

This page is copied from the IBM Customer Agreement - License and is provided to the subsequent licensee when Code is transferred.

The Specific Machine being transferred is identified as:

Type/Model_____        Serial Number_____

The following definitions are provided for the subsequent licensee of the Code:

1. "We" means International Business Machines Corporation (IBM);

2. The above Type/Model and Serial Number identify the Specific Machine to you; and

3. "You" means the subsequent licensee of the Code.

---

23FM00004 Rev.002 4/16/02                                                    ARR3711
Z125-4593-03 4/93 (MK003)                          42

EXHIBIT C

*International Business Machines Corporation*                                              *Armonk, New York 10504*

## Statement of Limited Warranty

The warranties provided by IBM in this Statement of Limited Warranty apply only to Machines you originally purchase for your use, and not for resale, from IBM or an IBM authorized reseller. The term "Machine" means an IBM machine, its features, conversions, upgrades, elements, or accessories, or any combination of them. Machines are subject to these terms only if purchased in the United States or Puerto Rico, or Canada, and located in the country of purchase. If you have any questions, contact IBM or your reseller.

---

Machine ____ Refer to the applicable Cerner System Schedule _____

Warranty Period* ____ Refer to the applicable Cerner System Schedule _____

*Elements and accessories are warranted for three months. Contact your place of purchase for warranty service information.*

---

### Production Status

Each Machine is manufactured from new parts, or new and serviceable used parts (which perform like new parts). In some cases, the Machine may not be new and may have been previously installed. Regardless of the Machine's production status, IBM's warranty terms apply.

### The IBM Warranty

IBM warrants that each Machine 1) is free from defects in materials and workmanship and 2) conforms to IBM's Official Published Specifications. IBM calculates the expiration of the warranty period from the Machine's Date of Installation. The date on your receipt is the Date of Installation, unless IBM or your reseller informs you otherwise.

During the warranty period, IBM or your reseller will provide warranty service under the type of service designated for the Machine and will manage and install engineering changes that apply to the Machine. IBM or your reseller will specify the type of service.

For a feature, conversion or upgrade, IBM or your reseller may require that the Machine on which it is installed be 1) the designated, serial-numbered Machine an 2) at an engineering-change level compatible with the feature, conversion, or upgrade. Some of these transactions (called "Net-Priced" transactions) may include additional parts and associated replacement parts that are provided on an exchange basis. All removed parts become the property of IBM and must be returned to IBM.

Replacement parts assume the remaining warranty of the parts they replace.

If a Machine does not function as warranted during the warranty period. IBM or your reseller will repair or replace it without charge. If IBM or your reseller is unable to do so, you may return it to your place of purchase and your money will be refunded.

If you transfer a Machine to another user, warranty service is available to that user for the remainder of the warranty period. You should give your proof of purchase and this Statement to that user.

### Warranty Service

To obtain warranty service for the Machine, you should contact your reseller or call IBM. In the United States, call IBM at 1-800-IBM-SERV (426-7378). In Canada, call IBM at 1-800-465-6666. You may be required to present proof of purchase.

Depending on the Machine, the service may be 1) a "Repair" service at your location (called "On-site") or at one of IBM's or a reseller's service locations (called "Carry-in") or 2) an "Exchange" service, either On-site or Carry-in.

When type of service involved the exchange of a Machine or part, the item IBM or your reseller replaces becomes its property and the replacement becomes yours. The replacement may not be new, but will be in good working order.

If it is your responsibility to:

23FM00004 Rev.002 4/16/02                                                                 ARR3711
Z125-4593-03 4/93 (MK003)                          43

**EXHIBIT C**

1. obtain authorization from the owner (for example, your lessor) to have IBM to your reseller service a Machine that you do not own.

2. where applicable, before service is provided -

   a. follow the problem determination, problem analysis, and service request procedures that IBM or your reseller provide.

   b. secure all programs, data, and funds contained in a Machine.

   c. inform IBM or your reseller of changes in a Machine's location, and

   d. for a Machine with exchange service, remove all features, parts, options, alterations, and attachments not under warranty service. Also, the Machine must be free of any legal obligations or restrictions that prevent its exchange and

3. be responsible for loss of, or damage to, a Machine in transit when you are responsible for the transportation charges.

**Extent of Warranty**

IBM does not warrant uninterrupted or error-free operation of a Machine.

Misuse, accident, modification, unsuitable physical or operating environment, improper maintenance by you, or failure caused by a product for which IBM is not responsible may void the warranties.

THESE WARRANTIES REPLACE ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. HOWEVER, SOME LAWS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES. IF THESE LAWS APPLY, THEN ALL EXPRESS AND IMPLIED WARRANTIES ARE LIMITED IN DURATION TO THE WARRANTY PERIOD. NO WARRANTIES APPLY AFTER THAT PERIOD.

In Canada, warranties include both warranties and conditions.

Some jurisdictions do not allow limitations on how long an implied warranty lasts, so the above limitation may not apply to you.

**Limitation of Liability**

Circumstances may arise where, because of a default on IBM's part (including fundamental breach) or other liability (including negligence and misrepresentation), you are entitled to recover damages from IBM.. In each such instance, regardless of the basis on which you are entitled to claim damages, IBM is liable only for:

1. bodily injury (including death), and damage to real property and tangible personal property; and

2. the amount of any other actual loss or damage, up to the greater of $100,000 or the charge for the Machine that is the subject of the claim.

Under no circumstances is IBM liable for any of the following:

1. third-party claims against you for losses or damages (other than those under the first item listed above);

2. loss of, or damage to, your records or data; or

3. economic consequential damages (including lost profits or savings) or incidental damages, even if IBM is informed of their possibility.

Some jurisdictions do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

This warranty gives you specific legal rights and you may also have other rights which vary from jurisdiction to jurisdiction.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 70 of 164   Document 1-1

EXHIBIT C

**PASS-THROUGH PROVISIONS-- BMC SOFTWARE DISTRIBUTION, INC.**

For purposes of the software application suites supplied by BMC Software Distribution, Inc. ("BMC"), as well as any and all software existing from time to time as part of such suite and made available by BMC, and any available maintenance releases and upgrade versions thereto (referred to herein as "BMC Software"), the following provisions shall apply:

1. Except as otherwise specifically authorized by BMC, only a nontransferable and non-exclusive right is granted to Client to use the BMC Software on the designated configuration designated in an order form (the "Designated Configuration").

2. BMC or its suppliers retain all title to the BMC Software, and all copies thereof and no title to the BMC Software, or any intellectual property in the BMC Software, is transferred to Client.

3. Except as otherwise specifically authorized by BMC or applicable law, Client may not copy the BMC Software, except for one (1) copy for back-up or archival purposes and only as necessary to use the BMC Software on the Designated Configuration; provided that all such copies shall contain those copyright and other proprietary notices or legends of BMC or its suppliers as contained on the BMC Software delivered to Client.

4. Client agrees not to modify or to reverse assemble, decompile, or otherwise attempt to derive source code from the BMC Software. If any BMC Software includes BMC's Software Development Kit and/or the PATROL Script Language, then, as part of the license rights granted to Client herein to such BMC Software, Client may (a) create, develop and build Knowledge Modules for PATROL®, and (b) modify or enhance existing PATROL Knowledge Modules licensed under this Agreement. The foregoing license rights are limited to Client's own internal, production use of each licensed copy of BMC Software and/or registered product licensed under this Exhibit C related to the BMC Software, and shall not include, AND CLIENT IS EXPRESSLY PROHIBITED FROM, disclosing, providing access to, selling, licensing, sublicensing or otherwise distributing such licensed copy and/or registered product(s), *including* PATROL Knowledge Modules, however created, to any third party without the prior written consent of an authorized representative of BMC. As used in this paragraph, the term "PATROL Knowledge Modules" means a software program that enables the PATROL Agent to support other applications or system software programs.

5. Client agrees to comply with all export and re-export restrictions and regulations of the Department of Commerce or other United States agency or authority, and not to transfer, or authorize the transfer, of any BMC Software to a prohibited country or otherwise be in violation of any such restrictions or regulations.

6. The BMC Software is copyrighted. BMC Software, although copyrighted, is unpublished and contains proprietary and confidential information of BMC and is considered by BMC to be trade secrets, and the Client agrees to hold the BMC Software in confidence. Without limiting the foregoing, the Client agrees to protect the BMC Software at least to the same extent that Client protects its own similar confidential information and to take all reasonable precautions to safeguard the confidentiality of such BMC Software. Client further agrees not to use the BMC Software to develop competitive systems or derivative works, or for any other purpose except pursuant to this sublicense and for the operation of the Designated Configuration.

7. BMC is, and as applicable, its suppliers, are each a direct and intended beneficiary of this Exhibit C related to the BMC Software and may enforce it directly against Client.

8. NEITHER BMC NOR ITS SUPPLIERS SHALL BE LIABLE TO CLIENT FOR ANY GENERAL, SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR OTHER DAMAGES ARISING OUT OF THE SUBLICENSE AND/OR USE OF THE BMC SOFTWARE AND/OR REGISTERED PRODUCT(S).

9. Client's rights with respect to the BMC Software may be terminated, either immediately or after a notice period not exceeding sixty (60) days, upon violation of any of the terms or conditions of this Exhibit C relating to the BMC Software.

10. Upon termination of the rights to use the BMC Software as set forth in this Exhibit C, Client shall return all copies of the BMC Software to Cerner.

11. BMC MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE BMC SOFTWARE, EXPRESS OR IMPLIED, AND SPECIFICALLY EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NO OTHER PARTY HAS ANY AUTHORITY TO MAKE ANY OTHER REPRESENTATION ON BEHALF OF BMC. ANY WARRANTY CLAIMS WITH RESPECT TO THE BMC SOFTWARE MADE BY CLIENT SHALL BE ASSERTED AGAINST CERNER.

12. BMC'S LIABILITY TO CLIENT FOR ACTUAL DAMAGES WILL BE LIMITED TO THE MONEY PAID TO BMC FOR THE BMC SOFTWARE.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 71 of 164   Document 1-1

EXHIBIT C

## PASS-THROUGH PROVISIONS-- BMC SOFTWARE DISTRIBUTION, INC.

13. To the extent that any warranty or representation made by BMC to Cerner in the Master Business Agreement between BMC and Cerner dated September 23, 1998 is deemed to run in favor of the Client, such warranty shall extend in favor of such Client no later than the expiration of the term of Client's rights to use the BMC Software as set forth in this Exhibit C.

EXHIBIT C

PASS-THROUGH PROVISIONS–CITRIX SYSTEMS, INC.

METAFRAME SOFTWARE LICENSE AGREEMENT

This is a legal agreement (AGREEMENT) between you, the recipient of the enclosed sealed disk package, and Citrix Systems, Inc. (CITRIX). BY OPENING THE SEALED DISK PACKAGE, YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, PROMPTLY RETURN THE UNOPENED DISK PACKAGE AND THE ACCOMPANYING ITEMS (INCLUDING WRITTEN MATERIALS AND BINDERS OR OTHER CONTAINERS) TO THE PLACE WHERE YOU OBTAINED THEM FOR A FULL REFUND.

1.  **GRANT OF LICENSE.**  This CITRIX product contains software that provides services on a computer called a server ("Server Software"), and software that allows a computer to access or utilize the services provided by the Server Software ("Client Software"). CITRIX grants to you the following non-exclusive rights to the Client Software and the Server Software and accompanying documentation (collectively called the "SOFTWARE"):

    a)  **Installation and Transfer.**  You may install one copy of the Server Software on a single computer (the computer running the Server Software shall be referred to as the "Server"). The CD on which the Server Software resides may contain several copies of the Server Software, each of which is compatible with a different microprocessor architecture (such as the x86 architecture or various RISC architectures). You may install the Server Software for use with only one of those architectures at any given time. You may transfer the Server Software to another computer, provided that it is removed from the computer from which it is transferred. The Client Software diskettes with the "Unlimited Copies Allowed Under User License Agreement" legend may be installed on an unlimited number of computers, provided that these computers are used to access the Server. All other Client Software diskettes can be installed and used on a single computer only. However, the number of concurrent logins will be limited pursuant to Section l.b.

    b)  **Use of the Server Software.**  You may use one copy of the Server Software at any time on one Server, which may be connected at any point in time to an unlimited number of computers operating remotely or on one or more networks. The Server Software supports usage by more than one user at a time. However, it may only be used to support the number of user logins you are entitled to based on your purchase of CITRIX licenses for the basic system and any additional CITRIX User License Packs which increase the number of allowable logins. Any attempt to defeat or circumvent these software-enforced login limitations is a breach of this AGREEMENT. You may make one (1) copy of the SOFTWARE in machine readable form solely for back-up purposes, provided that you reproduce all proprietary notices on the copy.

    c)  **Use of the Client Software.**  You may use the Client Software to access the Server.

    d)  **Microsoft Windows NT Server, Terminal Server Edition License.**  You will need to acquire a separate Microsoft Windows NT Server, Terminal Server Edition license. Licensing information is available from Microsoft Corporation.

    e)  **Other.**  Notice to Users — You shall inform all users of the SOFTWARE of the terms and conditions of this AGREEMENT. Not For Resale Software — If this SOFTWARE is labeled "Not For Resale" or "NFR," your license only permits use for demonstration, test, or evaluation purposes.

2.  **SUBSCRIPTION RIGHTS.**  If the licensed user has purchased a subscription to obtain "Updates" (as defined below) for the SOFTWARE (the "Subscription"), the following terms and conditions shall also apply.  If the licensed user has paid the appropriate subscription fee and registered its Subscription with CITRIX, the licensed user's Subscription shall begin on the effective date of this AGREEMENT and shall continue for a term of one or two years, whichever is applicable, thereafter unless terminated sooner (the "Subscription Term"). During the Subscription Term, CITRIX may, from time to time, generally make Updates available for licensing to the public. For the purposes of this AGREEMENT, an Update shall mean a generally available release of the SOFTWARE which is designated by CITRIX in its sole discretion as an increase in any digit of the SOFTWARE version number from that version number of the SOFTWARE originally licensed by the licensed user pursuant to this AGREEMENT. Upon general availability of such Update during the Subscription Term, CITRIX shall provide the licensed user with one (1) copy of such UPDATE for each copy of the SOFTWARE originally licensed by the licensed user pursuant to this AGREEMENT, without additional charge.  Any such Updates so delivered to the licensed user shall be considered SOFTWARE under the terms of this AGREEMENT.

47

EXHIBIT C

**PASS-THROUGH PROVISIONS--CITRIX SYSTEMS, INC.**

**METAFRAME SOFTWARE LICENSE AGREEMENT**

The licensed user acknowledges that CITRIX may develop and market new or different computer programs which use portions of the SOFTWARE and which perform all or part of the functions performed by the SOFTWARE. Nothing contained in this AGREEMENT shall give the licensed user any rights with respect to such new or different computer programs. The licensed user also acknowledges that CITRIX is not obligated under this AGREEMENT to generally make any Updates available to the public. All deliveries of Updates shall be F.O.B. Fort Lauderdale, Florida. CITRIX shall have no responsibility under this AGREEMENT for the installation of any Updates.

3. **DESCRIPTION OF OTHER RIGHTS AND LIMITATIONS. For all SOFTWARE** — You may not rent or lease the SOFTWARE, but you may transfer the SOFTWARE and accompanying written materials on a permanent basis, provided you retain no copies and the recipient agrees to the terms of this AGREEMENT. You may not modify, translate, reverse engineer, decompile, or disassemble, create derivative works based on, or copy (except for the backup copy of the SOFTWARE) the SOFTWARE, except to the extent such foregoing restriction is expressly prohibited by applicable law. You may not remove any proprietary notices, labels, or marks on the SOFTWARE and accompanying documentation.

YOU MAY NOT USE, COPY, MODIFY, OR TRANSFER THE SOFTWARE OR ANY COPY IN WHOLE OR IN PART, OR GRANT ANY RIGHTS IN THE SOFTWARE OR ACCOMPANYING DOCUMENTATION, EXCEPT AS EXPRESSLY PROVIDED IN THIS LICENSE. ALL RIGHTS NOT EXPRESSLY GRANTED ARE RESERVED BY CITRIX OR ITS SUPPLIERS.

**Limited Warranty and Disclaimer.** CITRIX warrants that, for a period of ninety (90) days from the date of delivery of the SOFTWARE to you as evidenced by a copy of your shipping receipt, the media on which the SOFTWARE is furnished under normal use will be free from defects in materials and workmanship and that the CITRIX product will perform substantially in accordance with the CITRIX product documentation published by CITRIX and included with the enclosed sealed media package. CITRIX and its suppliers' entire liability and your exclusive remedy under this warranty (which is subject to you returning the SOFTWARE to CITRIX or an authorized reseller with a copy of your receipt) will be, at CITRIX' option, to replace the media or to refund the purchase price and terminate this AGREEMENT.

EXCEPT FOR THE ABOVE EXPRESS LIMITED WARRANTIES, CITRIX AND ITS SUPPLIERS MAKE AND YOU RECEIVE NO WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, AND CITRIX AND ITS SUPPLIERS SPECIFICALLY DISCLAIM ANY CONDITIONS OF QUALITY AND ANY IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, NONINFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE. YOU ASSUME THE RESPONSIBILITY FOR THE SELECTION OF THE PRODUCTS AND HARDWARE TO ACHIEVE YOUR INTENDED RESULTS, AND FOR THE INSTALLATION OF, USE OF, AND RESULTS OBTAINED FROM THE PRODUCTS. CITRIX does not warrant that the SOFTWARE will be uninterrupted or error free.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES SO THE ABOVE EXCLUSIONS MAY NOT APPLY TO YOU. THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS. YOU MAY ALSO HAVE OTHER RIGHTS, WHICH VARY FROM JURISDICTION TO JURISDICTION.

**Proprietary Rights.** This license is not a sale. Title and copyrights to the SOFTWARE, accompanying documentation and any copies made by you remain with CITRIX or its suppliers.

**Limitation of Liability.** IN NO EVENT WILL CITRIX OR ITS SUPPLIERS BE LIABLE FOR ANY LOSS OF DATA, LOSS OF INCOME, LOSS OF OPPORTUNITY OR PROFITS, COST OF RECOVERY OR ANY OTHER SPECIAL, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE USE OF THE SOFTWARE, REFERENCE MATERIALS OR ACCOMPANYING DOCUMENTATION, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY. THIS LIMITATION WILL APPLY EVEN IF CITRIX, ITS SUPPLIERS OR AUTHORIZED DISTRIBUTORS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. IN NO EVENT SHALL THE LIABILITY OF CITRIX EXCEED THE AMOUNT PAID FOR THE LICENSED SOFTWARE AT ISSUE. YOU ACKNOWLEDGE THAT THE LICENSE FEE REFLECTS THIS ALLOCATION OF RISK. SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

**Export Restriction.** You agree that you will not export or re-export the SOFTWARE in any form without the appropriate United States and foreign government licenses. Your failure to comply with this provision is a material breach of this AGREEMENT.

48

EXHIBIT C

## PASS-THROUGH PROVISIONS--CITRIX SYSTEMS, INC.

### METAFRAME SOFTWARE LICENSE AGREEMENT

**Termination.** This AGREEMENT is effective until terminated. You may terminate this AGREEMENT at any time by removing from your computer and destroying all copies of the SOFTWARE. Unauthorized copying of the SOFTWARE or the accompanying documentation or otherwise failing to comply with the terms and conditions of this AGREEMENT will result in automatic termination of this license and will make available to CITRIX other legal remedies. Upon termination of this AGREEMENT, the license granted herein will terminate and you must immediately destroy the SOFTWARE and accompanying documentation, and all back-up copies thereof.

**Government End-Users.** The Software and accompanying documentation, and any updates thereto, are "commercial items," developed exclusively at private expense, consisting of "commercial computer software" and "commercial computer software documentation" as such terms are defined in the applicable acquisition regulations. If the Software and the documentation are licensed hereunder for use by a federal, state or local government of the United States or a political subdivision thereof, such Software and documentation are licensed (i) only as a commercial item, and (ii) with only those rights as are granted to all other end users pursuant to the terms and conditions of this Agreement. The following additional statement applies only to procurements governed by DFARS Subpart 227.4 (1988): "Restricted Rights--Use, duplication and disclosure by the Government is subject to restrictions set forth in subparagraph (c)(1)(ii) of the Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 (1988)."

This AGREEMENT will be governed by the laws of the State of Florida, without reference to conflict of laws principles. In any dispute arising out of this AGREEMENT, you and CITRIX each consent to the exclusive personal jurisdiction and venue in the State and Federal courts within Broward County, Florida.

Should you have any questions concerning this AGREEMENT, or if you desire to contact Citrix Systems, Inc. for any reason, please write: Citrix Systems, Inc., Customer Service, 6400 NW 6th Way, Fort Lauderdale, FL 33309.

49

EXHIBIT C

## PASS-THROUGH PROVISIONS –
## INNOVATIVE MANAGED CARE SOFTWARE, INC.

For the software applications provided by Innovative Managed Care Systems, Inc. ("IMaCS"), and any available maintenance releases and upgrade versions ("IMaCS Software"), the following shall apply:

1.  IMaCS grants to the Client a nontransferable and non-exclusive object code license and right to use IMaCS software as part of a Cerner solution. Client will neither copy nor distribute IMaCS Software except for one copy for back-up.

2.  Client agrees that the IMaCS Software will be provided the same protections as those provided to Cerner software in the Cerner Business Agreement including but not limited to copyright provisions.

3.  Client agrees to protect the IMaCS Software at least to the extent that the Client protects its own confidential information and to take reasonable precautions to safeguard the confidentiality of that software.

4.  Client agrees not to use IMaCS Software to develop competitive systems or derivative works.

5.  Client's rights with respect to the IMaCS Software may be terminated, either immediately or after a notice period not exceeding sixty (60) days, upon violation of any of the terms or conditions of this Exhibit C relating to the IMaCS Software.

6.  Client will discontinue use of the IMaCS Software and return all the copies of IMaCS Software to Cerner upon termination of the rights to use the IMaCS Software as set forth in this Exhibit.

7.  IMaCS MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE IMaCS SOFTWARE, EXPRESS OR IMPLIED, AND SPECIFICALLY EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICLULAR PURPOSE. NO OTHER PARTY HAS ANY AUTHORITY TO MAKE ANY OTHER REPRESENTATION ON BEHALF OF IMaCS.

8.  NEITHER IMaCS NOR ITS SUPPLIERS WILL BE LIABLE FOR ANY GENERAL, SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR OTHER DAMAGES ARISING OUT OF THE SUBLICENSE AND/OR USE OF THE IMaCS SOFTWARE.

9.  IMaCS' LIABILITY TO CLIENT FOR ACTUAL DAMAGES WILL BE LIMITED TO THE MONEY PAID IMACS FOR THE IMaCS SOFTWARE.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 76 of 164   Document 1-1

EXHIBIT C

## PASS-THROUGH PROVISIONS---OPTICAL TECHNOLOGY GROUP, INC.

For purposes of the products (the "OTG Product") supplied by Optical Technology Group, Inc. ("OTG"), the following provisions shall apply:

1. **License Grant.** In consideration of payment of the license fee you paid for this OTG Product, OTG and OTG's partners, as LICENSOR, grants to you, the LICENSEE, a non-exclusive right to use and display this copy of the OTG Product and permits you to use the OTG Product on as many computers as you have authorized licenses. OTG software is "in use" on a computer when it is loaded into the temporary memory (i.e., RAM) or installed into the permanent memory (e.g., hard disk, CD-ROM, or other storage device) of that computer. OTG reserves all rights not expressly granted to the LICENSEE.

2. **Ownership.** As the LICENSEE, you own the magnetic or other physical media on which the OTG Product is recorded or fixed, but OTG retains title to and ownership in the software program of the OTG Product. This license is not a sale of the original software program of the OTG Product or any portion or copy of it.

3. **Copy Restrictions.** The OTG Product and the accompanying materials are protected by copyrights and contain proprietary information and trade secrets of OTG. Unauthorized copying of the OTG Product even if modified, merged or included with other software, or of the written materials, is expressly forbidden. You may make one (1) copy of the OTG Product solely for backup purposes provided the copyright notice is reproduced in its entirety on the backup copy.

4. **Permitted Users.** This OTG Product, user guide, and documentation is licensed to you, the LICENSEE, and may not be transferred to any third party for any length of time without the written consent of OTG. You may not modify, adapt, translate, reverse engineer, decompile, disassemble, or create derivative works based on the OTG Product. Written materials provided to you may not be modified, adapted translated, or used to create derivative works without the written prior consent of OTG.

5. **Termination.** This Agreement is effective until terminated. This Agreement will terminate automatically without notice from OTG if you fail to comply with any provision contained herein. Upon termination, you shall destroy the written materials, the OTG Product and all copies of them in part and in whole, including any modified copies.

6. **Disclaimer and Limited Warranty.** OTG warrants the disk on which the OTG Product is furnished to be free from defects in materials and workmanship for a period of thirty (30) days from the date of activation of the OTG Product. OTG's entire liability and your exclusive remedy as to a disk shall be, at OTG's option, either the return of the license fee or replacement of the disk that does not meet OTG's limited warranty and which is returned to OTG with a copy of the receipt. If failure of any disk has resulted from accident, abuse, or misapplication, OTG shall have no responsibility to replace the disk or refund the license fee. Any replacement disk will be warranted for another thirty (30) days. This warranty gives you specific legal rights. You may have other rights, which vary from state to state.

EXCEPT AS EXPRESSLY PROVIDED ABOVE, THE OTG PRODUCT, USER GUIDE AND DOCUMENTATION ARE PROVIDED "AS IS." OTG DOES NOT MAKE ANY AND HEREBY DISCLAIMS ALL WARRANTIES OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

The entire risk as to the quality and performance of the OTG Product, user guide and other documentation is with you. OTG does not warrant that the functions contained in the OTG Product will meet your requirements or that the operation of the product will be uninterrupted or error free.

OTG SHALL NOT BE LIABLE FOR ANY DEFECT, INDIRECT, CONSEQUENTIAL OR INCIDENTAL DAMAGES (INCLUDING DAMAGES FROM LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, AND THE LIKE) ARISING OUT OF THE USE OF OR INABILITY TO USE THE OTG PRODUCT EVEN IF OTG HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

7. **U.S. Government Restricted Rights.** The software product referred to as the OTG Product and its related documentation are provided with RESTRICTED RIGHTS. Use, duplication or disclosure by the Government is subject to restrictions as set forth in FAR 52,227-19(c)(2) (May 1987) when applicable or the applicable provisions of the DOD FAR supplement 252,227-7013 subdivision (a) (15) (April, 1988) or subdivision (a) (17) (April, 1988). Contractor/manufacturer is OTG Inc., 6701 Democracy Blvd., Suite 805, Bethesda, MD20817.

8. **Export.** Regardless of any disclosure made by LICENSEE to OTG of an ultimate destination of the OTG Product, LICENSEE shall not export or re-export, whether directly or indirectly, the OTG Product to anyone outside the United States of America without first obtaining a license from the United States Department of Commerce or any other agency or department of the United States Government as required.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 77 of 164   Document 1-1

EXHIBIT C

## PASS THROUGH PROVISION - FMSU

For purposes of this Exhibit C, the following provisions apply with respect to the Products provided to Client ("End User") by Fujifilm Medical Systems U.S.A., Inc. ("FMSU"):

### CERTAIN DEFINITIONS.

Product shall mean the Fuji-brand products, parts, and accessories set forth on Attachment II.

### DISCLAIMER OF WARRANTIES.

THE FOLLOWING ARE IN LIEU OF ALL CONDITIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED CONDITION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND OF ANY OTHER WARRANTY OBLIGATIONS ON THE PART OF FMSU.

### WARANTIES.

FMSU shall provide the following warranty for the Product delivered to End-User:

1. For the period beginning twelve (12) months beginning at the time of installation or thirty (30) days after invoice, whichever occurs first, FMSU shall warrant the Product (subject to any exclusions or limitations provided in Schedule C) against faulty workmanship or defective materials.

2. FMSU warrants that at the time of delivery, FMSU has title to the Product free and clear of any and all liens and encumbrances.

3. If such Product fails to conform to the specification, FMSU's sole and exclusive maximum liability shall be (at FMSU's sole discretion) to either repair the Product, replace the Product, or refund the purchase price for the faulty Product returned by End-User to FMSU during the applicable warranty period, provided that:

   (i) FMSU is promptly notified in writing upon discovery by End-User that such Product failed to conform to the specification with an explanation of any alleged nonconformance;

   (ii) the Return Material Authorization (RA) process is followed;

   (iii) Product being returned within the 90-day inspection period may be returned at FMSU's expense to the address specified by FMSU during the RA process and as instructed by FMSU;

   (iv) Product being returned beyond the 90-day inspection period but still under warranty shall be returned prepaid to the address specified by FMSU; and

   (v) FMSU's examination of the Product confirms nonconformance and that the nonconformance was not caused by accident, misuse, neglect, alteration, improper installation or testing.

FMSU shall have a goal to repair or replace with new or like-new Product, at FMSU's sole discretion, within thirty (30) calendar days after receipt of the returned Product. Products returned as Out-of Box (OOB) failures and validated by FMSU will be replaced with the next available new Product. FMSU will use commercially reasonable efforts to expedite replacement of OOB failures so as to minimize end-user downtime. Product repaired or replaced as OOB failures or under warranty shall be returned to End-User at FMSU's expense using FMSU's preferred transportation carrier. Continued use or possession of the Product after expiration of the applicable warranty period shall be conclusive evidence that the warranty is fulfilled to the full satisfaction of BUYER.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 78 of 164   Document 1-1

EXHIBIT C

## ORACLE PASS THROUGH PROVISIONS

For purposes of this Exhibit C, Program shall mean the Oracle software and databases, and Application Program shall mean the Cerner Licensed Software.

Upon license of Programs from Cerner, Client has been granted a sublicense to use the Program. A sublicense is a sublicense which Client can use the Program solely for the purpose of operating the Application Program. Client shall comply with the requirements of the sublicense by restricting use of the Program to object code form of the Programs for the sole purpose of operating or supporting its use of the Application Program.

If Client uses the Program for any purpose other than for operating the Application Program, then Client shall not be deemed to be operating the Program pursuant to a sublicense. Client's use of the Programs shall be restricted to use of the Program to object code form in accordance with the scope defined in the applicable Cerner part number containing the Program for the sublicensee's own internal data processing only. Client shall negotiate the necessary limitation prior to making any use of the Program, which is outside the sublicense terms.

The Client ("Sublicensee") agrees to do the following with respect to Oracle Corporation products acquired from Cerner.

a.   restrict use of the Program to the object code form for the Sublicensee's own internal data processing only in accordance with the scope defined in the applicable Cerner part number containing the Program;

b.   prohibit a transfer or duplication of the Programs except for temporary transfer in the event of cpu malfunction and a single backup or archival copy;

c.   prohibit assignment, timesharing or rental of the Programs;

d.   prohibit use of the Programs for any purpose outside of the scope (as defined in the applicable Cerner part number containing the Program) of the Application Program;

e.   prohibit causing or permitting the reverse engineering, disassembly or decompilation of the Programs;

f.   prohibit title from passing to the Sublicensee;

g.   disclaim Oracle's liability for any damages, whether direct, indirect, incidental or consequential arising from the user of the Programs

h.   require the Sublicensee, at the termination of the Sublicense, to discontinue use and destroy or return to Cerner the Programs, Documentation and all archival or other copies of the Program;

i.   restrict publication of any results of benchmark tests run on the Programs;

j.   comply with any and all relevant export laws and regulations of the United States to assure that neither the Programs nor any direct product thereof, are exported, directly or indirectly, in violation of United States law; and

k.   specify Oracle as a third party beneficiary of the Sublicense agreement with respect to the provisions of this Exhibit C.

Intellectual Property Indemnification

If someone makes a claim against Sublicensee that the Program(s) infringe their intellectual property rights, Oracle will indemnify Sublicensee. To obtain this protection, Sublicensee must:

    •notify Oracle promptly in writing, no later than 30 days after Sublicensee receives notice of the claim, or sooner if required by applicable law;
    •give Oracle sole control of the defense and any settlement negotiations; and
    •give Oracle the notification, authority and assistance Oracle requests to defend against or settle the claim.

If Oracle believes that any of its programs may have violated someone else's intellectual property rights, Oracle may choose to either modify the programs or obtain a license to allow for continued use, or if these alternatives are not commercially reasonable, Oracle may end the license for the applicable program and refund any license fees you have paid for it. Oracle will not indemnify Sublicensee if Sublicensee uses a superseded release of a Program and the infringement claim could have been avoided by using the current release of the Program, and Oracle will not indemnify Sublicensee if the infringement claim would

53

EXHIBIT C

## ORACLE PASS THROUGH PROVISIONS

not have arisen but for the alteration, combination, or use of the Programs with software or hardware not furnished under this Agreement. This section provides Sublicensee's exclusive remedy for any infringement claims or damages.

54

## AGFA CORPORATION SOFTWARE LICENSE
## TERMS AND CONDITIONS

### CERTAIN DEFINITIONS.

All references to "Software" throughout these Terms and Conditions (hereinafter this "Agreement") shall mean the computer software in digitally encoded machine readable "object code" form for which Client has been granted a sublicense pursuant to this Agreement. The term "Documentation" shall mean the user guides or manuals for use of the Software generally provided to Client of the Software and the documentation, if any, expressly listed elsewhere in this Agreement as being delivered to Client from Cerner under this Agreement.

### SOFTWARE LICENSE.

Subject to the terms and conditions of this Agreement, Client is granted a non-exclusive, fully paid sublicense of the Software for use in Client's internal business. Client is prohibited from the following: (i) disclosure of the Software and the Documentation to any third party without prior written consent of AGFA or Cerner; (ii) duplication or copying of the Software or the Documentation except for a single backup or archival copy; and (iii) reverse engineering, disassembly, or decompilation of the Software. AGFA disclaims to the extent permitted by applicable law, liability for damages, whether direct, indirect, incidental or consequential, arising from the use of the Software. Client is required at the termination or expiration of the Sublicense to discontinue use and destroy or return to Cerner the Software and all copies of the Software and the Documentation. Client is prohibited from publishing any benchmark tests run on the Software. Client is required to comply fully with all relevant export laws and regulations of the United States to ensure that any Equipment, Software or United States source technical data acquired from Cerner is not exported or reexported, directly or indirectly, in violation of United States law. AGFA shall be a third party beneficiary of this Agreement. Subject to the terms and conditions of this Agreement, Client may use the Software at the Locations for the benefit of, or by, physicians and radiologists who are not employees of the Client and for the benefit of health care clinics, physician groups and other similar entities to be used by such individuals and entities; provided that in all such cases the use is only to the extent necessary to ensure that such individuals and entities may properly perform their professional medical responsibilities to patients. Client shall not otherwise use the Software for third-party training, commercial time sharing, rental, service bureau use or any similar use. Agfa retains all rights, title, and interest in and to the Software.

### CONFIDENTIALITY; NONDISCLOSURE.

Client acknowledges the proprietary rights of Agfa in and to the Software, the Documentation, and the related computer programs, manuals, identifying symbols and other supporting material. Client acknowledges and agrees that the use of the Software is furnished to Client on a confidential and secret basis for the sole and exclusive use of Client. Except as specifically agreed to in this Agreement, Client will not use, publish, disclose or otherwise divulge, or will not cause to be used, published, disclosed or otherwise divulged, to any person, except as necessary to officers and employees of Client, at any time, either during or after the termination of this Agreement, or permit its officers or employees to so divulge any such information regarding the Software, without the prior written consent of an officer of Agfa. Client agrees that all CD-ROMs, diskettes, tapes and written material provided to Client and containing or relating to the Software and the Documentation are the sole and exclusive property of Agfa and, upon termination of this Agreement for any reason, Client shall cease using the Software and the Documentation and shall forthwith return to Cerner all copies of the Software and all of the Documentation, the user manuals, CD-ROMs, diskettes, tapes, instructions and all related materials furnished to Client hereunder and shall not retain any copies for its use or for any purpose. Nothing herein shall be deemed to limit any rights of Agfa under copyright, patent or other law. Client shall not cause, suffer or permit the modification, alteration, disassembly, reverse engineering or decompilation of the Software or any portion thereof.

### LIMITATION OF LIABILITY.

IN NO EVENT WILL AGFA BE LIABLE FOR (1) LOST PROFITS, LOST DATA OR LOST USE, OR ANY OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR ANY INDIRECT, SPECIAL, OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ACTION, WHETHER CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR OTHERWISE, EVEN IF AGFA OR ANY THIRD PARTY LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; (2) DAMAGE CAUSED BY CLIENT'S FAILURE TO PERFORM ITS RESPONSIBILITIES; OR (3) REPAIRS, SERVICING OR ALTERATIONS DONE WITHOUT THE WRITTEN APPROVAL OF AGFA OR CERNER; (4) USE OF THE EQUIPMENT, SOFTWARE OR DOCUMENTATION IN A MANNER WHICH IS NOT AUTHORIZED BY THIS AGREEMENT.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 81 of 164   Document 1-1

## DISCLAIMER OF WARRANTIES.

THE WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## CLIENT SOFTWARE MODIFICATIONS.

If Client modifies or causes modification to be made to the Software without the prior written consent of Agfa, Client shall indemnify and hold Agfa harmless against damages, costs and expenses (including, without limitation, reasonable attorney's fees and costs of suit) resulting from the defense and settlement of any claim by a third party arising from Client's use of the Software, including without limitation, any claim that Client's use of the Software as modified violates or infringes any patent, copyright or any other intellectual property rights of such claiming party.

## THIRD PARTY LICENSORS.

The sublicense granted under this Agreement, with respect to certain software programs within the Software, may be granted under authority granted to Agfa and/or Cemer by Oracle Corporation or one or more other third party licensors. Client agrees that Oracle Corporation and each such third party licensor is, to the fullest extent permitted by law, a third party beneficiary of this Agreement, including without limitation, the provisions concerning confidentiality, warranty disclaimers and limitations of liability.

## U.S. GOVERNMENT USERS.

Use, duplication or disclosure by the government is subject to restrictions as set forth in the Rights in Technical Data clause at DFARS 252.227-7013, as appropriate. Further use, duplication or disclosure is subject to restrictions applicable to restricted rights software as set forth in FAR 52.227-19 (c)(1) and (c)(2), as applicable.

## INFRINGEMENT INDEMNIFICATION.

Agfa shall defend and indemnify and hold Client harmless against any action brought against Client to the extent that it is based on a claim that the Software, when properly used within the scope of this Agreement, infringes a United States patent or copyright, provided Client notifies Agfa promptly in writing of the action and gives Agfa the sole control of the defense, all negotiations and any settlement. If the Software becomes, or is likely to become, the subject of an infringement claim, Agfa may, at its option, secure Agfa's right to continue using the Software or replace or modify it to make it noninfringing with substantially similar functions and levels of performance or provide a substitute product. If none of these alternatives are reasonably available, Agfa may discontinue the Software and provide Client a depreciated credit or refund for such Software. Any such credit or refund shall be in accordance with the then effective schedule of Agfa or, if no such schedule is available, then in accordance with a five-year, straight line depreciation schedule. Agfa has no liability for any infringement claim: (i) based on the use of the Software with software, data, or equipment not supplied by Agfa, or (ii) concerning the Software based on use of other than a then current unaltered release of the Software, or (iii) based on use of the Software in a manner not authorized by Agfa. THIS PARAGRAPH STATES THE ENTIRE RESPONSIBILITY OF AGFA CONCERNING PATENT, COPYRIGHT OR OTHER PROPRIETARY RIGHT INFRINGEMENT.

## EQUIPMENT AND SOFTWARE UPGRADES.

Agfa assumes no responsibility for any Equipment or Software failure due to Client's modification, upgrade, or replacement of components, equipment, or software, including but not limited to the Equipment or the Software. Client may contract for equipment or software upgrades from Agfa, but Agfa makes no guarantees or warranties concerning future compatibility of that additional equipment or software with the equipment, the Software, or configurations that are not contained within this Agreement.

## EXPORT.

Client shall not, directly or indirectly, export or reexport outside the United States any Equipment, Software or United States source technical data acquired from Agfa or any direct product of any of that data.

56

**SOFTWARE CHANGES.**

Improvements, modifications, alterations and enhancements ("Changes") to any of the Software, including but not limited to those made by Client with authorization of Agfa, those made by Agfa at the request of Client, or those made by Agfa on behalf of Client, shall be the sole and exclusive property of Agfa. Notwithstanding the foregoing, Client remains solely responsible for any liability associated with Software modifications that were made without Agfa's prior written authorization.

57

EXHIBIT C

## CEDARA HARDSTORE AND/OR SOFTSTORE PASS THROUGH PROVISIONS

1. Each sublicense of the Cedara HardStore and/or SoftStore software will be valid only for a single workstation identified by a serial number. The sublicensed may be transferred to another identified workstation upon prior written consent of Cedara;

2. End user may use the Cedara HardStore and/or SoftStore software only for its own internal business purposes in connection with the identified workstation;

3. End user will take all reasonable precautions to keep the Cedara HardStore and/or SoftStore software and any related information and documentation confidential;

4. End user, to the extent permitted by law, may not reproduce (except for backup copies), reverse engineer, translate or create other versions of the Cedara HardStore and/or SoftStore software;

5. End user acknowledges that ownership of the copyright and all other intellectual property rights in the Cedara HardStore and/or SoftStore software remain exclusively with Cedara; and

6. TO THE MAXIMUM EXTENT PERMITTED BY LAW, CEDARA'S LIABILITY TO END USER FOR ANY AND ALL DIRECT, COMPENSATORY DAMAGES, UNDER ANY THEORY OF LAW OR EQUITY, WHETHER FOR BREACH OF CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR IN ANY WAY RELATED TO THE CEDARA HARDSTORE AND/OR SOFTSTORE SOFTWARE SHALL BE LIMITED TO THE AMOUNT PAID BY END USER FOR THE CEDARA HARDSTORE AND/OR SOFTSTORE SOFTWARE.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 84 of 164   Document 1-1

# IBM Customer Agreement - Maintenance



Thank you for doing business with us We are committed to providing you with the highest quality Services. If, at any time, you have any questions or are not completely satisfied, please let us know. Our goal is to do our best for you.

We have signed agreements with IBM authorized resellers to promote and market some of our Services. We have chosen these resellers because of their skills and experience in a particular field When you order our Services (marketed to you by these resellers) under this Agreement, we confirm that we are responsible for providing them to you under the terms of this Agreement. We are not responsible for 1) the actions of these resellers, 2) any additional obligations they may have to you, or 3) any products or services that they (and not us) may supply to you.

This IBM Customer Agreement - Maintenance (called the "Agreement") covers the major business transactions we may do with you regarding our provision of Services for your Machines. The following Attachment, which you select (by marking the appropriate space below), contains additional terms. If selected, a copy of the Attachment is included with this page. Please make sure you have it and notify us if it is missing.

**Other Services**

_ Service of Non-IBM Machines (z125-4sso-oo)

This Agreement and its applicable Attachments and Transaction Documents are the complete agreement regarding these transactions and replace any prior oral or written communications between us.

By signing below for our respective Enterprises, each of us agrees to the terms of this Agreement and the included Attachments. Once signed, 1) any reproduction of this Agreement, an Attachment, or Transaction Document made by reliable means (for example, photocopy or facsimile) is considered an original and 2) all Services you order under this Agreement are subject to it.

*Agreed to:* (Enterprise name)

*Agreed to:*
International Business Machines Corporation

By_____
   Authorized signature

By_____
   Authorized signature

Name (type or print):

Name (type or print):

Date:

Date:

Enterprise number:

Agreement number:

Enterprise address:

IBM Office address:

---

**IBM Authorized Reseller Use**

*The reseller must ensure that 1) the above customer information, AM office address, and the following information are filled in and 2) the IBM office shown above receives a copy of this Agreement, signed by the customer.*

**IBM authorized reseller name:**                                    **IBM authorized reseller address:**

---

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 85 of 164   Document 1-1

# IBM Customer Agreement - Maintenance

## 1. Definitions

Enterprise is any legal entity (such as a corporation) and the subsidiaries it owns by more than 50 percent. The term "Enterprise" applies only to the portion of the enterprise located in the United States or Puerto Rico.

Machine is a machine, its features, conversions, upgrades, elements, or accessories, or any combination of them, specified in a Transaction Document.

Service is performance of a task or project, provision of advice and counsel, assistance, or use of a resource (such as access to an information data base) we make available to you.

## 2. Agreement Structure

**Attachments**

Some Services have terms in addition to those we specify in this Agreement. For example, to maintain your non-IBM Machines, we provide Service of non-IBM Machines. We provide the additional terms in documents called "Attachments," which are also part of this Agreement.

**Transaction Documents**

For each order you place, we will provide to you the appropriate "Transaction Documents" that confirm the details of your order. The following are examples of Transaction Documents, with examples of the information they may contain:

1. supplements (Machine type, charges, rates and start date);

2. exhibits (eligible Machines by category, discount schedules, and available contract periods); and

3. invoices (item, quantity, charge, and amount payable).

**Conflicting Terms**

If there is a conflict among the terms in the various documents, those of an Attachment prevail over those of this Agreement. The terms of a Transaction Document prevail over those of both of these documents.

**Our Acceptance of Your Order**

A Service becomes subject to this Agreement when we accept your order. We accept your order by sending you a Transaction Document or providing the Service.

**Your Acceptance of Additional Terms in a Transaction Document**

You accept the additional terms in a Transaction Document by doing any of the following:

1. signing it;

2. using the Service or allowing others to do so; or

3. making any payment for the Service.

## 3. Delivery

We will use our best efforts to meet your delivery requirements for Services you order and will inform you of their status.

## 4. Electronic Communications

Each of us may communicate with the other by electronic means. Each of us agrees to the following for all electronic communications:

1. an identification code (called a "USERID") contained in an electronic document is legally sufficient to verify the sender's identity and the document's authenticity;

2. an electronic document that contains a USERID is a signed writing; and

3. an electronic document, or any computer printout of it, is an original when maintained in the normal course of business.

## 5. Prices and Price Changes

We may require the amount payable for a Service to be paid on a one-time basis, a recurring basis, or a combination of both. We will specify the amount and basis for the particular Service.

**Price Increases**

We may increase recurring charges by giving you three months' written notice. An increase applies on the first day of the applicable invoice period on or after the effective date we specify in the notice.

We may increase one-time charges and hourly rates without notice. However, an increase to one-time charges does not apply to you if we receive your order before the announcement date of the increase.

**Price Decreases**

You receive the benefit of a decrease in charges for amounts which become due on or after the effective date of the decrease.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 86 of 164   Document 1-1

## 6. Invoicing, Payment, and Taxes

We invoice some charges in advance for the applicable invoice period.

Amounts due are payable as we specify in the invoice. You agree to pay accordingly. You also agree to pay amounts equal to any applicable taxes resulting from any transaction under this Agreement. This does not include taxes based on our net income.

## 7. Additional Charges

Depending on the particular Service or circumstances, additional charges may apply. We charge extra if, for example, 1) we are required to use other than private automobile or scheduled public transportation to provide Maintenance Services to you or 2) we respond to your request for service of a Machine outside its standard service period. We will notify you in advance if these charges apply.

## 8. Types of Service for Machines

We provide certain types of service for a Machine to keep it in, or restore it to, good working order. The following terms apply to Maintenance Services and other applicable Services

Depending on the Machine, the service may be 1) a "Repair" service at your location (called "On-site") or at one of our service locations (called "Carry-in") or 2) an "Exchange" service, either On-site or Carry-in. We will inform you of the available types of service for a Machine. You may select the type of service from those available for the Machine. We require that a Machine and its features have the same type of service.

Under Maintenance Services, we offer On-site types of service 24 hours a day, seven days a week. For certain Machines, however, this service period may vary. Carry-in types of service are available during the normal business hours of our service locations.

Under Carry-in service, you may deliver the failing Machine, or ship it (prepaid, unless we specify otherwise, and suitably packaged), to a location we designate. After we have repaired or exchanged the Machine, we will return it to you at our expense.

Under On-site Exchange service, depending on the nature of the failure, we may repair the failing Machine at your site instead of exchanging it.

When a type of service involves the exchange of a Machine or part, the item we replace becomes our property and the replacement becomes yours. The replacement may not be new, but will be in good working order and at least functionally equivalent to the item replaced.

We are responsible for loss of, or damage to, your Machine while it is 1 ) in our possession or 2) in transit in those

cases where we are responsible for the transportation charges.

You agree to:

1. obtain authorization from the owner to have us service a Machine that you do not own;

2. where applicable, before we provide service—

a. follow the problem determination, problem analysis, and service-request procedures that we provide,

b. secure all programs, data, and funds contained in a Machine,

c. inform us of changes in a Machine's location, and

d. for a Machine with Exchange service, remove all features, parts, options, alterations, and attachments not under our service. You also agree to ensure that the Machine is free of any legal obligations or restrictions that prevent its exchange;

3. be responsible for loss of, or damage to, a Machine in transit in those cases where you are responsible for the transportation charges; and

4. on completion of Carry-in Repair service, connect a repaired Machine and verify its operation.

## 9. Warranty for IBM Services

For each IBM Service, we warrant that we perform it in a workmanlike manner, and according to its current description contained in this Agreement, an Attachment, or a Transaction Document.

## 10. Extent of Warranty

Misuse, accident, modification, unsuitable physical or operating environment, improper maintenance by you, or failure caused by a product for which we are not responsible, may void the warranties.

THESE WARRANTIES REPLACE ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 11. Items Not Covered By Warranty

We do not warrant uninterrupted or error-free operation of a Service.

## 12. Limitation of Liability

Circumstances may arise where, because of a default on our part or other liability, you are entitled to recover damages from us. In each such instance, regardless of the basis on which you are entitled to claim damages from us, we are liable only for:

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 87 of 164 Document 1-1

1. bodily injury (including death), and damage to real property and tangible personal property; and

2. the amount of any other actual loss or damage, up to the greater of $100,000 or the charges (if recurring, 12 months' charges apply) for the Service that is the subject of the claim.

This limit also applies to any of our subcontractors. It is the most for which we are collectively responsible.

**Items for Which We are Not Liable**

Under no circumstances are we or our subcontractors liable for any of the following:

1. third-party claims against you for losses or damages (other than those under the first item listed above);

2. loss of, or damage to, your records or data; or

3. economic consequential damages (including lost profits or savings) or incidental damages, even if we are informed of their possibility.

**13. Mutual Responsibilities**

Each of us agrees that under this Agreement:

1. neither of us grants the other the right to use its trademarks, trade names, or other designations in any promotion or publication;

2. all information exchanged is non-confidential. If either of us requires the exchange of confidential information, it will be made under a signed confidentiality agreement;

3. each is free to enter into similar agreements with others;

4. each will promptly notify the other if it becomes aware of any unsafe conditions or hazardous materials to which the other's personnel would be exposed at any of its facilities;

5. each will allow the other reasonable opportunity to comply before it claims that the other has not met its obligations; and

6. neither of us will bring a legal action more than two years after the cause of action arose.

**14. Your Other Responsibilities**

You agree:

1. not to assign, or otherwise transfer, this Agreement or your rights under it, delegate your obligations, or resell any Service, without prior written consent. Any attempt to do so is void;

2. to allow us to install mandatory engineering changes (such as those required for safety) on a Machine. Any parts we remove become our property;

3. that you are responsible for the results obtained from the Services; and

4. to provide us with sufficient, free, and safe access to your facilities for us to fulfill our obligations.

**15. Maintenance Services**

Based on the type of service, we will restore the Machine to good working order or exchange it. We may also perform preventive maintenance, including lubrication, adjustments, and replacement of parts. We manage and install engineering changes that apply to the Machine. We provide Maintenance Services for selected non-IBM Machines only when they are connected to certain IBM Machines.

We will inform you of the date on which Maintenance Services begin. We may inspect the Machine within one month following that date. If the Machine is not in acceptable condition for service, you may 1 ) have us restore it for a charge or 2) withdraw your request for Maintenance Services and we will refund any amounts you have paid to us for its service.

For a Machine under a usage plan, you agree to provide us with the meter reading as of the last working day of the period that the minimum maintenance charge covers.

Maintenance Services do not cover accessories and certain parts, such as frames and covers. In addition, Maintenance Services do not cover service of a Machine damaged by misuse, accident, modification, unsuitable physical or operating environment, improper maintenance by you, or failure caused by a product for which we are not responsible.

**Alternative Service During Warranty**

For certain Machines, at any time during the warranty period, you may select a different type of service from that which we designate for the Machine. For example, if you prefer On-site service to Carry-in, it may be available. We will inform you of the available types of service for the Machine and the available alternative service periods. We provide the alternative type of service for an additional charge. When the alternative service ends, we will continue Maintenance Services for the Machine under the same type of service you selected.

**Maintenance Services Termination**

You may terminate Maintenance Services coverage for a Machine on one month's notice to us under any of the following circumstances:

1. after it has been under Maintenance Services for at least six months;

2. if you permanently remove it from productive use within your Enterprise; or

3. as of the effective date of an increase in Maintenance Services charges.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 88 of 164   Document 1-1

We may terminate Maintenance Services for a Machine on three months' written notice, provided it has been under Maintenance Services for at least one year.

Either of us may terminate service for a Machine if the other does not meet its obligations concerning Maintenance Services. On termination of service for a Machine, we will give you any applicable credit.

### 16. Extended Maintenance Option

You may order the Extended Maintenance Option (called the "EMO") for certain Machines. Under EMO, we adjust your Maintenance Services charges based on your prepayment of those charges during an available contract period. We calculate the EMO charge for a Machine using the announced Maintenance Services charges. EMO charges are not refundable after coverage has started for the Machine.

We will specify the eligible Machine types and available contract periods. We will also inform you periodically of any changes. A change applies only to Machines you add under EMO on or after the effective date of the change.

The Transaction Document will list the Machines covered and the dates of coverage for the contract period you have selected for each Machine.

For a Machine not yet installed or set up, coverage starts on its Date of Installation. For an installed Machine, coverage starts on a mutually-agreed-to date. If applicable, the contract period includes the Machine's warranty period.

Each of us agrees that if a feature, conversion, or upgrade is installed on a Machine while it is under EMO, 1) an additional charge may apply and 2) the feature, conversion, or upgrade is subject to the remaining portion of the contract period.

If we increase the EMO charge, the increase does not apply to a Machine not yet installed or set up, unless we give you at least three months' notice before its scheduled date of shipment. If we decrease the EMO charge before coverage has begun for a Machine, you receive the benefit of the decrease.

We will give you at least three months' notice of a Machine's eligibility for renewal. At the end of your contract period, we will continue Maintenance Services for the Machine (if available), unless you request us not to do so.

If you transfer coverage for a Machine to a third party, you agree to inform that party 1) of the applicable terms of this Agreement and 2) that it must notify us in writing of the transfer, the location of the Machine, and acceptance of coverage.

### 17. Changes to the Agreement Terms

In order to maintain flexibility in our Services, we may change the terms of this Agreement by giving you three

months' written notice However, these changes are not retroactive. They apply, as of the effective date we specify in the notice.

Otherwise, for a change to be valid, both of us must sign it. Additional or different terms in any order or written communication from you are void.

### 18. Agreement Termination

You may terminate this Agreement on written notice to us following the expiration or termination of all your obligations.

Either of us may terminate this Agreement if the other does not comply with any of its terms, provided the one who is not complying is given written notice and reasonable time to comply.

Any terms of this Agreement, which by their nature extend beyond its termination, remain in effect until fulfilled and apply to respective successors and assignees.

### 19. Geographic Scope

All your rights and all our obligations are valid only in the United States and Puerto Rico.

### 20. Governing Law

The laws of the State of New York govern this Agreement.

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 89 of 164 Document 1-1

### Letter of Understanding for IBM Support Family Services

IBM has entered into an agreement with this IBM authorized remarketer (called "Remarketer") under which IBM will provide certain of the IBM Support Family Services (called "Services") for your eligible machines and programs (called "Products"). A short description of these Services is contained in this Letter. A more detailed description may be obtained from the Remarketer. You may order any of these Services through the Remarketer. IBM has no obligation to provide any other services to you. IBM may occasionally change the terms of the Services by giving you three month's written notice. However, these changes are not retroactive. They apply, as of the effective date we specify in the notice, only to new orders (those we receive from the Remarketer on or after the date of the notice) and to ongoing Services. Otherwise, for a change to this Letter to be valid, both you and IBM must sign it.

The Remarketer is an independent contractor and not IBM's legal representative, franchisee, or agent for any purpose.

Services available under IBMLink, Advantis*, or other networks may be required to obtain electronic access to IBM's support center and certain databases. When Services require such electronic access, you agree to sign the applicable agreement documents.

### 1.    Definitions

Prime Shift means from 8 a.m. to 5 p.m. in your local time zone, Monday through Friday (excluding national holidays). All Services are provided during Prime Shift unless we specify otherwise in their description.

Off Shift means all hours outside of Prime Shift.

Full Shift means 24 hours a day, seven days a week (including national holidays).

### 2.    Services (AS/400 and AIX)

These Services are available for AS/400 and AIX Products. The Support Line Service is also available for System/36 and System/38 Products. The Associate, Consult Line, and House Call Services are also available for System/36 Products.

Support Line provides telephone assistance with your 1) routine, short-duration installation and usage ("how to") questions, and 2) code-related problems for eligible Products. You must designate one primary (and one backup) Product knowledgeable person, as the System Administrator to coordinate communications with us. An IBM technical specialist will return your initial call within two hours during Prime Shift and within four hours during Off Shift. If the Remarketer selects the annual charge option of Support Line, it may request electronic access for you subject to the prerequisites IBM specifies. Electronic access allows you to search an IBM database of questions and answers, and to submit questions to us electronically. IBM will respond to the questions by the end of the next business day.

*Advantis is a registered trademark of Advantis.

This Letter of Understanding is the complete agreement between us and replaces any prior oral or written communications between us regarding these Services. By signing below, each of us agrees to the terms of this Letter.

**Authorized Remarketer name: Cerner Corporation**

*Agreed to:* (Customer Name)                                          *Agreed to:*
                                                                       International Business Machines Corporation

By: _____                                         By: _____
         Authorized signature                                                  Authorized signature

Name: (type or print):                                                Name: (type or print):

Date:                                                                 Date:

Customer address:      IBM Office Address:

IBM provides Support Line for System/38 Products only for installation and usage questions and only during Prime Shift.

A separately priced electronic-only option of Support Line for AS/400 or AIX Products is also available.

If you select AS/400 Support Line, and if the Remarketer has paid us the applicable additional charge, support for other eligible Products IBM designates will be available to you. Also available as an option, you may designate up to four additional primary (and four backup) System Administrators per each 8 hour work shift.

If you select AS/400 Support Line Premium, IBM provides you all the standard features of AS/400 Support Line and includes:

1.     Full Shift coverage;
2.     support for expanded selection of eligible Products; and
3.     up to four additional primary (and four backup) System Administrators per each 8 hour work shift;

If you select AIX Support Line Standard, IBM provides you with support for the IBM AIX operating system and other Products IBM designates. All IBM AIX systems at your designated location, as well as all those under the control of your System Administrators, must be included. If the Remarketer has paid us the applicable additional charge, support for other eligible Products will be available to you. Also available as an option, you may designate additional System Administrators.

If you select AIX Support Line Premium, IBM provides you all the features of AIX Support Line Standard and includes:

1.     Full Shift coverage;
2.     Support for expanded selection of eligible Products;
3.     Up to two additional primary (and two backup) System Administrators;
4.     AIX Technical Library;
5.     AIX Alert;
6.     AIX Associate; and
7.     two 10% discount coupons for AIX education.

Associate provides direct telephone access to an assigned IBM technical specialist to 1) assist with usage ("how-to") questions and problem analysis and 2) coordinate support requests, including code-related problem support. Your Remarketer must select the annual charge option of Support Line for you to receive this Service.

If the Remarketer offers the focal point option to you, and you choose to act as your own focal point for Support Line, you must also act as your own focal point for Associate, when you select this Service.

Alert provides you automatic weekly notification of 1) High Impact and Pervasive Authorized Program Analysis Reports (called "HIPER APARs") and 2) any program temporary fixes IBM discovers to be defective (called "PE PTFs").

Consult Line provides you with telephone access to an IBM technical expert who is qualified to provide advice on complex work efforts (for example, analysis and design) concerning Products. IBM will, upon your request, schedule a mutually agreeable time for telephone consultation.

Prime Shift for AIX and System/36 Consult Line is from 8 a.m. to 5 p.m. Central Time, Monday through Friday, excluding national holidays. All other hours will be considered Off Shift for this Service.

House Call provides you with on-site routine, task-oriented, operational support (such as help with installing eligible programs and fixes for such programs) at a mutually agreeable time.

3.     Services (AS/400)

These Services are only available for AS/400 Products.

Forum allows you to exchange information electronically with other users on a variety of topics related to the operation of Products. Forum is provided on an "AS IS" basis. IBM is not responsible for the accuracy or reliability of the information submitted to forums. IBM will provide you with around-the-clock electronic access to Forum, except for weekly maintenance periods. During periods of peak activity, IBM reserves the right to discontinue inactive sessions or sessions whose connect time has exceeded one continuous hour.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 91 of 164   Document 1-1

You agree to:

1)      obtain all required approvals if you use Forum to copy, download, upload, display, distribute, or execute programs or perform other work;

2)      ensure that you do not —
       a.      violate another's intellectual property rights, privacy rights, or contractual rights,
       b.      distribute harmful code, or
       c.      submit any item which contains solicitations, disparaging remarks, improper or discriminatory language, or inaccurate statements; and

3)      ensure that all users of Forum who obtain access through you understand that (1) and (2) also apply to them. You are responsible for their compliance.

Also available as an option is a private topic forum which will be limited to the USERIDs contained on a membership list you provide to us.

**Performance Management 400 (PM/400)** provides a set of performance analysis reports for the time period (for example, Prime Shift) and the calendar period (month, quarter, or year) specified by the Remarketer. If the Remarketer has paid us the applicable additional charge, IBM will provide you an additional set of reports for another time period (for example, Off Shift) for the same or different calendar period. Additionally, IBM provides online access to performance data.

IBM prepares the reports from data gathered from your system by a program IBM provides to you. IBM will provide the program on an "AS IS" basis. IBM grants you a license for the program under Section 6 of this Letter.

**Recovery Express** provides machines and equipment (called a "Configuration") for you to use as a backup system in responding to a Disaster at a Specified Location. "Disaster" means any unplanned interruption of information processing, beyond your control, which significantly impairs your ability to perform critical information processing applications. "Specified Locations" means your information processing facility located within a single building. However, IBM will consider host attached I/O equipment located outside the building to be part of your Specified Location.

You may upgrade to a larger Configuration on one month's written notice if the Remarketer has paid us the additional charge that allows you to do so.

If IBM plans to upgrade the Configuration to require programs of a later release level, IBM will provide you three month's written notice.

When you notify IBM of a Disaster at a Specified Location, we will:

1.      ship the Configuration, within 24 hours, to a location you choose within the United States (except Alaska and Hawaii). Although what we provide may not be identical to the Configuration specified by you, it will be compatible with it and provide equivalent or greater function; and
2.      provide you technical assistance by telephone, at any time, when you are installing the Configuration.

You agree to:

1.      notify IBM that you are declaring a Disaster;
2.      maintain your programs to be used on the Configuration at the release level IBM specifies;
3.      provide the ship to location, all personnel, supplies, utilities, and programs when using the Configuration;
4.      return the Configuration to IBM, in good working order, not later than six weeks after declaring a Disaster; and
5.      remove your data and programs from the Configuration before returning it.

**RemoteInstall** provides for remote installation at a mutually agreeable time of 1) new releases of IBM and other programs for which you are properly licensed or 2) cumulative program temporary fixes for eligible programs.

**SiteManager** automatically alerts you (via electronic mail on your alphanumeric message pager) when a problem occurs with your AS/400 system, its physical environment, or selected applications.

IBM will:

1.      provide and install at your location certain equipment and licensed programs (called the "AS/400 SiteManager System") on a bailment. We provide the AS/400 SiteManager System on an "AS IS" basis;
2.      provide an on-site training session, during installation, and a user's guide for your designated personnel; and

Case 2:17-cv-01254-JPS    Filed 09/15/17    Page 92 of 164    Document 1-1

3.    remove the AS/400 SiteManager System upon the termination of this Service.

If the Remarketer has paid us the additional charge, IBM will also provide you, as part of the AS/400 SiteManager System:

1.    a card to provide remote access;
2.    additional control units and sensor sets for additional environmental monitoring; or
3.    alphanumeric message pagers.

This Service will start when the AS/400 SiteManager System is installed.

You agree to:

1.    provide telephone connections and power outlets as IBM specifies;
2.    be responsible for risk of loss and damage to the AS/400 SiteManager System;
3.    accept the terms of any license agreements accompanying the installed programs, or, if none, then IBM grants you a license under Section 6 of this Letter; and
4.    grant IBM access to your facilities during normal business hours to remove the AS/400 SiteManager System upon the termination of this Service.

VitalSign provides you with a set of reports to help you assess your current system administrative practices. IBM prepares the reports using data 1) you provide and 2) gathered from your system by a program IBM provides to you. Help in interpreting the reports is available through Consult Line.

IBM provides the program on an "AS IS" basis. We grant you a license for the program under Section 6 of this Letter. You agree to return the program and a completed VitalSign questionnaire to us after gathering the data.

**4.    Services (AIX)**

These Services are only available for AIX Products.

**AIX/6000 Performance Management** provides you with information for planning and managing your system resources. Using data gathered from your system by a program that IBM supplies, IBM prepares and provides you with a set of performance analysis reports and a high level analysis of your system performance. IBM will provide the program on an "AS IS" basis. We grant you a license for the program under Section 6 of this Letter.

**AIX System Backup and Recovery/6000** is a program which provides you the capability to backup, verify, and restore your data in various formats and media. IBM grants you a license for the program under the agreement provided with it.

**AIX Technical Library** is a technical publication which provides your administrator with service and support information quarterly on a CD-ROM (under the terms of its license agreement). This information includes lists with descriptions of code corrections and answers to frequently asked installation and usage questions.

**IBM Scalable POWERparallel 2 Planning** provides you with an on-site specialist to assist (at a mutually agreeable time) with planning your system implementation.

**IBM Scalable POWERparallel 2 Implementation** provides you with an on-site specialist to perform installation, application of the latest IBM recommended software service level, configuration, and setup for IBM Scalable POWERparallel 2.

**Mobile Systems Support** provides you with telephone assistance for your routine, short duration installation and usage ("how to" questions regarding IBM AIX for N40 and IBM 7007 mobile computing, Products, and eligible IBM licensed programs when used with these Products. This Service also provides the ability to report code-related problems found in an unmodified portion of IBM AIX for N40 when it is used with an IBM 7007. This service is provided from 8 a.m. to 5 p.m. Central Time, Monday through Friday, excluding national holidays. A technical specialist will return your call within the timeframe established for the level of severity of the call. IBM may periodically provide you with a CD-ROM containing updates of IBM AIX for N40. Mobile Systems Support will be available until December 31, 1995.

**RISC System/6000 Recovery Express** provides machines and equipment (called a "Configuration") for you to use as a backup system in responding to a Disaster at a Specified Location. "Disaster" means any unplanned interruption of information processing beyond your control, which significantly impairs your ability to perform critical information processing applications. "Specified Location" means your information processing facility located within a single

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 93 of 164   Document 1-1

building. However, IBM will consider host attached I/O equipment located outside the building to be part of your Specified Location.

You may upgrade a larger Configuration on one month's written notice if the Remarketer has paid us the additional charge that allows you to do so.

If IBM plans to upgrade the Configuration to require programs of a later release level, IBM will provide you three month's written notice.

When you notify IBM of a Disaster at a Specified Location, we will ship the Configuration, within 24 hours, to a location you choose within the United States. Although what we provide may not be identical to the Configuration specified by you, it will be compatible with it and provide equivalent or greater function.

You agree to:

1. notify IBM that you are declaring a Disaster;
2. maintain your programs to be used on the Configuration at the release level IBM specifies;
3. provide the ship to location, all personnel, supplies, utilities, and programs when using the Configuration;
4. return the Configuration to IBM, in good working order, not later than six weeks after declaring a Disaster; and
5. remove your data and programs from the Configuration before returning it.

5. **Your Additional Responsibilities**

   You agree to:

   1. ensure that any access codes IBM provides to you are used only by those who are authorized to do so;
   2. pay any communications charges associated with accessing these Services;
   3. use the information obtained under these Services only in support of your internal information processing requirements; and
   4. provide the Remarketer with one month's written notice if you want to make any changes to your system that would affect any of the selected Services.

6. **License Terms**

   The following terms apply to each program we provide with these services that is not otherwise covered by license terms.

   The program is copyrighted and licensed (not sold). IBM does not transfer title to the program to you. You obtain no rights other than those granted you under this license.

   Under this license, IBM authorizes you to:

   1. use the program only on the machine designated by IBM; and
   2. make one copy of the program for backup purposes only in support of your use, provided you reproduce the copyright notice and any other legend of ownership on the copy.

   You agree to ensure that anyone who uses the program (accessed either locally or remotely) does so only for your authorized use and complies with these terms.

   You agree not to do any of the following:

   1. modify the program's machine readable instructions or data, or merge them into another program;
   2. reverse assemble, reverse compile, or otherwise translate the program.
   3. sublicense, assign, or transfer the program; or
   4. distribute the program to any third party.

   Your license terminates when 1) the Service terminates, is withdrawn, or expires and is not renewed, 2) the program is no longer needed to perform the Service, or 3) the machine which IBM designated for the program is removed from your productive use. IBM may terminate your license if you fail to comply with the terms and conditions of this license.

   Upon termination, you agree to destroy the program and any backup copy you made.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 94 of 164   Document 1-1

**7.     Warranty**

IBM warrants that it will perform Services in a workmanlike manner.

THIS WARRANTY REPLACES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED
WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

IBM does not warrant uninterrupted or error-free operation of a product or Service.

IBM is not responsible for failure to provide Services due to causes beyond its control.

**8.     Limitation of Liability**

Circumstances may arise where, because of a default on IBM's part or other liability, you are entitled to recover
damages from IBM. In each such instance, regardless of the basis on which you are entitled to claim damages from
IBM, IBM is liable only for 1) bodily injury (including death), and damage to real property and tangible personal
property and 2) the amount of any other actual loss or damage, up to $100,000. This limit also applies to any of IBM's
subcontractors and program developers. It is the maximum for which we are collectively responsible.

Under no circumstances are IBM, our subcontractors, or program developers liable for 1) third-party claims against you
for losses or damages (other than those under the first item listed above), 2) loss of, or damage to, your records or data,
or 3) economic consequential damages (including lost profits or savings) or incidental damages, even if IBM is
informed of their possibility. IBM will have no liability for failure to perform these services due to causes beyond its
control.

**9.     Exchange of Information**

You and IBM agree that all information exchanged between us in providing these Services is nonconfidential. If either
you or IBM requires the exchange of confidential information, it will be made under a signed confidentiality
agreement.

**10.    Termination of Services**

The Remarketer will promptly notify you of any termination or withdrawal of a Service.

**11.    Governing Law**

The laws of the State of New York govern this Letter.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 95 of 164   Document 1-1

## DESCRIPTION OF CERNER SUPPORT SERVICES

The following table provides a high level description of the benefits and services received through the payment of Licensed Software support fees:

| | | |
|---|---|---|
| 1 | Immediate Response Center ("IRC") | Cerner's support center that is staffed twenty four hours a day and seven days a week for the purpose of addressing and resolving client mission critical issues. |
| 2 | Immediate Answer Center ("IAC" or "Service Center") | Cerner's support center that is available for addressing and resolving client's non-mission critical issues. |
| 3 | Account Management | Periodic account manager contacts and visits for ongoing strategic planning and relationship management. |
| 4 | IntelliNet (secured access mechanism) | A data communications mechanism that facilitates problem resolution at the client site (secure and efficient method for service and support). |
| 5 | Revisions, Releases and Upgrades | Software revisions, releases and updates that deliver increased functionality over time and allow software to remain current with various technologies. |
| 6 | Knowledge transfer during service events | Education provided to client's personnel during problem resolution, and which leads to greater client self-sufficiency. |
| 7 | Service Escalation Process | Defined process for any client to escalate an issue (whenever the client feels a service or support issue is not being addressed) to receive executive management focus. |
| 8 | Service Levels | Performance metrics that establish a service delivery expectation. |
| 9 | Complete Service Record | Complete client service record identifying service issues, history, trends, and patterns. |
| 10 | On-Line Demographic Profile (Product/Technical Attributes) | Knowledge of client technical environment, supporting an efficient and effective problem resolution process (assumes hardware and sublicensed software maintenance through Cerner). |
| 11 | Catalog of Services | On-line access via Cerner Knowledge Network (CKN) to Cerner's Catalog of Services referencing and describing all of Cerner's services. |
| 12 | Telephone, e-mail, Fax, CKN | For the convenience of the client, Cerner offers multiple avenues of communication for support requests and for support services. |
| 13 | Cerner Knowledge Reference (www) | Internet access to Cerner's support knowledge base expanding client self-sufficiency through situation specific expert knowledge. |
| 14 | Cerner Knowledge Network (www) | Internet access to product documentation, communities of interest, announcements, on-line service request entry and the ability to review service activity. |
| 15 | Proactive Product And Service Flashes | Advance information concerning new products, as well as service & product issues. |
| 16 | Access To Cerner Direct | Access to a direct channel for ordering technology with 24 hour turnaround with discounted and/or competitive pricing through CKN or the Cerner Direct Order Desk. |
| 17 | Access to Cerner Virtual University ("CVU") | Information about Cerner product and technology education via CVU. |
| 18 | Regulatory Affairs Services | Consultative service on regulatory affairs. |
| 19 | Client Satisfaction Surveys | Client satisfaction survey process providing a feedback mechanism for the client. |

Cerner is constantly improving and revising the content and delivery of its support services to better meet the needs of clients, therefore, more specific details concerning the above services are set forth in Cerner's Catalog of Services available on the Cerner Knowledge Network (CKN.cerner.com).

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 96 of 164 Document 1-1

**Immediate Response Center (IRC)**

### Description

The Immediate Response Center (IRC) is committed to providing clients with the fastest possible solution or workaround to any critical issue that impairs the immediate operation of a Cerner production system. A critical issue is defined as an issue that impacts patient care, or causes financial or operational hardship. The IRC is focused on efforts to maximize application availability and to minimize operational issues. Access to the Immediate Response Center is entitled through a Licensed Software Support Agreement, Technology Maintenance Agreement, and / or Critical Technology Support Agreement.

The Immediate Response Center is located in Kansas City, Missouri, USA, and staffed 24 hours per day, 365 days per year by systems-trained Support Analysts, a Technical Team Leader, and an Operations Manager. The IRC is available to provide problem determination and resolution or workaround to critical, production system issues related to Cerner applications, Medical Device or Foreign System interfaces, or technology infrastructure issues (see entitlements in Cost Considerations section). Routine or non-production application or system issues should be addressed by the Immediate Answer Center (IAC).

The IRC team is supplemented by domain experts from other Cerner support groups who are available on an on-call basis to provide further expertise when needed. The IRC also has access to expertise from Technology Supplier partners. The IRC maintains an overview for critical situations provided by the IRC Operations Manager, 24 hours per day, 365 days per year.

If clients have purchased Maintenance through Cerner, the IRC works in partnership with the technology maintenance supplier to provide remedial, break-fix maintenance and functional replacements. Technology maintenance suppliers have provided Cerner with tracking processes to monitor progress on technology service requests. The IRC Support Analysts may escalate Service Requests within the technology maintenance supplier organizations, as necessary, to ensure timely resolution.

### General Support Services

The Immediate Response Center is designed and staffed specifically to respond to the following types of issues:

**Application Service Requests**

- Loss of Cerner application availability due to a Cerner software failure
- Failure of Cerner application startup
- Loss of Cerner application processing (for example, unable to see orders or results)
- Loss of report generation processing
- Loss of financial transaction processing
- Loss of interface (FSI, MDI, OpenEngine) processing
- Errors in scheduled application operations
- Intellinet connectivity
- Translog data recoveries
- Data integrity issues

**System Service Requests:**

- Loss of system availability
- System startup failures
- Loss of Cerner application availability due to technology infrastructure failure
- Critical degradation of system performance
- Hardware configuration issues
- Disk failure support
- Component failure support
- Operating system support
- Security management assistance
- File (RMS/RDBMS) management assistance
- Print queue management assistance
- Disk management assistance
- Disk failure support
- Errors in scheduled system maintenance and management operations

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 97 of 164   Document 1-1

*Service Goals*

The IRC has a service goal to engage in an initial assessment of a Service Request within 5 minutes of the initial call. Where necessary, the IRC may elect to disengage from a service request to respond to additional incoming service requests or to service requests of higher priority. Cerner's priority will not be driven by client size, but by the severity of client problem. Priority will always be given to any client who has a loss of functionality with an impact on patient care. If this is necessary, the IRC will re-engage in the service request as quickly as possible.

Investigation will continue as needed, with a service goal of providing a solution or work-around within 2 hours of the prerequisites being met and the service request being opened.

The IRC Millennium analysts strive to meet Service Goals for 85% of its service requests. Some small percentage of requests will require longer resolution times due to unusual complexity or the total number of in-process service requests.

*Service Requests Requiring Technology Supplier Partner Assistance*

Service requests requiring Technology Supplier Partner assistance involve a different set of activities than do those limited to Cerner applications. As a result, the service level will vary from other service requests.

Using an example involving a failed disk drive, IRC personnel may be able to provide more effective service by remaining engaged in moving files and in making a back-up copy of files instead of turning the system and remote access over to the Technology Supplier Partner for dial-up diagnostics. While this may delay the actual time in which the Technology Supplier Partner can effect the replacement of a piece of equipment, it will increase the likelihood that the failure can be recovered with little or no loss of data while allowing applications to remain available.

*Prerequisites*

Prior to placing a call to the IRC, the client should reference any troubleshooting material provided by Cerner which may suggest a resolution to the issue, complete an initial investigation, ensure that remote access is immediately available to the IRC Support Analyst, and should have the following information available to provide to the Analyst:

- Client name and number
- Name of client contact responsible for this service request
- Telephone number at which the contact can be reached immediately, including the extension and/or department, if applicable
- Any information required for conformance to the client's access policies, in order for the Analyst to gain remote access to the appropriate environment(s)
- A detailed description of the problem, including symptoms, accompanying examples, recent changes, and any initial problem determination
- Cerner system function/mnemonic that was being used during the incident, if applicable
- The exact error message on the screen or in the System Log Inquiry (SLI) application
- For problems involving an operations cycle, the following additional information will be needed:
  - The specific operations cycle that has failed.
  - The date for which the failed cycle was running.
  - The operations job number, job name and job description.
  - The operations step number and step name (for example, GEN, BKF, DF)
  - The severity of error (for example, critical error or warning error)

**Note:** If remote access is not possible, the IRC will provide support to the extent the situation allows.

*Access and Use*

The IRC is available 24 hours per day, 365 days per year, including holidays. The IRC is available to all clients for support of the Production Environment and Technology Maintenance service requests. Service requests involving Release Certification environments, PIM Certification environments, "training environments", "test environments", or other non-production environments should be addressed by the Immediate Answer Center.

*Opening Service Requests*

The IRC can be contacted directly at (816) 221-8877. The IRC telephone is answered by an automated system requesting the caller to select one of the following options:

    1 - For HNA Classic service requests
    2 - For Cerner Millennium service requests
    3 - For Cerner DHT systems, hardware or equipment-related requests for HNA Classic, MSMeds, or Millennium systems
    4 - For Cerner Management Service related requests

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 98 of 164   Document 1-1

5 - For ProVision, QuadRIS, MARS, Images3000, or LabCare products

0 - For calls with a 5-digit call-back number

If option 1 or 2 is selected, the caller is transferred to the next available IRC Support Analyst. If option 0 is selected, the caller is asked to enter the 5-digit call-back number provided by the analyst they were working with, and the caller is transferred directly to that analyst. If option 3 is selected, the caller is transferred to the next available Technology Maintenance Specialist. If option 4 is selected the caller is transferred to the OMS group. If option 5 is selected the caller is transferred to the group(s) supporting Envoi, QuadRIS, MARS, Images, and LabCare products.

Service requests to the IRC should be made by a System Manager, Assistant System Manager, MIS representative, or other client support personnel. The person opening the request should ensure the "Prerequisites" have been met and should have operating system level access to the system (or immediate access to someone who does), as their assistance may be required to locate information and enter commands in special circumstances.

The client should provide a single point of contact for ongoing communications during the problem determination and resolution of the service request. Should the contact change, the IRC should be notified.

Cerner recommends that the System Manager be notified and involved in all service requests reported to the IRC.

The IRC Support Analyst will provide the client with a service request number, a unique number assigned to each service request in Cerner Genesys, Cerner's internal service request tracking system.

To allow for easier tracking of service requests, clients may want to consider creating a request log, which includes the service request number and a description of the service request. This log will allow for an easy cross-reference as you check on service request statuses and review service activity reports.

For service requests that require ongoing communication between the IRC Support Analyst and the client contact, the analyst will also provide the client with a 5-digit call-back number for use with call processing option 0 described above. See also, Special Considerations.

*Management Responsibility*

The IRC Support Analyst who has been working on the service request should be the first point of contact for any further inquiries or updates, and can be reached directly using the zero call processing option. If the Support Analyst is not immediately available or if service expectations are not being met, the IRC Operations Manager and/or the Technical Team Leader on duty should be contacted. IRC Operations Managers and Technical Team Leaders are on duty 24 hours per day, 365 days per year. Any follow-up questions or comments regarding the IRC should be directed to the Manager of the Immediate Response Center during business hours at (816) 221-1024. The IRC Manager is available via pager during non business hours for mission critical escalation.

*Issue Escalation*

The *Issue Escalation* process may be initiated at any point in the service process if the client would like to raise visibility to a service request or request a higher priority be assigned to the service request based on the severity of the situation. This process may be initiated by a client or the client's assigned Client Manager to manage on their behalf.

Please be prepared to provide detailed information during your conversations to support why you are requesting issue escalation articulating the impact to healthcare delivery and overall operational impact for your institution. This information will allow those associates involved in the escalation discussions to effectively prioritize and respond.

**Issue Escalation – Level I**

- Call the IAC or IRC main phone number and request to speak with the Operations Manager. Share the reasons you deem necessary to escalate the service issue. The Operations Manager will follow internal escalation procedures as the situation warrants.

If satisfactory progress is not achieved, you may escalate to the next level.

**Issue Escalation – Level II**

- Call the IAC or IRC main phone number and request to speak with the IRC Manager or the appropriate IAC Solutions Executive.

If satisfactory progress is not achieved, you may escalate to the next level.

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 99 of 164 Document 1-1

**Issue Escalation – Level III**

- Call the IAC or IRC main phone number and request to speak with the IAC/IRC Executive.

The following table is provided to summarize who should be contacted at each escalation level.

| | IRC | IAC |
|---|---|---|
| **Service Request Status** | **IRC ANALYST** | **IAC SPECIALIST/SR OWNER** |
| **ESCALATION STEPS:** | | |
| Level I | IRC Operations Manager | IAC Operations Manager |
| Level II | IRC Manager | IAC Solutions Executive |
| Level III | IAC/IRC Executive | IAC/IRC Executive |

*Special Considerations*

When using call processing option 0 to reach an analyst directly, if the analyst is not available, the caller will have the option to leave a phone-mail message for the analyst. Leaving a message is NOT recommended; instead, use the 0 # option to exit phone mail and your call will be answered by an available IRC analyst.

---

**Immediate Answer Center (IAC)**

*Description*

The mission of the Immediate Answer Center (IAC) is:

To deliver world-class service by providing comprehensive solutions

*that delight our clients and associates.*

To accomplish this goal, the Immediate Answer Center is staffed with a combination of healthcare and information systems professionals to assist client support organizations. Access to the Immediate Answer Center is entitled through the Licensed Software Support Agreement and/or Client Server Services Agreement.

The Immediate Answer Center handles service requests that are classified into the following categories:

**Information Resolution**

Users often have specific questions regarding the implementation of system functionality, such as, application usage, adding procedures, or modifying the reference database. The IAC Service Specialists will answer the questions or involve other appropriate Cerner organizations to answer them.

**Change Requests**

The IAC has Service Specialists available to provide information or answer questions regarding proposed changes to Millennium software solutions.

**Issue Resolution**

The IAC has Service Specialists in each solution and technical area that are trained to assess any reported issue and to provide a complete resolution or alternative for the reported issue. Issues may range from user-created errors to issues requiring software modification.

If the Service Specialist cannot resolve the issue, or if it involves software modification, the appropriate Cerner application developer or supplier will be involved for further evaluation. Critical Cerner software modifications (patient care, operational hardship, or financial hardship issues) will be reviewed and prioritized by Product Management for immediate development. Product Management will also review and prioritize all non-critical issues, enhancements, and design modifications for development in order to benefit the majority of the solution's client base.

If the issue has a broad client impact, an Operations Manager will be engaged to assess the issue and determine resolution and communication to the client base.

Case 2:17-cv-01254-JPS · Filed 09/15/17 · Page 100 of 164 · Document 1-1

*Prerequisites*

The IAC assumes responsibility for servicing each converted client, once the turnover process has been completed. The turnover process is designed to ensure any major concerns have been addressed and that the client and Cerner are ready to transition support of the converted solution(s) to the Cerner support organization. The turnover process generally begins several weeks prior to conversion of the Cerner system and can be completed four weeks following conversion.

To obtain the best possible service, clients should adhere to the following guidelines when making a request for service:

- The individual initiating the service request should be the System Manager, Assistant System Manager, MIS Director, Database Coordinator, or other similar support personnel. They must have system level access (or immediate access to someone who does), as their assistance may be required to locate information and enter commands in special circumstances.
- Ideally, all service requests for a specific solution would be routed through a single client-designated employee.
- Before initiating the service request, clients should complete the initial problem definition.
- Issues should be reported as soon as possible. If too much time passes between the occurrence of the issue and the reporting of the issue, the data required to resolve the situation may no longer be available.

*Service Tracking*

Service requests are documented and tracked in Cerner Genesys, Cerner's internal service request tracking system. Each service request has a unique number and is assigned to an associate who remains the primary contact with the client from the point the request is logged through its final resolution.

*Priorities*

Clients are asked to prioritize their service requests. The service request's priority should accurately indicate the nature and severity of the issue to assist the IAC Service Specialists with timely issue resolutions.

**High** - Moderate loss of system functionality, or non-critical data recovery, where application availability and functionality are moderately impacted. Includes missing or incorrect data that could impact patient care or present a financial concern.

**Routine** - Procedural or system issues that do not affect patient care and for which an alternative solution is not available. All questions related to non-implemented features, questions of a prolonged or complex nature, and all other solution-related service requests.

**Note:** This priority is the default priority if a client does not specify one when the service request is logged.

**Question** - Any question that does not require an IAC associate to engage in an investigation, access your system(s) via modem or require more than 15 minutes to answer.

Any critical production-system issue should be directed to the IRC.

The IRC Support Analyst will work towards resolution of each service request immediately. Service requests with a HIGH priority will take precedence over those with a ROUTINE priority, and issues related to patient safety or significant financial loss will be investigated before non-critical issues.

*Complexity*

The IAC Service Specialist will assess each new service request level of *complexity* in addition to the assigned priority.

**Low** — Issue is easy to reproduce. Examples of situations with low complexity are: multiple examples are provided; dialing onto the client's environment may not be needed; known issues or a Cerner Genesys Solution exists.

**Medium** — Issue is reproducible but does not happen very often. Examples of situations with medium complexity are: few examples are provided; issue stems from stable and/or standard feature, script error, or installation.

**High** — Issue is not reproducible at will. Examples of situations with high complexity are: cause of the pattern is not identified; originates in the server or front end of the applications; requires intense collaboration across solution teams.

*Service Goals*

The IAC has the following service-level objectives, based on the service request's assessed combination of priority and complexity:

- For 95% of the incoming new service requests received by telephone, the caller will speak to a service specialist during the initial telephone call.

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 101 of 164 Document 1-1

- 50% of the Millennium IAC service requests that are categorized with a 'Question' priority will be closed or a resolution identified within 1 business day.
- 75% of the Millennium IAC service requests that are categorized with a 'Routine' priority will be closed or a resolution identified in 10 business days or less on a monthly basis.
- 55% of the Millennium IAC service requests that are categorized with a 'High' priority will be closed or a resolution identified in 4 business days or less on a monthly basis.

The service goals for the IAC are designed to meet the needs of Cerner's entire Millennium client base and ensure that resources are being applied to the right client issues at the right time.

### Access and Use

Listed below are instructions for submitting service requests and receiving information from the IAC. Cerner recommends that clients contact the IAC via telephone to log a new service request with a HIGH priority.

- Telephone

The Immediate Answer Center's telephone number is (816) 221-9009. The IAC Service Coordinators and Service Specialists are available to receive client calls between 7 a.m. and 7 p.m., Central Time, Monday through Friday, (holidays and weekends excluded).

Cerner holidays include:

- New Year's Day
- Memorial Day
- Independence Day
- Thanksgiving Day
- Day After Thanksgiving (Friday) - when Christmas falls on Saturday, Sunday or Monday
- Christmas Eve - when Christmas falls on Tuesday, Wednesday, Thursday, or Friday
- Christmas Day - December 25 (December 24, if Christmas falls on Saturday; December 26, if Christmas falls on Sunday)

In addition, the IAC changes its process twice each calendar year for Cerner corporate meetings. During these times, the Service Coordinators will be available to receive and log all service requests.

When clients telephone the IAC, a Service Coordinator answers their call. The Service Coordinator will enter the demographic information (client number, contact name and phone number, priority, type and area (for example, Millennium, Anatomic Pathology MILL) into Cerner Genesys and transfer the caller to the appropriate Service Specialist. The Service Specialist documents a detailed description of the problem, provides a service request (SR) number, and begins working with the client immediately toward resolution.

- Cerner Knowledge Network (CKN)

CKN Gold provides the ability to initiate a new service request, to track the status of a specific service request by service request number, and the ability to view all service activity. In addition, CKN Gold provides access to information specific to the software clients have licensed.

When using the link on CKN Gold to initiate a service request, the process generates an e-mail to SVCREQ@CERNER.COM. Clients may view the status of their service requests through the Cerner Genesys eService available on CKN.

For information about access to CKN (Cerner Knowledge Network) see the Cerner Knowledge Network section in this catalog.

- Electronic Mail

E-mail can be used to send requests to the IAC. The e-mail address is SVCREQ@CERNER.COM.

The Service Coordinators continually monitors the SVCREQ mailbox for new service requests. They enter each new service request into Cerner Genesys and then forward it to the appropriate Service Specialist based on information provided in the e-mail.

Clients may view the status of their service requests through the Cerner Genesys eService available on CKN.

### Issue Escalation

The *Issue Escalation* process may be initiated at any point in the service process if the client would like to raise visibility to a service request or request a higher priority be assigned to the service request based on the severity of the situation. This process may be initiated by a client or the client's assigned Client Manager to manage on their behalf.

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 102 of 164 Document 1-1

Please be prepared to provide detailed information during your conversations to support why you are requesting issue escalation articulating the impact to healthcare delivery and overall operational impact for your institution. This information will allow those associates involved in the escalation discussions to effectively prioritize and respond.

**Issue Escalation – Level 1**

- Call the IAC or IRC main phone number and request to speak with the Operations Manager. Share the reasons you deem necessary to escalate the service issue. The Operations Manager will follow internal escalation procedures as the situation warrants.

If satisfactory progress is not achieved, you may escalate to the next level.

**Issue Escalation – Level II**

- Call the IAC or IRC main phone number and request to speak with the IRC Manager or the appropriate IAC Solutions Executive.

If satisfactory progress is not achieved, you may escalate to the next level.

**Issue Escalation – Level III**

- Call the IAC or IRC main phone number and request to speak with the IAC/IRC Executive.

The following table is provided to summarize who should be contacted at each escalation level.

| | IRC | IAC |
|---|---|---|
| **Service Request Status** | IRC ANALYST | IAC SPECIALIST/SR OWNER |
| **ESCALATION STEPS:** | | |
| Level I | IRC Operations Manager | IAC Operations Manager |
| Level II | IRC Manager | IAC Solutions Executive |
| Level III | IAC/IRC Executive | IAC/IRC Executive |

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 103 of 164 Document 1-1

INTERNAL REVENUE SERVICE
District Director

DEPARTMENT OF THE TREASURY
1100 Commerce St., Dallas, TX 75242

AGNESIAN HEALTHCARE INC
430 E DIVISION ST
FOND DU LAC, WI 54935-4560

Person to Contact:
Customer Service Division

Telephone Number:
(800) 829-1040

Refer Reply to:
EP/EO:MC 4940 DAL

Date: JAN 3 0 1998

EIN: 39-0807236

Dear Sir or Madam:

Our records show that United States Catholic Conference is exempt from Federal Income Tax under Group Ruling Number 0928 subsection 501(c)(3) of the Internal Revenue Code. This exemption was granted March 1946 and remains in full force and effect. Agnesian Healthcare Inc is included in this group ruling. Contributions to your organization are deductible as provided by section 170(b) of the Code.

We have classified this organization as one that is not a private foundation within the meaning of Section 509(a) of the Internal Revenue Code because it is an organization described in section 170(b)(1)(A)(i) Internal Revenue Code.

This letter may be used to verify tax-exempt status.

If we may be of further assistance, please contact the person whose name and telephone number are shown above.

Sincerely,

E. Blazier

E. Blazier
Chief, Employee Plans and
Exempt Organizations Customer
Service Section

## CERTIFICATE OF EXEMPTION

[ ] Single Purchase    [X] Continuous

Wisconsin Department of Revenue
Income, Sales, Inheritance & Excise Tax Division
Post Office Box 8903
Madison, Wisconsin 53708
(608) 266-2776

The undersigned hereby claims exemption on the purchase, lease or rental of tangible personal property or taxable services from

_____

(Name of Seller or Lessor)

based upon his or her proposed exempt use of the item purchased or the exempt status of the purchasing institution as shown below:

[ ] 1. Containers and other packaging, packing and shipping materials used to transfer merchandise to customers of the purchaser.

[ ] 2. Tangible personal property becoming an ingredient or component part of an article of tangible personal property in any form destined for sale.

[ ] 3. Trailers, or accessories, attachments, parts, supplies, materials and service on motor trucks, tractors and trailers which are used exclusively in common or contract carriage under Authority No._____ (Motor trucks or tractors may be purchased ex-tax by use of Form MV-1.)

[X] 4. Items or services purchased directly by and used by a religious, charitable, educational, scientific or other organization holding a Certificate of Exempt Status. CES No. ___ES4900___

[ ] 5. Railway cars, locomotives and other rolling stock used in railroad operations, or accessories, attachments, parts, lubricants or fuel therefor.

[ ] 6. Commercial vessels (and barges) of 50-ton burden or over engaged in interstate or foreign commerce or commercial fishing, and accessories, attachments, parts and fuel therefor.

[ ] 7. Other purchases exempted by law. (State items and exempt use.)

_____

_____

_____

If "continuous" exemption is checked above, this certificate shall continue in force until revoked and shall be considered as a part of each order given to the above named seller or lessor. A continuous exemption certificate can be voided for a particular transaction only if a separate letter explaining the inapplicability of the certificate accompanies the purchase order. Use of this certificate does not exempt sales of taxable items for uses other than certified above. Misuse of this certificate by the seller, lessor, buyer, lessee, or other representative may constitute a misdemeanor.

| Purchaser's Business Name | Authorized Signature | |
|---|---|---|
| Agnesian HealthCare, Inc. | _signature_ | |
| Purchaser's Address | Title | Date |
| 430 E Division St., Fond du Lac, WI 54935 | Accounting Manager | |
| Purchaser's or Lessee's Business Activity (e.g. Grocer, Utility, Trucker, etc.) | | |
| Health Care Services | | |

This form is not to be used by farmers, or manufacturers purchasing machinery and equipment; they should use the exemption forms designed for their use.

Sellers must retain this form as a part of their records.

*This Form May Be Reproduced*

**See Instructions on Reverse Side**

S-207 (R. 3-85)

# CERTIFICATE OF EXEMPT STATUS

(Religious, Charitable, Scientific or
Educational Organization)

FORM ST-4

Sales to the below named organization are exempt from taxation under the Wisconsin
Sales and Use Tax Law pursuant to Section 77.54(9a) of the Wisconsin Statutes.

This certificate is valid until revoked by the Wisconsin Department of Taxation.

STATE OF WISCONSIN
DEPARTMENT OF TAXATION
SALES AND USE TAX DIVISION
MADISON 2, WISCONSIN

EXEMPTION CERTIFICATE NUMBER

**ES 4900**

DATE

**DEC 6 63**

St. Agnes Hospital of Fond du Lac

430 East Division Street

Fond du Lac, Wisconsin

_____
Commissioner

**IMPORTANT:**
Sales to Your Organization Are Taxable Unless
You Furnish Your Supplier With the Certificate
Number Shown Above.

## CERNER KNOWLEDGE NETWORK GOLD AGREEMENT

1.      Client agrees to protect and to keep in the strictest confidence all information and materials to which Client is granted access through CKN GOLD (the "CKN Confidential Information"), except for information which is clearly identified in writing by Cerner as sales, marketing, or other information available without restriction to the general public.

2.      Client shall use the CKN Confidential Information only for the purpose of supporting or otherwise facilitating its permitted use of the Licensed Software and System(s) identified in the Cerner Business Agreement, and for no other purpose whatsoever.

3.      Client shall designate and identify to Cerner those employees, agents, or other such representatives of Client which Client desires to have access to the CKN Confidential Information. Client agrees to limit access to CKN Confidential Information to such individuals as have a need to know or have need to access the information in order to increase their understanding or efficient use of Cerner products and services identified in the Cerner Business Agreement. All such persons shall be under a confidentiality agreement with Client that is sufficient to protect the proprietary and confidentiality interests of Cerner, its vendors and its clients. No copies of the CKN Confidential Information shall be made, except as necessary to facilitate Client's use of the CKN Confidential Information as described above.

4.      Client agrees to have in place, or implement if needed, appropriate policies, procedures, education, controls and internal audits necessary to assure Client's compliance with this agreement.

5.      Client understands that all persons who are granted access to the CKN Confidential Information will be advised by Cerner of their obligation of confidentiality with respect to the CKN Confidential Information. Nonetheless, Client agrees that it shall be responsible for any breach of this Confidentiality Agreement by any person who is given access to the CKN Confidential Information to facilitate Client's use of the Licensed Software or System(s). Client further understands and agrees that its responsibility shall not be reduced or affected in any way by the advisement given to each person accessing such CKN Confidential Information. Cerner reserves the right to terminate Client's and/or any of its personnel's access to CKN GOLD for any uncured breach of this Exhibit H.

6.      Client agrees to notify Cerner and Client's primary information services executive immediately upon learning of any loss of control, improper disclosure, or other misuse of any CKN Confidential Information or other materials made available through CKN GOLD, or of any password, logon procedure, or other method limiting access to CKN GOLD. Further, Client agrees to take whatever steps are reasonably required to halt and otherwise remedy, if possible, any such breach of security, and to take all appropriate steps to regain control of the CKN Confidential Information or such other information improperly disclosed or misused, and to prevent, as necessary, further disclosures or misuses.

7.      Client shall not be liable to Cerner for disclosure of CKN Confidential Information if: (a) the CKN Confidential Information is or becomes public without the fault of Client, or (b) the CKN Confidential Information was in Client's possession or was known by Client prior to Client's receipt of the CKN Confidential Information from Cerner, or (c) the CKN Confidential Information is or becomes available to Client from a source already in legitimate possession of said CKN Confidential Information, said source being other than Cerner, or (d) the CKN Confidential Information is developed independently by Client, or (e) the CKN Confidential Information is disclosed for unrestricted release with the written approval of Cerner to whom it relates, or (f) Client is obligated to disclose the CKN Confidential Information by order or regulation of any court or other governmental entity.

8.      All personal passwords, logon procedures, or other methods having the effect to limit access that Cerner discloses to Client are designed to be of limited scope and are highly confidential in nature. Client agrees to exercise all necessary control over such information so as to avoid the possibility of its disclosure or other misuse. Further, Client agrees that no such information shall be shared with any other individual or organization unless Client is otherwise authorized to do so, in writing, by Cerner.

9.      Information accessed through CKN GOLD shall not be further transmitted, reproduced, or otherwise copied, in whole or in part, through or under any medium, for the benefit or use of any person, not otherwise permitted to receive or use such information, without first obtaining Cerner's written consent.

10.      Client may, however, disclose the information to any person within Client's organization if necessary to facilitate Client's use of Licensed Software (or other Cerner products and services provided under agreement) to which the information relates so long as the party disclosing the information notifies the receiving party of the confidentiality of the information and of their obligation to comply with these confidentiality terms.

11.      Due to the nature of Cerner's business and the value of Cerner's proprietary information, Client agrees that a breach of any of the provisions hereof may inflict serious harm on Cerner, and that termination of Client's license, if reasonable under the circumstances, and money damages may be inadequate relief. Accordingly, Cerner shall be entitled to

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 107 of 164 Document 1-1

## CERNER KNOWLEDGE NETWORK GOLD AGREEMENT

injunctive relief to prevent or prohibit any threatened or continuing breach of any of the terms and provisions hereof and, in addition thereto, shall be entitled to any and all other remedies available at law or in equity.

12. Subsequent to execution of this Agreement but prerequisite to obtaining access to CKN GOLD, Client's permitted users will be obligated to accept or reject Cerner's Terms and Conditions of Access, the text of which is set forth below. In the event that a conflict should arise between either the Cerner Business Agreement including any Schedule thereto (such as this CKN GOLD Agreement) and the Terms and Conditions of Access, the Cerner Business Agreement and Schedules thereto shall, in that order, control.

### TERMS AND CONDITIONS OF ACCESS

You, Cerner's client and licensee, possess the licensed privilege to obtain certain copyrighted and other valuable information, proprietary to Cerner, through this medium of electronic access. You may acknowledge your acceptance of the following terms by selecting "I ACCEPT" below. If you do not accept these terms, please indicate by selecting "I DO NOT ACCEPT" below. You will not be granted access to CKN GOLD or the materials contained herein unless you accept these terms.

1. Unless otherwise indicated, all information and products accessed hereby are and shall remain the property of Cerner and such information or products are confidential to Cerner and shall not be disclosed by you.

2. All personal passwords, logon procedures, or other methods having the effect to limit access and which Cerner discloses to you, are designed to be of limited scope and are highly confidential in nature. You agree to exercise all necessary control over such information so as to avoid the possibility of its disclosure or other misuse. Further, you agree that no such information shall be shared with any other individual or organization unless you are otherwise authorized to do so, in writing, by Cerner.

3. You agree to notify Cerner and the primary information services executive of your employer (or principal, if applicable) immediately upon learning of a loss of control, improper disclosure, or other misuse of any password, logon procedure, or other method limiting access hereto. Further, if you learn of an improper or inappropriate disclosure of any information or products contained herein, you will notify Cerner and your information executive immediately.

4. Information accessed hereby shall not be further transmitted, reproduced, or otherwise copied, in whole or in part, through or under any medium, for the benefit or use of another without first obtaining Cerner's written consent.

5. Information accessed hereby consists of Cerner trade secrets and other proprietary and confidential information valuable to Cerner. You shall refrain from acts, or as appropriate, take steps, adequate to prevent the unauthorized disclosure of such information.

6. You are prohibited from disclosing to any third party any of the information that you hereby access except under the following conditions: (a) by lawful request or by lawful order of a court possessing proper authority and jurisdiction, provided that Cerner is timely notified of such request or order so that Cerner may be afforded due process in preventing an improper disclosure, or (b) the information is or becomes public without any fault on your part, or (c) the information is or becomes available to you from a source already in legitimate possession of said information, said source being other than yourself or your organization, or (d) the information is developed independently by you, or (e) the information is disclosed for unrestricted release with the written approval of Cerner.

7. You may, however, disclose the information to any co-worker or other personnel of your employer (or principal, if applicable) in order to facilitate your use of the Licensed Software to which the information relates so long as you notify such person of the confidentiality of the information and their obligation to comply with these confidentiality terms.

8. The consideration for your promises made hereunder is Cerner's agreement to disclose information for your benefit which consideration's receipt and sufficiency you hereby acknowledge.

9. Prior to acceptance of these Terms and Conditions of Access, you (either directly or indirectly through your employer or principal, if applicable), will have executed a separate agreement with terms or conditions that specifically pertain to use of CKN GOLD. In the event that any of the terms and conditions of this agreement should prove to be in conflict with the terms and conditions of either your Cerner Business Agreement or any separate agreement related thereto (including agreements that concern use of Cerner

Case 2:17-cv-01254-JPS Filed 09/15/17 Page 108 of 164 Document 1-1

## CERNER KNOWLEDGE NETWORK GOLD AGREEMENT

Knowledge Network), the Cerner Business Agreement and the separate agreement(s) related thereto shall, in that order, be controlling unless otherwise agreed in writing.

I ACCEPT                                    I DO NOT ACCEPT

(c) 1997 Cerner Corporation. All rights reserved.

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 109 of 164   Document 1-1

EXHIBIT I



23FM00004 Rev.001 10/22/01

83

ARR3711

EXHIBIT I

## OPTIONAL APPLICATIONS



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 111 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



85

ARR3711

EXHIBIT I

OPTIONAL APPLICATIONS



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 113 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 114 of 164   Document 1-1

EXHIBIT I

**OPTIONAL APPLICATIONS**



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 115 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



89

ARR3711

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 116 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



90

ARR3711

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 117 of 164   Document 1-1

EXHIBIT I

**OPTIONAL APPLICATIONS**



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 118 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 119 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



93

ARR3711

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 120 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



94          ARR3711

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 121 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



23FM00004 Rev.001 10/22/01

95

ARR3711

EXHIBIT I

## OPTIONAL APPLICATIONS



96

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 123 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



97

ARR3711

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 124 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 125 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



Case 2:17-cv-01254-JPS Filed 09/15/17 Page 126 of 164 Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS



Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 127 of 164   Document 1-1

EXHIBIT I

OPTIONAL APPLICATIONS

ARR3711

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 128 of 164   Document 1-1

EXHIBIT I

**OPTIONAL APPLICATIONS**



102

ARR3711

EXHIBIT I

OPTIONAL APPLICATIONS



103

ARR3711

## HIPAA BUSINESS ASSOCIATE AND DATA USE ADDENDUM

**WHEREAS**, the parties have entered into that certain Cerner Business Agreement dated March ___, 2004 (the "Agreement") pursuant to which, among other things, Cerner will provide certain software support and maintenance services;

**WHEREAS**, as part of the services provided to Client, Cerner may receive from Client, and may create or receive on behalf of Client, "protected health information" as that term is defined at 45 C.F.R. § 164.501 ("Protected Health Information"); and

**WHEREAS**, the parties desire to enter into this HIPAA Business Associate and Data Use Addendum (the "Addendum") so that Client may comply with relevant parts of 45 C.F.R. Parts 160 and 164 (Subparts A and E) (the "Privacy Standards"), and 45 C.F.R. Parts 160 and 164 (Subparts A and C) (the "Security Standards"), (collectively the "HIPAA Standards"), issued under the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Addendum, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties agree as follows:

1.  **Privacy Standards.**

    1.1.  **Permitted and Required Disclosures of Protected Health Information.** Except as otherwise provided in this Addendum, Cerner may use and disclose Protected Health Information only as necessary and appropriate to provide the services called for under the Agreement. Cerner may not use or further disclose Protected Health Information other than as permitted or required by this Addendum or as required by law. Cerner may not use or further disclose Protected Health Information in a manner that would constitute a violation of the Privacy Standards if done by Client, except that (a) Cerner may use and disclose Protected Health Information for the proper management and administration of Cerner, or to carry out its legal responsibilities in accordance with Section 1.2 of this Addendum; and (b) Cerner may provide Data Aggregation services relating to the health care operations of Client.

    1.2.  **Management and Administration of Cerner.** Notwithstanding any provision of Section 1.1 of this Addendum to the contrary:

        1.2.1.  Cerner may use Protected Health Information (a) for the proper management and administration of Cerner, or (b) to carry out the legal responsibilities of Cerner; and

        1.2.2.  Cerner may disclose Protected Health Information for the purposes identified in Section 1.2.1 above if (a) the disclosure is required by law; or (b) Cerner obtains reasonable assurances from the person to whom the information is disclosed that (i) such Protected Health Information will be held confidentially and used or further disclosed only as required by law or for the purposes for which it was disclosed to such person, and (ii) the person will notify Cerner of any instances of which the person is aware in which the confidentiality of the Protected Health Information has been breached.

    1.3.  **Appropriate Safeguards.** Cerner agrees that it will use appropriate safeguards to prevent the unauthorized use or disclosure of Protected Health Information.

    1.4.  **Reporting Obligation.** Cerner promptly shall report to Client any use or disclosure of Protected Health Information not provided for by this Addendum of which Cerner is aware.

    1.5.  **Agents/Subcontractors.** Cerner shall ensure that any agent, including a subcontractor, to which Cerner provides Protected Health Information agrees to the same restrictions and conditions that apply to Cerner pursuant to this Addendum with respect to such Protected Health Information.

    1.6.  **Access to Information.** To the extent Cerner maintains any Protected Health Information in a Designated Record Set, upon request by Client, Cerner shall make available to Client such Protected Health Information contained within a Designated Record Set as necessary to permit Client to fulfill its obligation to make available protected health information in accordance with 45 C.F.R. § 164.524.

    1.7.  **Amendment of Information.** To the extent Cerner maintains any Protected Health Information in a Designated Record Set, upon request by Client, Cerner shall provide such information to Client for amendment and incorporate any such amendments in the Protected Health Information as necessary to permit Client to fulfill its

## HIPAA BUSINESS ASSOCIATE AND DATA USE ADDENDUM

obligation to amend Protected Health Information in accordance with 45 C.F.R. § 164.526.

      **1.8.**    <u>Accounting of Disclosures</u>. Cerner shall maintain, and upon request by Client shall furnish to Client, information regarding any disclosures of Protected Health Information made by Cerner required for Client to make an accounting required by 45 C.F.R. § 164.528.

      **1.9.**    <u>Availability of Books and Records</u>. Cerner hereby agrees to make its internal practices, books and records relating to the use and disclosure of Protected Health Information available to the United States Secretary of the Department of Health and Human Services for purposes of determining Client's compliance with the Privacy Standards.

**2.**    <u>Security Standards</u>.

      **2.1.**    <u>Appropriate Safeguards</u>. Cerner shall implement Administrative, Physical and Technical Safeguards that reasonably and appropriately protect the Confidentiality, Integrity and Availability of the Electronic Protected Health Information that Cerner creates, receives, maintains or transmits on behalf of Client.

      **2.2.**    <u>Agents/Subcontractors</u>. Cerner shall ensure that any agent, including a subcontractor, to which it provides Electronic Protected Health Information agrees to implement reasonable safeguards to protect it.

      **2.3.**    <u>Reporting Obligation</u>. Cerner shall report to Client any Security Incident of which Cerner becomes aware.

**3.**    <u>Limited Data Set</u>.

      **3.1.**    Notwithstanding anything to the contrary in this Addendum, Cerner may receive Data from Client in accordance with the terms of Section 9.9 of the Agreement, for the uses identified in Section 9.9, provided that such uses are for the purpose of Research or public health within the meaning of 45 C.F.R. § 164.514(e)(3)(i), and provided further that Cerner otherwise complies with the provisions of this Article 3 of this Addendum.

      **3.2.**    Cerner will not use or further disclose the Data except as permitted in accordance with Article 3 of this Addendum and Section 9.9 of the Agreement, and Cerner will not use or further disclose the Data in a manner that would violate the Privacy Standards if done by Client.

      **3.3.**    Cerner will use appropriate safeguards to prevent use or disclosure of the Data other than as permitted in accordance with Article 3 of this Addendum and Section 9.9 of the Agreement.

      **3.4.**    Cerner will report to Client any use or disclosure of the Data other than as permitted in accordance with Article 3 of this Addendum and Section 9.9 of the Agreement of which Cerner becomes aware.

      **3.5.**    Cerner will ensure that any agent, including a subcontractor, to which Cerner provides any Data agrees to the same restrictions and conditions that apply to Cerner pursuant to Article 3 of this Addendum with respect to such Data.

      **3.6.**    Cerner agrees not to identify the Data within the meaning of the Privacy Standards, or to contact the individuals who are the subjects of the Data.

      **3.7.**    The restrictions and conditions imposed on Cerner with respect to use and disclosure of Protected Health Information set forth in Article 1 and Section 4.2 of this Addendum shall not apply to Data disclosed to Cerner, and used and/or disclosed by Cerner, in accordance with Article 3 of this Addendum.

**4.**    <u>Termination</u>.

      **4.1.**    <u>Termination Upon Material Breach</u>. Client may terminate the Agreement in the event that Cerner breaches any material term of this Addendum, provided that any such termination shall be governed by the applicable terms of Section 9.2 of the Agreement, including without limitation terms applicable to notice and rights to cure.

      **4.2.**    <u>Post-Termination Obligations</u>. Cerner agrees that upon termination of the Agreement, if feasible, Cerner will return or destroy all Protected Health Information that Cerner still maintains in any form, and will retain no copies of such information; provided, however, that if such return or destruction is infeasible, Cerner shall extend the

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 132 of 164   Document 1-1

## HIPAA BUSINESS ASSOCIATE AND DATA USE ADDENDUM

protections of this Addendum to the Protected Health Information and shall limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction of the information infeasible.

5.    Miscellaneous.

5.1.    Defined Terms. All capitalized terms not otherwise defined in this Addendum shall have the meanings set forth in the Agreement. All capitalized terms and other terms not otherwise defined in this Addendum that are defined in the HIPAA Standards shall have the meanings set forth in the HIPAA Standards, as applicable.

5.2.    Compliance; Construction. This Addendum shall comply, and shall be interpreted in all respects to comply, with HIPAA and the HIPAA Standards. All references to the HIPAA Standards shall be deemed to include any subsequent amendments to such standards and/or any successor provisions.

5.3.    Cooperation. Cerner agrees reasonably to cooperate with Client to amend this Agreement as appropriate to facilitate Client's compliance with the HIPAA Standards.

5.4.    Conflict. In the event of any conflict between this Addendum and any other part of the Agreement, this Addendum shall control.

5.5.    No Third Party Beneficiaries. This Addendum shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and successors and nothing herein, express or implied, is intended to or shall confer upon any other person or entity, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Addendum.

**MAINTENANCE SERVICES**

This Exhibit sets forth the added-value services that are provided to Client upon Client's election to obtain Equipment and Sublicensed Software Maintenance from Cerner. Cerner is uniquely qualified to deliver combined integrated technology and application system maintenance for the System to provide industry leading performance and value. Cerner Maintenance services provide the highest quality application, hardware, and operating software maintenance to Client.

## Total Technology Maintenance

Cerner technology Maintenance services go well beyond the initial hardware and operating system software problem determination that is offered by other application software vendors. If Client elects to obtain Maintenance from Cerner, such total technology Maintenance ("Total Technology Maintenance") includes Critical Technology Maintenance (CTM) combining Cerner's proprietary software expertise with a highly specialized knowledge of the covered Equipment, Sublicensed Software and Licensed Software. CTM includes problem determination, problem management, situation management, critical situation escalation, and recovery services. CTM is augmented by remedial on-site hardware and software Maintenance performed by Cerner's authorized service providers under the direct control of Cerner's Maintenance specialists.

Because of the close relationship we have established between our Maintenance specialists and our authorized service providers, Cerner provides the following services with Total Technology Maintenance.

### Sole Source Solutions Management

Cerner provides initial problem determination to identify the source as application software, hardware, or operating system software. With Total Technology Maintenance, Cerner will remain engaged in problem diagnosis and resolution regardless of the problem area. Cerner will provide full Maintenance and will engage and manage any and all internal and external resources required to restore the System to full operations. To the extent Client elects to obtain Maintenance on Sublicensed Software and Equipment, Cerner will procure, on Client's behalf, third party supplier commitments and arrangements necessary to support and maintain the Sublicensed Software and Equipment in a manner and to the extent necessary to permit Client to utilize the System as contemplated under the Agreement.

### Priority Scheduling

Equipment and Sublicensed Software covered under Cerner's equipment Maintenance agreement are serviced ahead of customers requesting service on a time and materials basis. Cerner's Immediate Response Center will provide immediate assistance to Client should Client elect to obtain Maintenance on Equipment and Sublicensed Software. If necessary, Cerner's Immediate Response Center will call in on-call associates to provide this level of service. Should Client elect to obtain Maintenance, Client will be prioritized ahead of those receiving time-and-materials service.

### Continuous Effort

From the point of problem diagnosis through problem resolution, Cerner provides continuous Maintenance to resolve problems until Cerner and Client verify that all repairs are complete and the System is fully operational, regardless of whether the problem is caused by Licensed Software, Sublicensed Software or Equipment.

### Call Management

When contacted with a System problem, Cerner goes beyond dispatching the appropriate service provider by managing the call from start to finish. Call management begins with providing an initial problem

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 134 of 164   Document 1-1

### MAINTENANCE SERVICES

diagnosis and dispatching and coordinating the activities of engineers to work directly with Client to provide remedial Maintenance. Once Cerner has dispatched the service provider, Cerner shall work with Client throughout the resolution and documents the entire process. Cerner shall contact the service providers for updates and communicate information to Client regarding the status and efforts being undertaken to resolve the problem.

Cerner will assist in providing a solution to maintain System availability while the component is repaired, testing the repair, and restoring the environment to its original configuration once the repair is complete. If a service request is not handled appropriately, Cerner will escalate the issue to insure it is resolved and will perform the appropriate follow-up with the service provider to insure future problems do not occur.

<u>Problem Escalation</u>

Cerner follows clearly defined internal call escalation procedures that include standard call escalation protocols for our authorized service providers.

## Critical Technology Maintenance for Equipment

<u>Situation Management</u>

If a component of the Equipment has failed or appears to be failing, Cerner goes beyond simply repairing the device. Cerner will assist in providing a solution to maintain System availability while the component is being repaired. Quite often, this solution prevents hours of partial or total system outage. Cerner Maintenance specialists anticipate the impact of Equipment failures on daily, weekly, and monthly operations cycles and will modify these cycles to insure they continue to execute.

A failed disk drive provides an example of this service. A disk drive failure prevents users from accessing any of the information on the failed disk and may result in an extended period of downtime waiting for device repairs. To avoid this downtime, Cerner will assist in moving the files on the failed device to an alternate disk drive, dynamically adjust the file location parameters, modify the appropriate startup procedures, allow users to access the information, and modify the appropriate operations cycles. This would provide full System availability during the time it takes to repair the drive. Upon completion of the disk repair, Cerner will assist in testing the disk and moving the files back to their original location at a time convenient for client operations.

Similar procedures would be used to maintain System availability when any Equipment component fails. Whether the failed component is a disk drive, a printer, a tape drive, a CPU board, or a terminal server, this situation management can prevent hours of downtime.

<u>Integrated Application Maintenance</u>

The Immediate Response Center and Service Center shall be staffed by Maintenance specialists knowledgeable in the Licensed Software, Sublicensed Software and Equipment. Cerner Maintenance specialists shall maintain extensive documentation on a Client's System and know how to reconfigure the System to maximize availability during failures.

<u>Recovery Services</u>

Upon electing to obtain Cerner Equipment Maintenance, Cerner will provide recovery services for Equipment problems which result in the loss of data. In these instances, Cerner will attempt to minimize the amount of data loss while maximizing System availability.

108

**MAINTENANCE SERVICES**

Cerner has developed and shall utilize proprietary software utilities specifically designed to maximize data recovery. These utilities generally provide a complete recovery of data. In the event that a complete recovery is not possible, Cerner will develop audits and utilities to identify information that requires further review by designated individuals at the Client's site.

In recovering lost data, Cerner uses proprietary software utilities to restore as much of the data as possible. These restoration utilities take advantage of file backups and Cerner's Transaction Logging. Quite often, these utilities alone are able to restore all of the lost data.

## Technology Service Database

Cerner shall maintain an Equipment database, which includes the device name, model number, serial number, level of coverage, and coverage expiration date for each component that is under Maintenance. Cerner shall document the Equipment component for each Equipment service request. The serial number is especially critical because it drives problem resolution by Cerner and the service provider. This documentation enables Cerner to maintain detailed client service histories for Equipment. Cerner shall detail every service request placed on a particular component. Cerner shall also resolve any discrepancies with the service providers.

## Technology Trend Analysis

Cerner's client-wide database provides the opportunity to resolve issues rapidly, many times even before they cause an outage. When Cerner detects a problem with a particular component, Cerner shall query the Client's database to identify whether its System has the same components. Cerner can productively address a problem before it results in an outage.

## Critical Technology Maintenance for Sublicensed Software

Critical Technology Maintenance for Sublicensed Software shall be provided upon Client's election to obtain Maintenance from Cerner on such software.

## Initial Problem Determination

Initial problem determination provides diagnostic services to identify the source of the problem as application software, hardware, or operating system software. With critical technology Maintenance for operating system Sublicensed Software, Cerner will remain engaged in problem diagnosis and resolution regardless of the System problem area.

## Unlimited Number of Contacts

Cerner's Maintenance for Sublicensed Software does not restrict the number of people in who may contact Cerner for assistance. Cerner requests that everyone requesting service has a working knowledge of the System and is able to assist in troubleshooting. However, if these requirements are not met, Cerner will accept the call and request that a qualified individual be contacted.

## Situation Management

If the Sublicensed Software causes problems to a Cerner application or prevents System usage, Cerner goes beyond simply repairing the problem. Cerner will assist in providing a solution to maintain System availability while the problem is being repaired. Quite often, this solution prevents hours of partial or total system outage.

109

## MAINTENANCE SERVICES

A disk drive with no available space provides an example of this service. If disk space is not managed properly, an application may attempt to write information to a disk drive which has no space available. This can cause the application to abort or result in the loss of information. This results in application unavailability until a solution is implemented which frees disk space on the problem disk drive. To avoid this downtime, Cerner will assist by moving files off of the disk or by adjusting file location parameters to create temporary locations for the applications to process. This would provide application availability during the time it takes to create a permanent solution to the disk space issue. Upon completion of the permanent solution, Cerner will assist in performing the proper steps to restore the system to its proper configuration at a convenient time for Client operations.

### Integrated Application Maintenance

Cerner's Immediate Response Center and Immediate Answer Center shall be staffed by Maintenance specialists knowledgeable in Cerner's application software, including both Licensed Software and Sublicensed Software, and its inter-relationship with all other components of the problem System. When resolving issues with Sublicensed Software, Cerner Maintenance specialists are able to draw on their knowledge of this relationship to insure that the System is not adversely impacted.

### Recovery Services

As part of Maintenance, Cerner will provide recovery services for Sublicensed Software issues which result in the loss of data. This may occur due to failures during file conversions, reorganizations, or relocations. In these instances, Cerner will attempt to minimize the amount of data loss while maximizing System availability.

Cerner has developed and shall utilize proprietary software utilities specifically designed to maximize data recovery. These utilities generally provide a complete recovery of data. In the event that a complete recovery is not possible, Cerner will develop audits and utilities to identify information that requires further review by designated individuals at the Client's site.

Cerner uses proprietary software, CURES, to restore data. These restoration utilities take advantage of file backups and Cerner's transaction logging. Quite often, these utilities alone are able to restore all of the lost data.

### Operating System Release Certification and Media Distribution

As new versions of the Sublicensed Software and layered products are released, Cerner shall perform extensive testing and certification of the new version to insure compatibility with all relevant components of the System. This certification process shall insure that the versions of Sublicensed Software Client shall receive are compatible with other components of the System and combine to form a stable operating environment.

### Documentation Distribution and Update Service

Distribution of documentation for the Sublicensed Software and layered products which are purchased are included in the Maintenance services. As the versions of the Equipment and/or Sublicensed Software are upgraded, the appropriate documentation will be distributed to Client.

**FILED**

**08-16-2017**

Clerk of Courts
Fond du Lac County WI
1 40QH2TN

 **CERNER SALES ORDER**

| | | |
|---|---|---|
| **Prepared For:** Agnesian Health Care ("Client")<br>430 E Division St PO Box 385<br>Fond Du Lac, WI 54935-4560 USA | **Expiration Date:** May 18, 2015 | Honorable Robert J. Wirtz<br>Branch 5 |
| **Cerner Sales Contact:** Barry Holcomb | **Phone #:** (816) 201-3707 | **E-mail Address:** bholcomb@cerner.com |

This Cerner Sales Order is made on February 26, 2015 ("Effective Date"), between Client and Cerner Corporation ("Cerner"), a Delaware corporation with its principal place of business at 2800 Rockcreek Parkway, Kansas City, Missouri, 64117. This Cerner Sales Order is subject to, and incorporates by reference, the Cerner Business Agreement, dated March 25, 2004, between Client and Cerner (the "Agreement").

## SCOPE OF USE

**Scope of Use Limits.** Client will use the following solutions for processing data related to clinical procedures performed at the Permitted Facilities, and in accordance with the Solution Descriptions.

| Solution Description | Scope of Use Metric | Scope of Use Limit | Scope of Use Metric Description |
|---|---|---|---|
| Cerner Contract Management | Claims | ▮ | Monthly volume of claims for payment by a medical provider for a given medical service or item. |
| Cerner Electronic Payment Services | Patient Payments | ▮ | Monthly count of completed transactions that process error free, whether reversed or not, through the transaction partner and successfully charge the payer's card |
| Claims Editor - Min Chg | Claims Scrubbed | ▮ | Monthly volume of claims for payment by a medical provider to be screened prior to submission to a Payer. |
| Letters | Correspondence Letters | ▮ | Monthly volume of correspondence letters distributed to patients. |

**Scope of Use Expansion.** If a scope of use limit is exceeded, Client agrees to expand scope of the solutions at Cerner's then-current expansions fees.

Scope of use will be measured periodically by Cerner's system tools, or, for metrics that cannot be measured by system tools or obtained through the American Hospital Association (e.g. FTEs or locations), Client will provide the relevant information (including records to verify the information) to Cerner at least one (1) time(s) per year. Client agrees that if an event occurs that will affect Client's scope of use (such as acquisition of a new hospital or other new facility), Client will promptly notify Cerner in writing of such event no later than thirty (30) days following the effective date of such event so that Client's scope of use can be reviewed. Any additional fees due under this Section will be payable within thirty (30) days following Client's receipt of an invoice for such fees. Any additional monthly fees will begin on the date the limit was exceeded, and paid monthly (pro-rated for any partial month).

## PAYMENT TERMS

### TRANSACTION SERVICES

Ordinarily **One-Time Fees.** The one-time transaction services fees will be paid on the Effective Date.

**Monthly Fees.** The monthly transaction services fees are based on the expected monthly transaction volumes set forth in the "Fees To Be Paid" section. The monthly fees will be invoiced each month in advance, beginning upon First Productive Use, ▮

**Monthly Overage Fees.** If Client's transaction volume in any given month exceeds the scope of use limit(s) for the transaction services as set forth in the "Scope Of Use Limits" section, the additional overage fee(s) set forth in the "Solutions and Services" section will apply. Monthly overage fees are invoiced in arrears, as incurred.

### PROFESSIONAL SERVICES

**Fixed Fee.** Professional Services fees will be paid as follows:


Agnesian Health Care
1-40QH2TN
February 26, 2015

**EXHIBIT C**




**FEE INCREASES**

[redacted]

## TERM AND TERMINATION

**Other Services.** All applicable recurring services (such as managed services, application services, subscription services, application management services, employer services, transaction services, and Shared Computing Services) begin on the First Productive Use, and continue for the term set forth in the "Solutions and Services" section. At the end of the applicable term, each service will automatically renew for additional twelve (12) month periods at the rate charged in the final period of the then-current term, unless either party provides the other party with written notification of its intent to terminate the relevant service no less than sixty (60) days prior to the expiration of the applicable then-current term

## SOLUTION DESCRIPTIONS

Each solution with a Solution Description has a code noted in the "Solutions and Services" section of this Cerner Sales Order, and that code can be entered at https://solutiondescriptions.cerner.com to view the Solution Description. These Solution Descriptions are incorporated into this Cerner Sales Order by reference. In the event a Solution Description is not published on Cerner's website, it may be attached to this Cerner Sales Order.

## PASS-THROUGH PROVISIONS

Where pass-through provisions are applicable to third party products, these provisions are referenced by a pass-through code in the "Solutions and Services" section of this Cerner Sales Order, and that code can be entered at http://www.cerner.com/members/PassThroughProvisions/default.aspx?id=30061 to view the pass-through provisions. These pass-through provisions are incorporated into this Cerner Sales Order by reference.

## FINANCIAL OVERVIEW

| Description | One-Time Fees | Monthly Fees | Annual Fees |
|---|---|---|---|
| Transaction Services | ▮ | ▮ | - |
| Professional Services | | | |
|    Fixed Fee | ▮ | - | - |
| **TOTALS:** | ▮ | ▮ | - |

All prices in this Cerner Sales Order are shown in US Dollar (USD).

## SOLUTIONS AND SERVICES



Agnesian Health Care
1-40QH2TN
February 26, 2015

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 139 of 164   Document 1-1


**TRANSACTION SERVICES**

**One-Time and Monthly Fees**

| Solution Code | Description | Qty | Scope | Term (Mo) | One-Time Fees | Monthly Fees | Solution Description Code | Pass-Through Code |
|---|---|---|---|---|---|---|---|---|
| colspan=9 | **Quote: Cerner Solutions - Contract Management (1-8763162810-R-2)** | | | | | | | |
| RC-20403C-MIN | Cerner Contract Management | | Claims | ■ | | | | |

| Solution Code | Description | Qty | Scope | Term (Mo) | One-Time Fees | | | |
|---|---|---|---|---|---|---|---|---|
| colspan=9 | **Quote: Cerner Solutions - Transaction Services (1-8954261054-** | | | | | | | |
| TSEDI-LTR-MIN | Letters | | Correspondence Letters | ■ | | | | |
| TSEDI-EDIT-MIN | Claims Editor - Min Chg | | Claims Scrubbed | ■ | | | | |
| TSEDI-EDIT-STUP | Claims Editor - Submitter Setup Fee | | Submitter IDs | | ■ | | | |
| RC-20402-MIN | Cerner Electronic Payment Services | | Patient Payments | ■ | | | | |

**Transaction and Overage Fees**

| Solution Code | Description | Qty | Scope | Transaction Usage Fees | Monthly Overage Fees | Annual Overage Fees | Solution Description Code | Pass-Through Code |
|---|---|---|---|---|---|---|---|---|
| colspan=9 | **Quote: Cerner Solutions - Contract Management (1-8763162810-R-2)** | | | | | | | |
| RC-20403C-TRANS | Cerner Contract Management-Transactions | | Claims | | ■ | | | ■ |
| RC-20403C-BILL | Cerner Contract Management | | Claims | | | | . | |
| RC-20413C | Payer Specific Content | | Claims | | | | | |

| Solution Code | Description | Qty | Scope | Transaction Usage Fees | Monthly Overage Fees | Annual Overage Fees | Solution Description Code | Pass-Through Code |
|---|---|---|---|---|---|---|---|---|
| colspan=9 | **Quote: Cerner Solutions - Transaction Services (1-8954261054-R-2)** | | | | | | | |
| TSEDI-LTR-BILL | Letters - Overage | | Correspondence Letters | | ■ | | | |
| TSEDI-LTR-TRANS | Letters - Transaction | | Correspondence Letters | | | | | |
| TSEDI-LTRIMG-BILL | Letters Imaging | | Correspondence Letters | | | | | |
| TSEDI-EDIT-BILL | Claims Editor - Monthly Overage Rate | | Each | | | | | |
| TSEDI-EDIT-TRANS | Claims Editor - Transactions | | Each | | | | | |
| RC-20402-BILL | Cerner Electronic Payment Services - Overage | | Patient Payments | | | | | |
| RC-20402-TRANS | Cerner Electronic Payment Services - Transaction | | Patient Payments | | | | | |


Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 140 of 164   Document 1-1



# CERNER SALES ORDER

## PROFESSIONAL SERVICES

| Phase | Project | **Bill Type | Solution | Rate | Metric | Qty | Fees | Pass-Through Code |
|---|---|---|---|---|---|---|---|---|
| \multicolumn Quote: Professional Services (1-8763168832-R-4) | | | | | | | | |
| 1 | RevWx Services | FF | Cerner Network | | | | | |
| 1 | RevWx Services | FF | FSI - Support | | | | | |
| 1 | RevWx Services | FF | Transaction Services | | | | | |

**FF = Fixed Fee / FFS = Fee For Service

Professional services pricing is valid until May 16, 2015. If a Cerner Sales Order is not executed on or before such date, this pricing is considered null and void and will be subject to revision. Cerner will not schedule resources for implementation services until this Cerner Sales Order has been executed by both parties and processed by Cerner.

## ADDITIONAL TERMS AND PROVISIONS

### TRANSACTION SERVICES TERMS

The provisions in these "Transaction Services Terms" apply specifically to the transaction services set forth in the "Solutions and Services" section of this Cerner Sales Order. In the event of any conflict between these terms and conditions and those in the Agreement, the terms and conditions set forth in this "Transaction Services Terms" shall prevail with respect to the Transaction Services.

### Definitions

For all purposes of this Cerner Sales Order, the following terms have the meanings set forth below:

**Cerner Product** shall mean any equipment, firmware, software, and all modifications, updates, enhancements, or replacements for any of the foregoing furnished to Client by Cerner for the use of Transaction Services.

**First Productive Use** shall mean Client's first use of the Transaction Services to transfer production data to a Cerner trading partner or Payer.

**Payers** shall mean entities, including but not limited to, clearinghouses, print facilities and insurance carriers that receive Transactions submitted by Clients through the Transaction Services as identified from time to time by Cerner.

**Provider** shall mean a member of a healthcare team whose services are billable to at least one Payer or health plan.

**Submitter ID** shall mean a department or facility requiring independent invoices.

**Transactions** shall mean transactions submitted by Client for the Transaction Services, whether or not a Payer accepts or favorably adjudicates such transactions.

### Transaction Services and Cerner Product

Subject to the terms and conditions of this Cerner Sales Order, Cerner grants to Client a non-exclusive and non-transferable right to use the Transaction Services and Cerner Products for the Term and at the locations listed under the "Facilities" section of this Cerner Sales Order. Furthermore, Cerner shall provide reasonable ongoing technical support through telephone consultations with respect to the Transaction Services. Cerner may separately charge any applicable taxes and shipping, insurance, and delivery charges associated with the delivery and any subsequent return of the Cerner Product, or any portion thereof.

### Client Obligations

Client agrees to execute all documents and comply with all applicable procedures, rules and regulations which Cerner, the applicable Payer, clearinghouses, insurance carriers, or other third parties, or applicable law, rule or regulation may reasonably require in relation to the Transaction Services including, without limitation, rules governing record retention, non-discrimination, error resolution, obtaining patient's consent and/or authorization for the transmission of patient data. Client agrees to provide all supporting documents requested by Cerner necessary to comply with the foregoing. Client agrees to indemnify, and hold Cerner harmless from any and all claims, demands, damages, action, causes of action, liens, claims of liens, costs, losses, and expenses including attorneys' fees, of any nature arising out of or relating in any way to the failure of Client to comply with the requirements of this Cerner Sales Order. In furtherance hereof, Cerner is required to pass on and/or



Agnesian Health Care
1-40QH2TN
February 26, 2015


## TRANSACTION SERVICES TERMS

obtain the following covenants from Client to the extent applicable: (a) access to eligibility information shall be restricted to the sole purpose of verification of eligibility where the recipient has requested medical services; (b) verification of eligibility under the system is not a guarantee of payment and the records as to the recipient's eligibility status shall be the final authority; (c) as to eligibility information, Client agrees to indemnify and holds harmless the applicable State, its agents and employees, from any and all claims to the extent required by Cerner's suppliers' contracts with State agencies, or any Medicaid recipient who is aggrieved by the actions of Client hereunder; and (d) Client agrees to abide by the Federal and State law, rules and regulations regarding confidentiality of information.

Client agrees that, with respect to Eligibility and Benefits Transaction Services, before a provider submits any 270s, and at all times thereafter, Client will ensure that each provider provides sufficient security measures, including user ID and passwords, to associate a particular 270 with the particular employee who submitted the 270, with respect to all 270s that it submits. Client will cooperate with Cerner and its suppliers (and their respective agents) in the event that a supplier has a security concern with respect to any 270 submitted by Client or a provider. Client will immediately notify Cerner in the event any of the assurances in this paragraph provided are no longer met. Client will immediately cease transmission of 270 at such time that any of the assurances herein provided are no longer met. With respect to 270s submitted by Client or a provider for submission to the Centers for Medicare & Medicaid Services Medicare Data Communication Network, such 270s will be limited to requests for Medicare beneficiary eligibility data with respect to a patient currently being treated or served by the Client or a provider, or who has contacted Client or a provider about treatment or service, or for whom Client or a provider has received a referral from a health care provider that has treated or served that patient.

Client hereby grants Cerner the right to submit electronic Transactions and/or sign hard copy (paper) Transactions on Client's behalf to third-party payers or processors, including but not limited to commercial insurers, Medicare, Medicaid, and government agencies, and, where appropriate, agencies or carriers covering work-related accident or illness benefits where Client's signature is required for Transaction processing. Client acknowledges that Cerner is not responsible for any Medicare, Medicaid, work related accident or illness claim or other insurance claim and Client retains all liability on such claims and agrees to indemnify and hold Cerner harmless on account of all such claims, including the reconciliation or adjustment of any claim.

Client guarantees that all transactions submitted to the Transaction Services by Client will be on behalf of physicians or suppliers that have executed appropriate written authorizations for such submission and a true copy of such authorization shall be furnished to Cerner upon request. Client also agrees to maintain each claim in a manner to assure that such claim can be associated or identified with a claim form from the applicable physician or supplier and such source document will be maintained by Client for a period of seventy-two (72) months.

Client shall retain records of Client's use of the Transaction Services, and Cerner may access such records as reasonably necessary during normal business hours upon reasonable advance prior notice to verify Client's compliance with its obligations.

### Limitation of Liability

In no event will Cerner or any third party provider be liable for any special, indirect, incidental, speculative, punitive or consequential damages or loss of goodwill in any way relating to this Cerner Sales Order or resulting from the use of or inability to use the products or the performance or non-performance of any services, including, without limitation damages for loss of profits, data or use incurred by Client or any third party, even if Cerner has been notified of the possibility of such damages.

IN NO EVENT WILL CERNER'S LIABILITY OR ANY THIRD PARTY SOFTWARE PROVIDER'S LIABILITY FOR ANY COSTS, EXPENSES, OR DAMAGES TO CLIENT OR ANY THIRD PARTY, REGARDLESS OF THE FORM OF ACTION, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, PRODUCTS LIABILITY OR OTHERWISE, EVER EXCEED THE AMOUNT RECEIVED BY CERNER FROM CLIENT FOR THE APPLICABLE PRODUCT(S) AND SERVICE(S) DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE ACTION.

### License to Cerner

Client grants to Cerner a non-exclusive, perpetual, irrevocable, royalty free, transferable, license to use, distribute, sublicense, publish, transmit, display, exploit, manipulate, compile, with other databases and create derivative works in and to the Anonymous Data and to exercise all of the above rights in connection with such derivative works. "**Anonymous Data**" means all patient, insurance, drug and medical information and other data that is input by, or on behalf of, Client or processed

 **Cerner**

Agneslan Health Care
1-40QH2TN
February 26, 2015

Case 2:17-cv-01254-JPS  Filed 09/15/17  Page 142 of 164  Document 1-1



# CERNER SALES ORDER

through or generated by any Transaction Service (but not including any confidential patient information, such as a patient's name or social security number or any information that would disclose the identity of any patient, or any other information, which if disclosed, would be prohibited by law.

**Miscellaneous**

Each party will obtain any license, permit or authorization required by law in connection with those aspects of the transmission process for which it is responsible under this Cerner Sales Order. Cerner shall have the right to assign this Cerner Sales Order, and to contract with third parties to perform any or all of the Transaction Services.

## ALPHA II CLAIMSTAKER SOFTWARE LICENSE AGREEMENT

*Alpha II*

| | | |
|---|---|---|
| **MEGAS, LLC** | **Unicor Medical, Inc.** | Licensor Contact: _Nancy Birschbach_ |
| **1650 Summit Lake Dr., Ste. 101** | **4160 Carmichael Road** | Email: _birschbacha @agnesian.com_ |
| **Tallahassee, FL 32317** | **Montgomery, AL 36106** | Phone: _920 926.4260_ |
| **800-476-8477 ("MEGAS")** | **800-825-7421 ("Unicor")** | Number of Providers: |

**Group/Practice/Billing Service Name ("Licensee"):**
_Agnesian Healthcare Inc._
_430 E. Division St_
City: _Fond du Lac_ St: _WI_ Zip: _54935_
Telephone: _920 9264260_ Fax: _____
E-mail: _birschbachn@agnesian.com_

**Mailing Address (if different):**
City: _____ St: ____ Zip: ____
Telephone: _____ Fax: _____
E-mail: _____

THIS SOFTWARE LICENSE AGREEMENT FOR ALPHA II CLAIMSTAKER ("License") is made as of the Effective Date by and between Licensor and the party identified above as "Licensee". The terms of this License shall prevail over any conflicting or additional terms of any order, acknowledgement, click-through agreement, or similar communication between the parties during the term of this License.

**Witnesseth:**

WHEREAS, MEGAS and Unicor (collectively "Licensor" as hereinafter defined) have developed and own that certain healthcare computer software entitled Alpha II ClaimStaker; and

WHEREAS, Licensee has reviewed Alpha II ClaimStaker and has determined that Alpha II ClaimStaker edits will meet the requirements of Licensee; and

WHEREAS, Licensee desires to license Alpha II ClaimStaker; and

NOW, THEREFORE, in consideration of the mutual benefits of the covenants set forth below, Licensor and Licensee hereby agree as follows:

**Article 1: Definitions**

Section 1.01 – Recitals. The above identification of parties and recitals are true and correct.

Section 1.02 – Definitions. The following definitions and variations identified below shall apply to this License. Except as clearly indicated otherwise by the context, "or" shall mean "and/or." Other terms shall have meanings given to them under the provisions of this License.



**Cerner**
Agnesian Health Care
1-40QH2TN
February 26, 2015


**ALPHA II CLAIMSTAKER SOFTWARE LICENSE AGREEMENT**

**"Access"** means to store data in, retrieve data from or otherwise interface or make use of data (directly or indirectly) through electronic means or otherwise.

**"Affiliate"** means an entity that meets each of the following criteria: (1) any subsidiary of Licensee controlled by or under common control with the Licensee; (2) that agrees to be bound by the terms and conditions of this License as if such entity were the Licensee; and (3) in all such cases the Licensee has complete authority to bind and shall bind such entity to the terms and conditions of this License. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through ownership of more than fifty percent (50%) of the outstanding voting securities or other interests or by contract.

**"Authorized Person"** means a person that is an employee of Licensee or Affiliate, who agrees to hold all Confidential Information in strict confidence and is specifically authorized through proper assignment of an individual user name and Password by Licensee or Affiliate to Access the Licensed Software and Documentation for the sole and exclusive purposes of applying edits to encounters or insurance claims.

**"Confidential Information"** means all information disclosed by Licensor to Licensee which is identified as proprietary or confidential at the time such information comes into the possession or knowledge of Licensee and that is not: (i) already known to Licensee; (ii) in the public domain; (iii) conveyed to Licensee by a third party without restriction; (iv) released by Licensor without restriction; (v) independently developed by Licensee; and (vi) required by Court Order to be released by Licensee. For purposes of this definition, all information concerning the Licensed Software and the Documentation, including data formats, data content and edit names, edit descriptions and edit logic, shall be deemed Confidential Information.

**"CPT"** means that certain medical coding system owned and developed by the American Medical Association commonly referred to and marketed under the name "Current Procedural Terminology."

**"Documentation"** means the printed and online Licensed Software user's guide and any related Licensed Software documentation provided to You. Licensor reserves the right to modify the Documentation to reflect changes in the Licensed Software that may occur during the life of the License.

**"Effective Date"** means the date Licensee signs the License.

**"First Productive Use"** means Licensee's first use of the Licensed Software with Licensee's live patient data for which information returned by the Licensed Software is used to assist in correct coding or to identify the need for correction to meet proper coding, billing or claim filing requirements.

**"License"** and **"Terms and Conditions"** each means this License Agreement for Alpha II ClaimStaker between You and Licensor.

**"Licensor"** means, collectively, Unicor Medical, Inc., an Alabama corporation, and MEGAS, LLC, an Alabama limited liability company with their current respective addresses listed above.

**"Material Error"** means an error within the Licensed Software that is not related to Internet connectivity that creates a serious loss of functionality important in the daily operation of the Licensed Software and for which a workaround is not available.

**"Password"** means, if applicable, any password or passwords assigned to You for purposes of enabling You to access the Licensed Software during the term of this License.

**"Licensed Software"** means the Alpha II software and includes all updates, upgrades and revisions thereof as made available to Licensee by Licensor or VAR under this License.

**"Unauthorized Access"** shall mean any access to the Licensed Software or the Documentation by anyone other than employees of Licensee for the exclusive purpose of applying edits to encounters or insurance claims.

**"Unauthorized User"** means any individual who Accesses the Licensed Software or the Documentation except for the employees of Licensee who are specifically authorized by Licensee to Access the Licensed Software and Documentation for the sole and exclusive purposes of applying edits to encounters or insurance claims.



Agnesian Health Care
1-4OQH2TN
February 26, 2015


**ALPHA II CLAIMSTAKER SOFTWARE LICENSE AGREEMENT**

**Section 2 -- License.** Until this License terminates, Licensor grants to Licensee and its Affiliates who agree to be bound by the terms and conditions of this License a non-exclusive and non-transferable license to Access and use the Licensed Software and to use the Documentation for the sole and exclusive purpose of applying edits to encounters or insurance claims. This License may not be sublicensed. If applicable, You agree that You and Your authorized employees shall Access the Licensed Software solely via the Password.

**Section 3 -- Affiliate Guaranty.** The Licensee warrants that it is authorized to bind, and by virtue of its execution hereof, binds all of the Affiliates to the Terms and Conditions of this License as if such Affiliates were the Licensee. The Affiliates hereby assume all of the obligations of the Licensee under this License. The Licensee shall indemnify, defend and hold harmless Licensor and its respective officers, directors, employees, agents, successors and permitted assigns from and against any damages sustained by the Affiliates due to the breach of the foregoing warranty by the Licensee. The Licensee shall be jointly and severally liable for any and all damages sustained by Licensor due to the breach of the foregoing warranty and guaranty by the Licensee.

**Section 4 -- Password.** Licensee hereby accepts responsibility for, and shall be liable for, all persons that Access the Licensed Software using the Passwords assigned by or to Licensee and/or Affiliates. Licensee acknowledges that any Password assigned to or by Licensee and/or Affiliates is confidential and may not be disclosed to any third parties, and Licensee shall inform its authorized employees and Affiliates of the confidential nature of the Password. Licensee shall be responsible for the continued confidentiality of the Password assigned to or by Licensee and/or Affiliates and shall protect it like You would protect a trade secret. Licensee shall not assign any Password to Unauthorized Users. Licensor shall have the right to disable and deny the Password without notice for cause.

**Section 5 -- Unauthorized Access.** Licensee shall not allow Unauthorized Users to Access the Licensed Software. In the event Licensee becomes aware that the Licensed Software or any Password is being used in a manner not permitted by this License, Licensee shall immediately notify Licensor in writing of such facts at MEGAS, LLC Attention: Alpha II License Manager, P.O. Box 12292, Tallahassee, FL 32317. If the person(s) so using the Licensed Software or Password are employed by or otherwise subject to Licensee's direction and control, Licensee shall use its best efforts to have such impermissible use of such Licensed Software or Password immediately cease.

**Section 6 -- Specifications.** You hereby acknowledge and agree that certain hardware and system requirements are required to access and use the Licensed Software. You shall be solely responsible for meeting such computer hardware and system requirements.

**Section 7 -- Obligation of Confidentiality.** Licensor and Licensee shall hold Confidential Information in strict confidence. Licensor and Licensee shall not disclose Confidential Information except to Authorized Persons. Licensor and Licensee shall not duplicate, use or disclose Confidential Information except as otherwise permitted under this License.

**Section 8 -- Intellectual Property Rights.** You hereby agree that the Licensed Software and the Documentation, including any and all modifications, is the sole and exclusive property of Licensor. Licensor owns all rights, title and interests to the Licensed Software and the Documentation including (but not limited to) any and all copyrights, patents, trademarks and trade secrets related thereto. Neither You nor any of Your employees, officers, directors, shareholders, parents, affiliates or subsidiaries will challenge Licensor's ownership of the Licensed Software. The Licensed Software is and shall remain Licensor's exclusive property. Except for the license expressly granted by this License, Licensor grants no other rights to You with regard to the Licensed Software or to Licensor's other intellectual property. Upon termination of this License, all licenses and rights granted to You by Licensor terminate. You shall not contest or aid in contesting the ownership or validity of the copyrights, trademarks, service marks or trade secrets of the Licensor. This provision survives the termination of this License.

**Section 9 -- Trademarks.** You hereby acknowledge that the trademark(s) used by Licensor are owned exclusively by Licensor. All use of such trademark(s) and all goodwill developed therefrom shall inure exclusively to the benefit of and be on behalf of Licensor. This License does not grant You any right to use any trademark of Licensor without the prior written consent of Licensor. This provision survives the termination of this License.

**Section 10 -- Prohibitions.** You agree that You shall not (and shall not allow Your officers, directors, members, agents, representatives, employees or a third party to): (i) duplicate the Licensed Software; (ii) decompile, decrypt, disassemble or otherwise reverse engineer or attempt to reconstruct or discover any source code or algorithms of the Licensed Software by

 **Cerner**
Agnesian Health Care
1-40QH2TN
February 26, 2015

Page 8 of 16
Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 145 of 164   Document 1-1


**ALPHA II CLAIMSTAKER SOFTWARE LICENSE AGREEMENT**

any means whatsoever; (iii) remove any product identification, copyright or other such notices; (iv) provide, lease, lend, use for timesharing or outsourcing or hosting or otherwise allow third parties to use or benefit from the Licensed Software; (v) modify, incorporate into other software or create a derivative work of any part of the Licensed Software; (vi) decompile, disassemble or otherwise reverse engineer or attempt to reconstruct the Confidential Information (or any portion thereof); or (vii) provide, lease, lend, use for timesharing or outsourcing or hosting or otherwise allow unlicensed third parties to use or benefit from the Confidential Information. This provision survives the termination of this License.

Section 11 – CPT. CPT is and shall remain the American Medical Association's exclusive property. Upon termination of the Agreement, all rights to CPT terminate. This provision survives the termination of this License. IN NO EVENT SHALL THE AMERICAN MEDICAL ASSOCIATION BE LIABLE TO YOU  FOR ANY DAMAGES RESULTING FROM OR RELATED TO ANY FAILURE OF CPT USED IN CONJUNCTION WITH THE LICENSED SOFTWARE, INCLUDING, BUT NOT LIMITED TO PUNITIVE, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST DATA.

Section 12 – U.S. Government Rights.  Licensee agrees that the Licensed Software and Documentation is "commercial computer software" or "commercial computer software documentation" and that, absent a written agreement with Licensor to the contrary, Licensee's rights with respect to such Licensed Software or Documentation are, in the case of civilian agency use, Restricted Rights, as defined in FAR §52.227.19, and if for Department of Defense use, limited by the terms of this License, pursuant to DFARS §227.7202. The Licensed Software includes CPT codes and other components which are commercial technical data and/or computer databases and/or commercial computer software and/or commercial computer software documentation, as applicable, that were developed exclusively at private expense by Licensor or the American Medical Association, 515 N. State Street, Chicago, Illinois, 60610, United States. Licensee's rights to use, modify, reproduce, release, perform, display, or disclose, these technical data and/or computer databases and/or commercial computer software and/or commercial computer software documentation are subject to the Limited Rights restrictions of DFARS §252.227-7015(b)(2) (June 1995) and/or subject to the restrictions of DFARS §227.7202-1(a) (June 1995) and DFARS §227.7202-3(a) (June 1995), as applicable for Department of Defense procurements and the Limited Rights restrictions of FAR §52.227-14 (June 1987) and/or subject to the Restricted Rights provisions of FAR §52.227-14 (June 1987) and FAR §52.227-19 (June 1987), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal procurements. Notwithstanding anything herein to the contrary, the parties agree that the Restricted Rights use restrictions of 52.227 that pertain to computer software as defined therein are applicable to the Licensed Software hereunder, and the Limited Rights use restrictions that pertain to computer software documentation as defined therein apply to documentation hereunder. Specifically, the parties agree that all software and technical data is and has been privately developed at the expense of Licensor and/or its third party suppliers.

Section 13 – Warranty and Indemnity For Licensed Software.  Licensor warrants that it has authority to grant Licensee a license to use the Licensed Software described in this License.  Licensor also warrants that it shall deliver the Licensed Software free from the rightful claims of any third party for infringement of United States patents, trademarks, and copyrights. Licensee's exclusive remedy with respect to breach of the foregoing warranty shall be that Licensor will defend at its own expense, and will pay the costs and damages made in settlement or awarded as a result of any action brought against Licensee based on an allegation of such infringement with respect to the Licensed Software, if Licensor is notified promptly by Licensee in writing of any such action or allegation of infringement, and if Licensor shall have sole control of the defense of any such action and all negotiations for its settlement or compromise.  If an injunction is obtained against Licensee's use of the Licensed Software by reason of an infringement described above, or if in Licensor's opinion the Licensed Software is likely to become the subject of a claim of such infringement, Licensor will, at its option and at its own expense, procure the right for Licensee to continue using the Licensed Software, replace or modify the Licensed Software so that it becomes non-infringing or, if the previous options are not feasible, terminate this license. Licensor shall not have any obligation to Licensee under this section if the infringement claim is based upon the use of the Licensed Software in combination with any program or equipment, or any part thereof, not furnished or recommended in writing by Licensor, or the use of Licensed Software in a manner or environment, or for any purpose, for which Licensor did not design or license it.

LICENSEE'S RIGHTS UNDER THIS SECTION CONSTITUTE ITS SOLE AND EXCLUSIVE REMEDY AND LICENSOR'S SOLE AND EXCLUSIVE OBLIGATIONS WITH RESPECT TO ANY INFRINGEMENT OF ANY PROPRIETARY RIGHTS OF ANY THIRD PARTY CLAIMED BY VIRTUE OF ANY USE BY THE LICENSEE OF THE LICENSED SOFTWARE. THIS PROVISION SHALL SURVIVE TERMINATION OF THIS LICENSE.

Section 14 – Software Warranty. Licensor warrants that, beginning upon the date of First Productive Use and extending for so long as Licensor is being paid for the License under this License, the Licensed Software will perform without Material Error, the functions set forth in the Documentation when operated in accordance with the Documentation and in the



**Agnesian Health Care**
**1-4OQH2TN**
**February 26, 2015**

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 146 of 164   Document 1-1



# CERNER SALES ORDER

environment for which Licensor designed the Licensed Software to operate. In the event of a breach of this warranty, Licensor will repair or replace the failing item of the Licensed Software so that it does perform in accordance with such warranty. If, however, after repeated efforts (not to exceed six months from the date Licensor received written notice from Licensee concerning the warranty breach), Licensor is unable to repair or replace the Licensed Software so that it performs in accordance with the such warranty, Licensor may terminate this license. LICENSEE'S RIGHTS UNDER THIS PARAGRAPH CONSITUTE ITS SOLE AND EXCLUSIVE REMEDY AND LICENSOR'S SOLE AND EXCUSIVE OBLIGATIONS WITH RESPECT TO ANY BREACH OF THIS WARRANTY.

Section 15 -- Disclaimer. THE WARRANTIES CONTAINED IN THIS ARTICLE EXTEND TO AND ARE FOR THE BENEFIT OF LICENSEE ONLY. THE WARRANTIES SET FORTH IN THIS ARTICLE ARE IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES OF MERCHANTABILITY. THE WARRANTIES SET FORTH IN THIS ARTICLE ARE LIMITED TO THE LICENSED SOFTWARE AND DO NOT APPLY TO ANY THIRD PARTY SOFTWARE OR TECHNOLOGY. EXCEPTING THE WARRANTIES EXPRESSLY ACKNOWLEDGED HEREUNDER, LICENSOR HEREBY DISCLAIMS AND LICENSEE HEREBY WAIVES ALL WARRANTIES (EXPRESS OR IMPLIED) INCLUDING, BUT NOT LIMITED TO, ALL IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES OF MERCHANTABILITY INCLUDING ANY WARRANTY OF DESIGN OR ANY PATENT, TRADEMARK OR PROPRIETARY KNOW-HOW WARRANTIES. THIS PROVISION SHALL SURVIVE TERMINATION OF THIS LICENSE.

Section 16 -- Results. LICENSOR HAS MADE REASONABLE EFFORTS TO PROVIDE THAT THE INFORMATION CONTAINED IN THE LICENSED SOFTWARE IS ACCURATE. THE ULTIMATE RESPONSIBILITY FOR THE CORRECT CODING, HOWEVER, FALLS UPON THE MEDICAL PROVIDER OF SERVICES (AND YOU). LICENSOR NEITHER EXPLICITLY NOR IMPLICITLY, WARRANTS/GUARANTEES THAT THE CONTAINED CODES, STATEMENTS OR NARRATIVES ARE ERROR-FREE. LICENSOR DISCLAIMS ANY RESPONSIBILITY OR LIABILITY IF A DISPUTE OF PAYMENT ARISES, BASED ON CODES FROM THE LICENSED SOFTWARE, EITHER MEDICALLY OR OTHERWISE. YOU HEREBY ACKNOWLEDGE AND AGREE THAT (I) LICENSOR DOES NOT WARRANT THE ACCURACY, COMPLETENESS, TIMELINESS OR USEFULNESS OF THE DATA; (II) YOU HAVE ASSUMED THE RISK OF DEFECTS OR DEFICIENCIES IN THE DATA; AND (III) LICENSOR IS NOT RESPONSIBLE FOR THE RESULTS, SUCCESSFUL OR UNSUCCESSFUL, OBTAINED FROM USING THE LICENSED SOFTWARE. THIS PROVISION SHALL SURVIVE TERMINATION OF THIS LICENSE.

Section 17 -- Indemnification. You shall defend, indemnify and hold harmless Licensor from and against any and all claims, damages, expenses (including attorneys' fees) and liabilities arising from your negligence, the negligence of your employees, any breach of this License by you or your employees or any use or misuse of the Licensed Software by You or by Unauthorized Users who gain access to the Licensed Software through You. The terms of this provision shall survive termination of this License.

Section 18 -- Limitation of Damages. Licensor shall not be liable to You under any License, negligence, strict liability or other legal or equitable theory: (i) for any consequential, exemplary, incidental or punitive damages, (ii) for cost of procurement of substitute goods, technology or services or (iii) for loss or corruption of data, loss of revenue or interruption of use including, but not limited to, lost computer data, loss of privileges, lost profits or lost savings regardless of whether You have been advised of the possibility of such damages in advance or whether such damages are reasonably foreseeable. This provision shall survive termination of this License.

Section 19 -- Force Majeure. Licensor shall not be liable to You for failing to perform its obligations under this License due to circumstances beyond the control of Licensor. Such circumstances shall include, but not be limited to, any acts or omissions of any government or governmental authority, natural disaster, act of a public enemy, riot, sabotage, disputes or differences with workers, acts of terrorism, power failure, Internet outages or delays, delays in transportation or deliveries of supplies or materials, acts of God, computer failure or any events reasonably beyond the control of Licensor.

Section 20 -- Access. You hereby acknowledge and agree that access to the Licensed Software may be affected by local market network telecommunications activity, electronic mail failure, capacity and compatibility with third party communication equipment, communication software, web browsers and Internet (or Intranet) enabled software ("Interfering Technologies"). You hereby agree that Licensor shall not be responsible for Interfering Technologies.

Section 21 -- Downtime. You hereby acknowledge and agree that the Licensed Software may be inaccessible for a period of



Agnesian Health Care
1-40QH2TN
February 26, 2015

Page 10 of 16


**ALPHA II CLAIMSTAKER SOFTWARE LICENSE AGREEMENT**

time for purposes of maintenance, installation, update implementation, replacement, backup or modification. You hereby acknowledge that Licensor shall have no liability for Your inability to access the Licensed Software during such reasonable downtime.

**Section 22 -- Lawful Purpose.** You hereby represent and warrant all Your (and Your employees') access to the Licensed Software shall not violate any license, statute, rule, regulation or other obligation under which You are bound. You represent and warrant that You shall not access the Licensed Software to conduct or solicit the performance of any business or activity that is tortuous or prohibited by law.

**Section 23 -- Materials.** Upon termination of this License, You agree to destroy all copies of the Licensed Software, if any, and Documentation provided to You and shall provide Licensor at MEGAS, LLC, Attention: Alpha II License Manager, P.O. Box 12292, Tallahassee, FL 32317 with a signed certificate of compliance with this provision executed by You or Your highest executive officer or authorized representative. This provision shall survive the termination of this License.

**Section 24 -- Termination.** This License and Your license to the Licensed Software shall terminate upon the occurrence of any of the following events: (i) Your breach of this License and Your failure to cure such breach within ten (10) days of being given written notice of said breach; (ii) You or, if applicable, any reseller, value added reseller, or distributor with which You have a contractual relationship, fails to pay the relevant license fee(s) for Your license of the Licensed Software after an opportunity to cure, if any, as set forth in the applicable contract unless such payments are in valid dispute; (iii) You are given thirty (30) days prior written notice by Licensor that this License shall terminate; iv) termination of the agreement between You and any reseller, value added reseller, or distributor (any one and/or collectively "VAR") that relates to Your use and/or license of the Licensed Software if such agreement is terminated because of a material breach by such VAR; or (v) termination of the agreement between You and VAR that relates to Your use and/or license of the Licensed Software if such agreement is terminated because of any reason other than a material breach by VAR. Notwithstanding the foregoing, upon the occurrence of (v) immediately above, termination of this License may be delayed for up to a period of one (1) year to enable You to continue to use the Licensed Software strictly subject to the terms and conditions of this License up to a period of one (1) year after the occurrence of (v) above so long as no other termination events have occurred under this License and the VAR agrees to and continues to perform its obligations under the applicable agreement that has otherwise terminated, including payment of all applicable fees to Licensor. Upon the termination of this License all licenses and rights granted You under this License immediately terminate.

**Section 25 -- Miscellaneous.** The relationship between You and Licensor is that of a licensee and licensor, and that of independent contractors with regard to one another. The subject headings and captions of the paragraphs, sections and subsections of this License are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions. This License constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior agreements, representations and understandings. No supplement, modification or amendment of this License shall be binding unless executed in writing by both parties. All assignments of rights under this License by Licensee without the prior written consent of Licensor shall be void. The parties hereby agree that any assigns of the Licensor shall be intended third party beneficiaries with vested rights in this License. No waiver of any of the provisions of this License shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. This License shall be binding on and shall inure to the benefit of the parties hereto and their respective legal representatives and assigns. Notwithstanding any language to the contrary herein, this License may not be assigned by You without the prior written consent of Licensor. Whenever possible, each provision of this License shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this License shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this License. Licensor and You each mutually agree that this License shall be construed and enforced in accordance with the laws of the State of Florida, without regard to the internal law of Florida regarding conflict of laws. The parties mutually acknowledge and agree that they shall not raise in connection therewith, any defenses based upon venue, inconvenience of forum or lack of personal jurisdiction. Any controversy or claim arising out of or relating to this License, or breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association in Leon County, Florida. Judgment upon the award rendered by the arbitrators may be entered in any Court having jurisdiction thereof. Three (3) qualified arbitrators shall be appointed in accordance with the Commercial Arbitration Rules of the American Arbitration Association and this Agreement. Such qualified arbitrators shall have at least five (5) years of experience in technology law matters. Each party shall have the right of discovery as set forth in the Federal Rules of Civil Procedure. A stenographer shall be present at the arbitration proceedings and the stenographic record shall be the official record of the proceeding. The arbitration award shall be in writing and shall include findings of fact and conclusions of law.



Agnesian Health Care
1-40QH2TN
February 26, 2015

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 148 of 164   Document 1-1


## ALPHA II CLAIMSTAKER SOFTWARE LICENSE AGREEMENT

Each party shall pay an equal share of the fees and expenses of the arbitrators and administrative fees and expenses of the arbitration.

Section 26 – Notice. All communications shall be in writing. Notices shall be deemed delivered when delivered by overnight service, courier or mailed postage prepaid by certified or registered mail, return receipt requested, to the addresses set forth below for MEGAS and Unicor as Licensor and to the address set forth below for Licensee. Notice shall be deemed given on the date of receipt, as evidenced in the case of overnight service by written or electronic delivery confirmation or as evidenced in the case of certified or registered mail by return receipt. Notice shall be effective upon receipt.

MEGAS:  MEGAS, LLC
PO Box 12292
Tallahassee, FL 32317

Unicor:  Unicor Medical, Inc.
4160 Carmichael Road, Suite 101
Montgomery, AL 36106

Licensee: _Agnesian HealthCare, Inc._
(Insert Full name of Licensee)

By (Signature): _Nancy Buchbach_

Print Name: _Nancy Birschbach_

Title: _VP & CIO_

Date: _3/16/15_

## SCOPE OF SERVICES

This section defines the service deliverables ("Scope") for the services set forth in this Cerner Sales Order.

### TRANSACTION SERVICES

| CLAIMS EDITOR - SUBMITTER SETUP FEE (TSEDI-EDIT-STUP) | |
|---|---|
| Initial Setup | |
| Project Duration | |

### PROFESSIONAL SERVICES

| IMPLEMENTATION SERVICES | |
|---|---|
| Project Duration | |

 **Cerner**

Agnesian Health Care
1-40QH2TN
February 26, 2015



# CERNER SALES ORDER

| | |
|---|---|
| **Facility Implementation Strategy** | |
| **Go Live Support** | |
| **Cerner Delivery Project Team Work Space Assumptions** | |
| **Client Project Team** | |
| **Special Project Assumptions** | |

| CERNER NETWORK | |
|---|---|
| **Cerner Contract Management** | |
| **Contract Load** | |
| **Contract Maintenance** | |



**Agnesian Health Care**
**1-40QH2TN**
**February 26, 2015**

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 150 of 164   Document 1-1

 **CERNER SALES ORDER**

**IMPLEMENTATION SERVICES**

| | |
|---|---|
| **Reports** | |
| **Patient Accounting Integration** | |

**TRANSACTION SERVICES**

Cerner Transaction Services has partnerships and connections in place with multiple third party partners. Cerner manages that relationship on behalf of our Clients.

| | |
|---|---|
| **Claim Editor** | |
| **Cerner Electronic Payment Services** | |

**AUTHORIZATION**

By executing this Cerner Sales Order, Client agrees to purchase and take delivery of the products, services, Maintenance, and installation set forth herein. Please fax this Cerner Sales Order in its entirety, along with Purchase Order* (if applicable), to the Cerner Contract Management Office at 816-571-6947, and return all originals to the following address:

Cerner Corporation
Attn: Contract Management Office
2800 Rockcreek Parkway
Kansas City, MO 64117
USA

**AGNESIAN HEALTH CARE**

By: _Nancy Birschbach_ (signature)
_Nancy Birschbach_ (type or print)

Title: _VP & CIO_

Purchase Order #: _PO# 404380-0-SCAP_ (if applicable)

Project Kick-off requested the week of: _ASAP_

**CERNER CORPORATION**

By: _____

Teresa Waller

Title: Sr. Director, Contract Management

≋ **Cerner**

Agnesian Health Care
1-40QH2TN
February 26, 2015

Page 14 of 16

Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 151 of 164   Document 1-1

 **CERNER SALES ORDER**

*If Client chooses to submit a third-party Purchase Order, the third-party must submit payment in full along with this executed Cerner Sales Order in order for the scheduling of resources to commence.

Client shall complete the following upon execution of this Cerner Sales Order:

Client Invoice Contact: _Nancy Birschbach_

Contact Phone #: _920 926 4260_

Contact E-mail Address: _birschbachn@agnesian.com_

Client's account can be managed online at cerner.com by registering for Cerner eBill. To gain access to eBill, contact the Cerner Client Care Contact Center at 866-221-8877 or e-mail ClientCareCenter@cerner.com.

**≋ Cerner**

Agnesian Health Care
1-40QH2TN
February 26, 2015

```
COMPANY GLN:                    Purchase Order: 404330-0-SCAP        REVISION

ST AGNES HOSPITAL / FDLRC                                    Page:      1
                                Revision Number: 001          Date: 03/11/15

SHIP TERMS:                              FREIGHT: FREIGHT INCLD
  SHIP VIA:

    VENDOR: 5911                          SHIP TO:
                                          SAH FDLRC RECEIVING
          CERNER CORP                     ST AGNES HOSPITAL
          PO BOX 412702                   430 E DIVISION ST
          KANSAS CITY MO 64141-2702       FOND DU LAC WI 54935
          United States of America        US

  CONTACT:                       CONTACT: PAMELA DEICH-SUPERVISOR
     PHONE:   816-201-0975                PHONE:  920-926-5620
     FAX:                                 FAX:
                                 BUYER GLN:


                                 DISCOUNT
TERMS                            DAYS  RATE  NET  ACCOUNT NUMBER
-------------------------------- ----  ----- ---- ----------------------------
NET 30 DAYS                                   30
```

```
       +---------------------------------------------------------------+
       | Purchase Order Currency: UNITED STATES DOLLAR                 |
       |                                                               |
       | Invoice by mail                                               |
       | Process Level: 1000                                           |
       | PRICE IS PER SALES ORDER SUBMITTED ON 12-19-14                |
       |                                                               |
       | INCLUDES:                                                     |
       | CLAIMS SCRUBBER                                               |
       | CONTRACT MGMT                                                 |
       | PO'S COLLECTIONS FOR CPM PROJECT                              |
       | PROFESSIONAL SERVICES                                         |
       | SET-UP FEES                                                   |
       | ATTENTION ORDER ENTRY:                                        |
       |                                                               |
       | IF SHIPPING CHARGES CONTRACTUALLY APPLY, SHIP "BILL 3RD PARTY"|
       | VIA FEDEX ACCOUNT# 337881742, FOB DESTINATION. IF COMBINED    |
       | SHIPPING WEIGHT EXCEEDS 150LBS, PLEASE CONTACT OUR FREIGHT    |
       | LOGISTICS COMPANY @ 888-457-5851 FOR CARRIER INSTRUCTIONS.    |
       | AGNESIAN PO MUST APPEAR ON BILL OF LADING AND PACKING SLIPS.  |
       |                                                               |
       | Bill To Address:                                              |
       |                                                               |
       | AGNESIAN HEALTHCARE INC                                       |
       | DBA ST AGNES HOSPITAL 10023210                                |
       | 430 E DIVSION ST                                              |
       | FOND DU LAC WI 54935                                          |
       +---------------------------------------------------------------+
```

```
       ITEM NUMBER                        QUANTITY
LINE   DESCRIPTION                          PRICE      EXTENDED AMOUNT
------ -------------------------------------------------------------------
```

|       | ITEM NUMBER  |                    | QUANTITY |                 |
| LINE  | DESCRIPTION  |                    | PRICE    | EXTENDED AMOUNT |
| ----- | ------------ | ------------------ | -------- | --------------- |

██████████████████████████████████████████████████████████████████████████

                    Order Total:                          ████████████

                End of Purchase Order: 404330-0-SCAP

SHIP TERMS:                             FREIGHT: FREIGHT INCLD
  SHIP VIA:

    VENDOR: 5911                            SHIP TO:
                                        SAH FDLRC RECEIVING
          CERNER CORP                   ST AGNES HOSPITAL
          PO BOX 412702                 430 E DIVISION ST
          KANSAS CITY MO 64141-2702     FOND DU LAC WI 54935
          United States of America      US

CONTACT:                          CONTACT: PAMELA DEICH-SUPERVISOR
  PHONE:   016 201-0975                PHONE: 920 926 5620
    FAX:                                 FAX:
                                  BUYER GLN:


                              DISCOUNT
TERMS                         DAYS  RATE  NET  ACCOUNT NUMBER
------------------------------ ---- ------ ---- ----------------------------
NET 30 DAYS                                30

        +----------------------------------------------------------------+
        | Purchase Order Currency: UNITED STATES DOLLAR                  |
        |                                                                |
        | Invoice by mail                                                |
        | Process Level: 1000                                            |
        | PRICE IS PER SALES ORDER SUPPLIED ON 12-19-14 TO JENNIFER      |
        | JIROHNVONG                                                     |
        | ATTENTION ORDER ENTRY:                                         |
        |                                                                |
        | IF SHIPPING CHARGES CONTRACTUALLY APPLY, SHIP "BILL 3RD PARTY" |
        | VIA FEDEX ACCOUNT# 337881742, FOB DESTINATION. IF COMBINED     |
        | SHIPPING WEIGHT EXCEEDS 150LBS, PLEASE CONTACT OUR FREIGHT     |
        | LOGISTICS COMPANY @ 888-457-5851 FOR CARRIER INSTRUCTIONS.     |
        | AGNESIAN PO MUST APPEAR ON BILL OF LADING AND PACKING SLIPS.   |
        |                                                                |
        | Bill To Address:                                               |
        |                                                                |
        | AGNESIAN HEALTHCARE INC                                        |
        | DBA ST AGNES HOSPITAL 10023210                                 |
        | 430 E DIVSION ST                                               |
        | FOND DU LAC WI 54935                                           |
        +----------------------------------------------------------------+

        ITEM NUMBER                    QUANTITY
LINE    DESCRIPTION                      PRICE      EXTENDED AMOUNT
------  ---------------------------------------------------------------------

        Purchase Order Summary

                    Goods Total:

                    Order Total:


        End of Purchase Order: 628621-0-SSRV



**EXHIBIT D**



Agnesian HealthCare, Inc. vs. Cerner Corporation

**Electronic Filing Notice**

FILED
08-16-2017
Clerk of Courts
Fond du Lac County WI
2017CV000331
Honorable Robert J.
Wirtz
Branch 5

Case No. 2017CV000331
Class Code: Intentional Tort

CERNER CORPORATION
301 S. BEDFORD ST., SUITE 1
C/O CT CORPORATION SYSTEM
MADISON WI 53703

Case number 2017CV000331 was electronically filed with/converted by the Fond du Lac County Clerk of Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $ 20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 25b1f5**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 920-929-3034.

BY THE COURT:

Electronically signed by Ramona M. Geib
Clerk of Circuit Court

08-16-2017
Date

SERVED *Cerner Corporation*
*% CT Corporation System*
By Leaving With

AT *301 S. Bedford St. Suite 1*
DATE *8-17-17* *11:55* A.M. P.M.
PER *Rob Colby*

Civil Process Investigation
920-921-5353

GF-180(CCAP), 02/2017 Electronic Filing Notice §801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.

Case 2:17-cv-01354-JPS Filed 09/15/17 Page 159 of 164 Document 1-1

 **CT Corporation**

TO: Sara Meinhard
Cerner Corporation
2800 Rock Creek Pkwy # PA17-1078
Kansas City, MO 64117-2521

RE: **Process Served in Wisconsin**

FOR: Cerner Corporation (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Agnesian HealthCare, Inc., Pltf. vs. Cerner Corporation, etc., Dft. |
| **DOCUMENT(S) SERVED:** | Notice |
| **COURT/AGENCY:** | Fond du Lac County Circuit Court, WI<br>Case # 2017CV000331 |
| **NATURE OF ACTION:** | Product Liability Litigation - Breach of Warranty - Notice of Hearing |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Madison, WI |
| **DATE AND HOUR OF SERVICE:** | By Regular Mail on 09/11/2017 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | Wisconsin |
| **APPEARANCE OR ANSWER DUE:** | 10/11/2017 at 08:15 a.m. |
| **ATTORNEY(S) / SENDER(S):** | John A. St. Peter<br>Edgarton, St. Peter, Petak & Rosenfeldt<br>10 Forest Avenue<br>Suite 200<br>PO Box 1276<br>Fond Du Lac, WI 54936-1276<br>920-922-0470 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/11/2017, Expected Purge Date: 09/16/2017 |
| | Image SOP |
| | Email Notification, Sara Meinhard sara.meinhard@cerner.com |
| | Email Notification, Marc Elkins melkins@cerner.com |
| | Email Notification, Daniel P. Devers ddevers@cerner.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 301 S. Bedford St.<br>Suite 1<br>Madison, WI 53703 |
| **TELEPHONE:** | 302-658-7581/7582/7583 |

Page 1 of 2 / MZ

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not of its contents.

| STATE OF WISCONSIN | CIRCUIT COURT | FOND DU LAC COUNTY |

**FILED**
**09-07-2017**
**Clerk of Courts**
**Fond du Lac County WI**

Agnesian HealthCare, Inc. vs. Cerner Corporation

**Notice of Hearing**

Case No: 2017CV000331

CERNER CORPORATION
301 S. BEDFORD ST., SUITE 1
C/O CT CORPORATION SYSTEM
MADISON WI 53703

This case is scheduled for: **Telephone scheduling conference**

| Date | Time | Location |
|------|------|----------|
| 10-11-2017 | 08:15 am | |

| Court Official | |
|------|------|
| Daniel Bissett | |

| Re | |
|------|------|
| Intentional Tort | |

This matter will not be adjourned by the court except upon formal motion for good cause or with the specific approval of the court upon stipulation by all parties.

NOTE:  Attorney St. Peter shall initiate the set up of the phone conference.  Once all parties are on the line please contact the Court at 920-236-4912.

**If you require reasonable accommodations due to a disability in order to participate in the court process, please call 920-929-3034 at least 10 working days prior to the scheduled court date. Please note that the court does not provide transportation.**

Fond du Lac County Circuit Court
Date: September 7, 2017

**Distribution**

Christopher J. Barber

William B. McAllister

Peter J. Meyer

John A. St. Peter

Cerner Corporation

 **CT Corporation**

**TO:** Sara Meinhard
Cerner Corporation
2800 Rock Creek Pkwy # PA17-1078
Kansas City, MO 64117-2521

**RE:** **Process Served in Wisconsin**

**FOR:** Cerner Corporation (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Agnesian HealthCare, Inc., Pltf. vs. Cerner Corporation, etc., Dft. |
| **DOCUMENT(S) SERVED:** | Notice |
| **COURT/AGENCY:** | Fond du Lac County Circuit Court, WI<br>Case # 2017CV000331 |
| **NATURE OF ACTION:** | Product Liability Litigation - Breach of Warranty - Notice of Hearing |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Madison, WI |
| **DATE AND HOUR OF SERVICE:** | By Regular Mail on 09/11/2017 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | Wisconsin |
| **APPEARANCE OR ANSWER DUE:** | 10/11/2017 at 08:15 a.m. |
| **ATTORNEY(S) / SENDER(S):** | John A. St. Peter<br>Edgarton, St. Peter, Petak & Rosenfeldt<br>10 Forest Avenue<br>Suite 200<br>PO Box 1276<br>Fond Du Lac, WI 54936-1276<br>920-922-0470 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/11/2017, Expected Purge Date: 09/16/2017<br><br>Image SOP<br><br>Email Notification, Sara Meinhard sara.meinhard@cerner.com<br><br>Email Notification, Marc Elkins melkins@cerner.com<br><br>Email Notification, Daniel P. Devers ddevers@cerner.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 301 S. Bedford St.<br>Suite 1<br>Madison, WI 53703 |
| **TELEPHONE:** | 302-658-7581/7582/7583 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not of its contents.

| STATE OF WISCONSIN | CIRCUIT COURT | FOND DU LAC COUNTY |
|---|---|---|

Agnesian HealthCare, Inc. vs. Cerner Corporation

**Electronic Notice
Status Change**

Case No.: 2017CV000331

CERNER CORPORATION
301 S. BEDFORD ST., SUITE 1
C/O CT CORPORATION SYSTEM
MADISON WI 53703

For 2017CV000331, the electronic notice preference for Christopher J. Barber, attorney for Agnesian HealthCare, Inc., has changed.

Christopher J. Barber has registered as an electronic notice party and has agreed to file any documents and receive all communications from the court for this case electronically. You will no longer need to provide traditional paper documents to this party. You still need to provide traditional paper documents to the court and any other parties who are not electronically filing.

If you have questions regarding this notice, please contact our office at 920-929-3034.

Electronically signed by Ramona M. Geib
Clerk of Circuit Court

September 8, 2017
Date

GF-208(CCAP), 03/2010 Electronic Notice Status Change

This form shall not be modified. It may be supplemented with additional material.

Agnesian HealthCare, Inc. vs. Cerner Corporation

**Electronic Notice
Status Change**

Case No.: 2017CV000331

CERNER CORPORATION
301 S. BEDFORD ST., SUITE 1
C/O CT CORPORATION SYSTEM
MADISON WI 53703

For 2017CV000331, the electronic notice preference for William B. McAllister, attorney for Agnesian HealthCare, Inc., has changed.

William B. McAllister has registered as an electronic notice party and has agreed to file any documents and receive all communications from the court for this case electronically. You will no longer need to provide traditional paper documents to this party. You still need to provide traditional paper documents to the court and any other parties who are not electronically filing.

If you have questions regarding this notice, please contact our office at 920-929-3034.

Electronically signed by Ramona M. Geib
Clerk of Circuit Court

September 8, 2017
Date

GF-208(CCAP), 03/2010 Electronic Notice Status Change
This form shall not be modified. It may be supplemented with additional material.
Case 2:17-cv-01254-JPS   Filed 09/15/17   Page 164 of 164   Document 1-1